**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL FOOTBALL LEAGUE MANAGEMENT
COUNCIL,

                           Plaintiff,

           v.

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION,

                        Defendant.

Case No. 1:17-cv-06761-KPF

**ANSWER AND**
**COUNTERCLAIM**

Defendant-Counterclaimant National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Dallas Cowboys Running Back Ezekiel Elliott, denies the claims in the National Football League Management Council's (the "NFL" or "League") Complaint, and counterclaims, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and Section 10 of the Federal Arbitration Act, 9 U.S.C § 10 ("FAA"),[1] to vacate an Arbitration Award ("Award") (Ex. H),[2] which is the product of a process that has deprived the Union and Elliott of fundamental fairness, as specified in the text of the FAA.

It remains the NFLPA's position that the mirror-image, first-filed action in the Eastern District of Texas (the "Texas Action") is the appropriate case for resolving this dispute. However, as described herein and in the NFLPA's forthcoming Motion for Temporary Restraining Order and Preliminary Injunction, the NFL has taken the position that it is no longer bound by the preliminary injunction entered in the Texas Action, and the Texas Action is now in a procedural limbo such that the NFLPA must seek preliminary injunctive relief before this Court in order to

---

[1] Although this case arises under Section 301 of the LMRA, and not the FAA, because the LMRA "does not articulate the substantive or procedural rules" for confirming or vacating arbitral awards, the Second Circuit and other courts have indicated that it is proper to look to the FAA "for guidance about arbitration conducted under section 301." *NFLPA v. NFL*, 523 Fed. Appx. 756, 760 (2d Cir. 2013); *see also Trs. of New York City Dist. Council of Carpenters Pension Fund, et al. v. Port Parties*, 2017 WL 3267743 (July 31, 2017) ("federal courts have often looked to the [FAA] for guidance in labor arbitration cases especially in the wake of the holding that § 301 of the [LMRA] empowers the federal courts to fashion rules of federal common law to govern 'suits for violation of contracts between an employer and a labor organization.") (citations omitted; alterations in original); *HRH Constr., L.L.C. v. Local No. 1, Int'l Union of Elevator Constructors, AFL-CIO*, No. 03 Civ. 8944 (DC), 2005 WL 31948, at *4 (S.D.N.Y. Jan. 5, 2005) (collecting cases); *Otis Elevator Co. v. Local 1, Int'l Union of Elevator Constructors*, No. 03 Civ. 8862 (DAB), 2005 WL 2385849, at *4 (S.D.N.Y. Sept. 23, 2005) ("Particularly in the context of a petition to confirm or vacate an arbitration award, '[t]he policies of [S]ection 301 and the FAA are analogous' .... As such, the Court considers the instant case in light of the body of law developed under Section 301 and draws on the FAA for guidance.") (citations omitted).

[2] All exhibit references are to those exhibits concurrently filed with the October 16, 2017 Declaration of Jeffrey L. Kessler.

protect Elliott from the irreparable harm of an imminent suspension as a result of a fundamentally unfair Award which should be vacated.

## INTRODUCTION

1.      The NFL initiated this action with a threadbare Complaint that supplies essentially no information about the underlying arbitration process.  There is a good explanation why.  No matter how narrowly the NFL tries to define the bedrock labor law requirement to conduct fundamentally fair arbitration hearings as embodied in the FAA, the NFL and its unilaterally appointed arbitrator—Harold Henderson—have defied it.

2.      Indeed, Judge Mazzant of the Eastern District of Texas has *already* found that "[t]he circumstances of this case are unmatched by any case this Court has seen"—"Fundamental unfairness is present throughout the entire arbitration process. . . . At every turn, Elliott and the NFLPA were denied the evidence or witnesses needed to meet their burden.  Fundamental unfairness infected this case from the beginning, eventually killing any possibility that justice would be served."  *NFLPA v. NFL* -- F. Supp. 3d --, 2017 WL 3940545, at *10 (E.D. Tex. Sept. 8, 2017) ("PI Order").

3.      Fifth Circuit Judge Graves similarly characterized the Award at issue as one "about undisclosed information, uninformed decisions, and an arguably unfair process in determining whether Dallas Cowboys running back Ezekiel Elliott should be punished for allegations of domestic violence made by an accuser who was found not credible by the NFL's lead investigator, who was then excluded from meetings with NFL Commissioner Roger Goodell."  Order, *NFLPA v. NFL*, No. 17-40936, at 11 (5th Cir. Oct. 12, 2017) ("Fifth Circuit Order").  Judge Graves further concluded that the NFL's and Arbitrator Henderson's conduct "impugned the integrity of the arbitration process."  *Id.* at 19 (citation omitted).  And the two other Fifth Circuit panel Judges,

while declining to analyze the merits of the NFLPA's fundamental fairness claim, nonetheless observed that Judge Graves' "arguments and concerns about the arbitration process may have merit." *Id.* at 9 n. 8.

4.       As detailed herein, Elliott and the NFLPA appealed a six-game disciplinary suspension imposed upon Elliott by the NFL that threatens irreparable harm to his season, career, and reputation.  Elliott and the Union were subjected to an arbitration process in which, among other things, there was a League-orchestrated conspiracy by senior NFL executives, including NFL Senior Vice President and Special Counsel for Investigations Lisa Friel, to hide critical information—which would exonerate Elliott—from: (i) NFL Commissioner Roger Goodell, who imposed the discipline; (ii) the outside expert advisors who were appointed by the Commissioner to counsel him on imposing discipline; (iii) the NFLPA and Elliott; (iv) the Dallas Cowboys; and (v) NFL fans.  That purposefully concealed information was the undisputed fact that the co-lead investigator who conducted all but one fact witness interview in the investigation of Elliott—Kia Roberts, the NFL's Director of Investigations—concluded that no discipline should be imposed on Elliott.  Roberts reached this conclusion based on her assessment, after *six* interviews with Elliott's accuser Tiffany Thompson, that Thompson's allegations of abuse were not credible, and that there was insufficient corroborating evidence of her incredible allegations.  Not only did the NFL keep Roberts' conclusions from Goodell, it tried to prevent Roberts from testifying at the arbitration by asserting the outrageous position that her testimony would be ***"cumulative and unnecessary."***  A-NFLPA-52 at 4.  The withholding of such exculpatory information from the disciplinary process was a momentous denial of every labor arbitrator's obligation to consider what the FAA describes as "pertinent and material" evidence.

5.      The fundamental unfairness described above was then compounded, multiple times.  Specifically, Arbitrator Henderson denied Elliott the opportunity to confront his accuser— the most pertinent and material witness—and have her sit for cross-examination, thereby depriving Elliott and the Union of the most basic rights of a fundamentally fair procedure, in a proceeding where everyone agreed that the credibility of the accuser and Elliott were essential to resolution. As for Elliott, he appeared before the arbitrator, testified under oath, and gave strong, credible testimony denying any wrongdoing.  Arbitrator Henderson, however, would not grant Elliott and the Union's request to have the accuser, Thompson, testify, and would not even provide Elliott or the Union with the investigative notes of the six times Thompson was interviewed by the NFL. As such, not only was Elliott denied the most fundamental rights to be able to confront his accuser and to have her credibility assessed against his, the arbitrator also rendered himself incapable of directly assessing the credibility of Thompson—denying the most pertinent and material evidence to conducting a fundamentally fair arbitration.

6.      The third deprival of fundamental fairness was the arbitrator's refusal to compel the pertinent and material testimony of Commissioner Goodell, who imposed Elliott's discipline. Without testimony from the Commissioner, it was not possible to determine precisely what the Commissioner knew or did not know about his co-lead investigator's conclusion that there was no credible evidence to impose discipline under a League Personal Conduct Policy that requires "credible evidence" where, as here, the player has been accused of domestic violence but law enforcement files no charges.

7.      Even more significantly, the failure to require testimony from Commissioner Goodell about what he did and did not know about the suppressed conclusions of his Director of Investigations, Roberts, made it impossible for Elliott and the NFLPA to effectively challenge the

NFL's argument that the arbitrator should defer to the Commissioner's fact-findings.  Without the pertinent and material testimony of the Commissioner, no one knew what the Commissioner's findings were based upon, and the arbitrator was left to issue an Award that stated he was deferring to "whatever determinations" the Commissioner had made.  Ex. H at 8.  This was the opposite of a fundamentally fair proceeding as required by both the LMRA and the FAA.

8.      On August 11, 2017, the NFL suspended Elliott for six games for violating Commissioner Goodell's Personal Conduct Policy ("PCP").  Exs. A-NFLPA-16 and 49.  The Commissioner's representative stated there was "substantial and persuasive evidence" that Elliott had committed acts of physical violence against Thompson, a woman with whom he had an intimate relationship.  Ex. A-NFLPA-49 at 3, 5.  But that determination was made during a now-exposed conspiracy to conceal from all relevant parties that Roberts had concluded that the accuser's repeatedly inconsistent stories and other credibility issues were an insurmountable obstacle to imposing discipline, given the absence of any corroborating evidence and Elliott's consistent denials of domestic violence.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 301:22-302:4.

9.      Indeed, Elliott was never charged with any crime, and the city attorney investigating Elliott concluded his inquiry with a public statement announcing that Elliott would not be charged due to "conflicting and inconsistent information across all incidents" provided by Elliott's accuser, the only eyewitness against him.  Ex. A-NFLPA-40.  Nor was Elliott ever arrested, because the police officers on the scene concluded that there was no probable cause to require a mandatory arrest "[d]ue to conflicting versions of what had taken place over the listed dates."  Ex. A-NFLPA-24 at 2.

10.     In imposing discipline against Elliott despite the absence of any action by law enforcement, the NFL conducted a massive investigation that lasted almost a year, co-led by

Roberts, who personally conducted 22 interviews.  This massive amount of work resulted in a final investigative report ("Elliott Report") which, unlike virtually every similar NFL investigative report in the past, deliberately omitted a conclusion.  Had the report stated a conclusion, Roberts, as co-author, would have had to reveal her determination, as an experienced lawyer, prosecutor and lead investigator, that there was insufficient evidence to discipline Elliott.

11.     Unbeknownst to Roberts, it was Friel—who, despite having never interviewed the accuser, believed that there was sufficient evidence to support discipline—along with unidentified NFL counsel, who determined that the Elliott Report should be devoid of a conclusion rather than reveal the conclusions of Roberts.  *See* Arb. Hr'g Tr. (Aug. 29), Ex. C at 138:16-20 (Roberts unaware of who decided that Elliott Report should not provide conclusions); Arb. Hr'g Tr. (Aug. 30), Ex. C at 265:15-21 (decision to exclude conclusions in Elliott Report was made by Friel and NFL counsel).  *See also generally*, Ex. A-NFLPA-44 (Elliott Report).

12.     The exclusion of Roberts' conclusions from the Elliott Report was part of a conspiracy by Friel and others to conceal this critical information from Elliott, the Union, the Cowboys, the Commissioner, and his expert advisors.  The severe prejudice from this concealment was apparent from the fact that the Commissioner was required to determine whether there was "credible evidence" to discipline Elliott without being informed that his co-lead investigator (who conducted each interview of the accuser) had reached the exact opposite conclusion.

13.     This uninformed determination by the Commissioner was also based on advice he received from four designated outside expert advisors, but those experts, too, were kept in the dark about Roberts' conclusions about the lack of credibility and corroborating evidence to support the accuser's claims.  Indeed, when one of the expert advisors, Mary Jo White, a former prosecutor herself, asked Friel what conclusions the NFL's investigators had drawn about the credibility of

the accuser's allegations, Friel affirmatively concealed Roberts' conclusion, and only admitted that she (Friel) had concluded that one of the five claimed incidents was not credible.  June 26, 2017 Hr'g Tr., Ex. A-NFLPA-45 at 151:20-152:7.  As for the rest, Friel did not reveal the conclusions of Roberts that all of the allegations were not credible and could not be supported with corroborating evidence, and instead gave the false impression that the other allegations were found to be credible by the investigators who had gathered the evidence.  *Id.* at 152:8-153:14.  There was also a deliberate decision made by senior NFL Executives to exclude Roberts from this meeting with the advisors, as part of the overall conspiracy to conceal her conclusions from the Commissioner, the player, the Union, and the Cowboys.  *E.g.*, Arb. Hr'g Tr. (Aug. 29), Ex. C at 162:22-25; Arb. Hr'g Tr. (Aug. 30), Ex. C at 265:15-21; 278:13-21.

14.     As for Thompson, it was undisputed that she publicly threatened to ruin Elliott's career at the time she made the allegations of abuse at issue.  *E.g.*, Ex. A-NFLPA-44 at 98, 100.  When the police and city attorney would not act on her false allegations, she turned to the NFL and voluntarily provided the NFL with six interviews in which she repeated her false allegations.  It was the lack of credibility and repeated inconsistencies in her claims that led Roberts to conclude that the allegations could not be relied upon in the absence of corroborating evidence, which the investigators did not find.  Indeed, Roberts prepared a separate document listing some of the most significant inconsistencies in Thompson's claims—a document she labeled the "Inconsistency Transcript" (a term someone at the NFL tried to cross out).  *See* Ex. B-NFL-B.2.99.  Roberts even found that Thompson had asked one of her friends to lie to police about the allegations against Elliott.  Yet, arbitrator Henderson deprived Elliott and the NFLPA of the right to confront Thompson and fully expose her lack of credibility at the arbitration hearing, depriving them of the

most pertinent and material evidence imaginable to challenging whether Commissioner Goodell had properly concluded that there was "credible evidence" to support a PCP violation.

15.     Elliott appealed his suspension pursuant to the procedures set forth in Article 46 of the NFL-NFLPA Collective Bargaining Agreement ("CBA").   Thereunder, Commissioner Goodell or his designee—in this case Henderson, the former head of Plaintiff NFL Management Council—served as the arbitrator.  The CBA requires player discipline to be "fair and consistent." Ex. A-NFLPA-15 at 8; Arb. Hr'g Tr. (Aug. 29), Ex. C at 84:3-7.  And, pursuant to the terms of the PCP, when there is no criminal finding on which to base discipline, there must be "credible evidence" to support the discipline.  Ex. A-NFLPA-16 at 5.

16.     The arbitration before Henderson lasted for three days, from August 29-31, and on September 5, 2017, Henderson issued the Award sustaining Elliott's six-game suspension.  After the record was closed, the NFLPA and Elliott sought to vacate the award in the Eastern District of Texas.  The District Court preliminarily enjoined the suspension, finding that Elliott was likely to succeed on the merits of his petition and that he faced irreparable harm whereas the NFL faced none.

17.     During the pendency of the Texas Action, and the NFL's appeal to the Fifth Circuit, and up until now, Elliott has participated in all team-related activities, including practices and games.  This, predictably, caused no harm whatsoever to the NFL.

18.     For the avoidance of doubt, the NFLPA and Elliott do not ask the Court to make its own determinations about Elliott's or Thompson's credibility, or any other matter of fact-finding properly left to the arbitrator.  Rather, the controlling and paramount *legal* question presented here is whether an arbitration concerning the existence of "credible evidence" for employee discipline based on "he-said/she-said" claims of domestic violence can be fundamentally fair when senior

NFL Executives have conspired to suppress their own Director of Investigations' conclusion that there was no credible basis to impose discipline, and the arbitrator has refused to require the NFL to make available evidence that, in the language of the FAA, was "pertinent and material" to conducting a fundamentally fair arbitration:  (i) the testimony and cross-examination of the accuser, whose credibility was the linchpin of Elliott's appeal (or Roberts' investigator notes of the six times she interviewed Thompson), and (ii) the testimony of the Commissioner, to determine precisely what he knew and did not know about the suppressed conclusions of Roberts.  Indeed, as the Eastern District of Texas found, Friel's arbitration testimony left an incoherent record about what the Commissioner knew and was told about Roberts' conclusion that there was not credible evidence upon which to discipline Elliott.  *See* PI Order at 9 n.9 (collecting "varying testimony").  Without this pertinent and material information, the arbitrator himself could only guess what the Commissioner did and did not know in rendering his disciplinary determination.

## PARTIES

19.    Plaintiff National Football League Management Council is the exclusive bargaining representative of all present and future employer member franchises of the NFL.

20.    Defendant NFLPA is a nonprofit corporation duly organized and existing under the laws of the Commonwealth of Virginia.  The NFLPA is the Union and exclusive collective bargaining representative of all present and future NFL players, including Elliott.  The NFLPA's offices are located at 1133 20th Street, N.W., Washington, D.C., 20036.

## RELEVANT NON-PARTIES

21.    The National Football League maintains its offices at 345 Park Avenue, New York, New York, 10154, and is an unincorporated association consisting of thirty-two separately owned and operated professional football franchises, none of which is located in this District.

22.     Ezekiel Elliott is a professional football player and member of the NFLPA.  He was selected by the Dallas Cowboys in the 2016 NFL Draft.  Last season, his first in the NFL, he was named Offensive Rookie of the Year, first team All-Pro, and he was selected for the Pro Bowl.  He is the starting running back for the Cowboys and one of the top players at his position in the NFL.  Elliott resides in Texas, plays and practices in Texas, and will continue to suffer irreparable harm in Texas.

23.     Arbitrator Harold Henderson spent 16 years as the NFL's Executive Vice President for Labor Relations and Chairman of Plaintiff National Football League Management Council's Executive Committee.  Upon information and belief, Henderson is still employed part-time by the NFL and thereby reports to the NFL Commissioner, the NFL controls Henderson's pension, prior NFL financial disclosures show that the League paid Henderson $2.5 million from 2009-2012, and the NFLPA expects that Henderson has received significant additional sums since that time (no more recent information is publicly available).

24.     Tiffany Thompson lives in Columbus, Ohio, where Elliott attended college.  She previously had a personal, intimate relationship with Elliott.  Thompson made the allegations against Elliott that prompted the NFL's investigation into his conduct, and she is the only eyewitness upon whose claims the NFL premised Elliott's suspension.

25.     Kia Roberts is the Director of Investigations for the NFL.  She conducted the League's investigation of Thompson's accusations against Elliott, interviewed Thompson six different times, and compiled many of the notes that were the basis for the Elliott Report.  The NFL excluded her from meeting with the Commissioner to discuss her conclusions about the investigation, excluded her from meeting with the Commissioner's outside expert advisors in the investigation, excluded from the NFL's investigative report her conclusion that there was

insufficient evidence to substantiate the accuser's incredible claims, and tried to prevent her from testifying at the hearing, before she was ordered to appear.

26.     Lisa Friel is the Special Counsel for Investigations for the NFL.  She was a co-author of the Elliott Report.  She did meet with Commissioner Goodell to express her conclusions that discipline should be imposed, and also met with the Commissioner's expert advisors to answer their questions, while Roberts was deliberately excluded.

27.     Cathy Lanier is the Senior Vice President of Security for the NFL.  Roberts reports directly to Lanier.

## STATEMENT OF FACTS

### A.     Discipline for Conduct Detrimental Under the CBA

28.     The parties are bound by the CBA, which was executed on August 4, 2011.

29.     Through the collectively-bargained NFL Player Contract (Appendix A to the CBA), the NFL Commissioner is empowered to impose discipline for "conduct detrimental to the integrity of, or public confidence in, the game of professional football."[3]  As an asserted exercise of this authority, the Commissioner each year unilaterally (i.e., without collective-bargaining with the Union) promulgates the PCP to provide notice to players about what the Commissioner considers to be conduct detrimental to the League, as well as the disciplinary consequences of such conduct, the investigative procedures to be employed, the role of expert advisors, and the requirements of evidentiary proof to find a violation.  Ex. A-NFLPA-16.

30.     It is undisputed that the CBA requires that the Commissioner's conduct detrimental discipline be fair and consistent.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 84:5-7 (NFL "certainly

---

[3]  Available   at   https://nfllabor.files.wordpress.com/2010/01/collective-bargaining-agreement-2011-2020.pdf.

do[es]n't dispute that the discipline has to be fair and consistent."). *See also Rice* Arbitration Award (Nov. 28, 2014), Ex. A-NFLPA-15 at 8 ("[D]iscipline under [Article 46] must be fair and consistent."); *Bounty* Arbitration Award (Dec. 11, 2012), Ex. D at 4 (role of the Article 46 Hearing Officer is to "review[] the discipline for consistency of treatment, uniformity of standards for parties similarly situated and patent unfairness or selectivity"); *Peterson* Arbitration Award (Dec. 12, 2014), Ex. E at 3 (fair and consistent is "agreed" standard of review).

31.    And, in the applicable iteration of the PCP, the NFL added the evidentiary requirement that conduct detrimental discipline imposed by the Commissioner must be supported by "credible evidence" where, as here, the discipline is not based on criminal charges or findings:

> A player violates this policy when he has a disposition of a criminal proceeding (as defined), or if the league's investigation demonstrates that he engaged in conduct prohibited by the Personal Conduct Policy. *In cases where the player is not charged with a crime, or is charged but not convicted, he may still be found to have violated the Policy if the **credible evidence** establishes that he engaged in conduct prohibited by this Personal Conduct Policy.* Ex. A-NFLPA-16 at 5 (emphasis added).

32.    Article 46 of the CBA sets forth the procedures for players to appeal conduct detrimental discipline. Article 46 of the NFL Collective Bargaining Agreement, Ex. A-NFLPA-58. The hearing officer (arbitrator) is either the Commissioner or his designee. In this case, Commissioner Goodell designated Henderson.

33.    In the letter to Elliott announcing his suspension ("Discipline Letter"), the NFL wrote that "[p]ursuant to Article 46 of the Collective Bargaining Agreement," Elliott was suspended because of "substantial and persuasive evidence that [Elliott] engaged in physical violence against Ms. Thompson," a violation of the PCP subject to a baseline six-game suspension. Out of five alleged incidents of domestic violence claimed by Thompson, the Commissioner found a basis for discipline for three of the alleged acts. The Commissioner also found no mitigating or

extenuating circumstances and imposed a six-game suspension on Elliott.  Ex. A-NFLPA-49 at 1, 3, 5.

**B.    Columbus Law Enforcement Determines There Is "Conflicting Evidence" and Declines to Charge Elliott**

34.    In July 2016, the Columbus, Ohio Police Department investigated allegations by Thompson that Elliott had been physically abusive toward her on five alleged occasions during the week of July 16, 2016.  *See* Ex A-NFLPA-49 at 1, 3-4.

35.    Officers on the scene on July 22 concluded there was no probable cause to require a mandatory arrest of Elliott under governing Ohio law.  Their Police Report states their determination was "[d]ue to conflicting variations of what happened."  Ex. A-NFLPA-24 at 7.

36.    Thereafter, the Columbus City Attorney's office conducted its own extensive investigation, including interviewing witnesses and gathering relevant evidence.  It subsequently announced, after an extensive fact investigation, that it would not bring charges against Elliott.  Ex. A-NFLPA-40.  The Columbus City Attorney's office explained that "[a]fter reviewing the totality of the evidence," it "declin[ed] to approve criminal charges . . . primarily due to conflicting and inconsistent information across all incidents, resulting in concern regarding the sufficiency of the evidence to support the filing of criminal charges."  *Id*. at 2.

**C.    The NFL's Investigation**

37.    The NFL's Director of Investigations, Kia Roberts, co-led the League's own investigation into Thompson's allegations with Friel.  But it was Roberts who conducted all but one of the fact interviews (an interview of Elliott by Friel in front of the Commissioner's outside expert advisors, from which Roberts was excluded).  *See* Arb. Hr'g Tr. (Aug. 30), Ex. C at 261:8-16; *see also generally* Ex. A-NFLPA-44.

38.     The NFL would ultimately conduct twenty-three fact interviews, including six with Thompson and numerous others with her relatives and friends.  Ex. A-NFLPA-44 at 1-2.  Roberts personally interviewed Elliott, Thompson (six times), several of Thompson's friends, and conducted all other fact interviews as part of the NFL investigation (except one interview of Elliott, which was conducted by Friel in front of the outside expert advisors).  Ex. A-NFLPA-44; Arb. Hr'g Tr. (Aug. 30), Ex. C at 261:8-16.  The League also collected a number of photos from Thompson and public documents from Columbus law enforcement authorities, and asked two medical examiners to review and opine on Thompson's bruises as depicted in the photographs.  Ex. A-NFLPA-44 at 9-10.  Ultimately, it was established that neither doctor could rule out the fact that the bruises depicted were consistent with numerous other possible causes apart from the allegations of abuse, including drunken and drug-induced falls, fights with other persons, rough sex, and other possible causes.  Arb. Hr'g Tr. (Aug. 31), Ex. C at 5-120; 129:24-135:3.

39.     Of the six Thompson interviews, the NFL transcribed only two.  Exs. A-NFLPA-42 and 43.  League investigators did take notes of the four, non-transcribed Thompson interviews, but the NFL refused to produce them, and the arbitrator ruled that the NFL could withhold them.  Ex. A-NFLPA-55 at 3.  The NFL similarly chose not to make audio recordings, video recordings, or transcriptions of numerous other fact interviews over the course of the League's investigation.  *See, e.g.*, *id*. at 2-3.

40.     The NFL issued the Elliott Report on June 6, 2017, reporting on the results of its almost year-long investigation.  Ex. A-NFLPA-44.  Unlike most other NFL investigative reports issued in connection with Commissioner discipline, the investigators' conclusions about what the evidence showed were excluded from the Elliott Report.  *See id*.  Friel testified that she and unidentified NFL counsel made the decision not to have any conclusions or recommendations in

this mammoth report (Arb. Hr'g Tr. (Aug. 30), Ex. C at 265:15-21), which was more than 160 pages long, with more than 100 accompanying exhibits (Ex. A-NFLPA-44).

41.    The League subsequently provided the Elliott Report to the NFLPA and Elliott, as the PCP required, and the Union responded on July 17 by filing a submission demonstrating critical flaws in the purported evidence against Elliott, including the glaring unreliability of Thompson's allegations.  Ex. A-NFLPA-48.  But what the Union and Elliott did not know was that Roberts had reached the same conclusion as the player and the Union:  there was insufficient credible or corroborating evidence to proceed with any discipline against Elliott.

42.    The NFL convened a meeting on June 26—attended by League personnel, a panel of outside expert advisors to the Commissioner (provided for in the PCP), Elliott, his agents, and NFLPA counsel—at which Friel presented the findings of the Elliott Report.  A-NFLPA-45. Significantly, Roberts was excluded from this critical meeting, and neither Roberts nor Friel could identify which top NFL Executive made this decision.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 162:22-25 ("Roberts: Is the question do I know why I wasn't invited?  Mr. Kessler: Yes.  Ms. Roberts: No."); Arb. Hr'g Tr. (Aug. 30), Ex. C at 277:5-8 ("Q: Who made the decision for Ms. Roberts not to meet with the outside advisors at the meeting?  Friel: I have no idea.").

43.    At this hearing, one of the Commissioner's advisors, Mary Jo White, a former Chair of the Securities and Exchange Commission and a former federal prosecutor, asked what conclusions the investigators had reached about the credibility of the allegations.  Because Roberts was excluded from the meeting, only Friel was there to answer, and she continued the cover-up in the following exchange, only admitting that one alleged domestic violence incident was incredible, while sidestepping any revelation of the investigators' conclusions about the lack of credibility or corroborating evidence with respect to the four other alleged acts:

Ms. White: And then, Adolpho, you tell me if this is an inappropriate question. You've obviously, and your investigators, your staff as well, have interviewed Miss Thompson several times from the record. With respect, I will start at the back end. With respect to what she has told you and told the police, city attorney, with respect to the July 22 incident, have you found what she said to you – we will take it with you first – to be credible, as to the July 22 event?

Ms. Friel: No.

Ms. White: Otherwise, have you generally found her to be credible? I know that is a big question.

Ms. Friel: It is a big question. I will go back and say it this way. We felt comfortable making the determination that she was not credible about the July 22 incident in large part because of her own friend Ayrin Mason, said it did not occur. And we found Ayrin Mason very credible. I would say that the other person we found very credible was her Aunt, Elaine Glenn. What we looked at in terms of looking at the evidence was here's what Miss Thompson said and what other evidence can we gather to see if it backs up her credibility or does not back up her credibility. And that would be hard evidence, like the text messages; they say what they say, they went to who they went to. The photographs, especially the ones with metadata on them. The opinions we got back from the two doctors that we spoke to. And as I said, Ayrin Mason who saw injuries during the week as did her Aunt both seeing it [on] FaceTime and then seeing photographs that got sent. I want to say it that way, that that evidence is really, in my opinion what we should be looking at, and what does all that corroborative consistent or inconsistent evidence say about Miss Thompson's credibility. Ex. A-NFLPA-45 at 151:20-153:14.

44.     Had Roberts been at the meeting, she undoubtedly would have informed the outside expert advisors, the player, and the Union of her conclusion that there was no credible or corroborating evidence sufficient to find a PCP violation with respect to any of the allegations.

45.     Further, other top NFL Executives, including Jeffrey Pash, the Executive Vice President and General Counsel of the NFL, and B. Todd Jones, the Senior Vice President and Special Counsel for Conduct, were in attendance. It is unknown whether one of them made the decision not to include Roberts in this meeting or whether they were also victims of the conspiracy to conceal.

46.     In response to the Elliott Report and the June 26 meeting, as noted above, the NFLPA and Elliott prepared a written submission cataloguing the evidence **contained in the NFL's own report** undermining Thompson's credibility.  Ex. A-NFLPA-48.  For example:

- Thompson lied to investigators and encouraged her friend to lie to the police as well (*id.* at 15-16, 22-23);

- Thompson destroyed relevant evidence from her cell phones (*id.* at 23-24);

- Thompson changed her account of critical events repeatedly and made new allegations of abuse only after she had been interviewed a number of times (*see, e.g.*, *id.* at 11, 20, 27-29);

- Thompson's allegations were inconsistent with other evidence in the Elliott Report (*see e.g.*, *id.* at 8, 12, 32);

- Thompson's credibility was undermined by her threats to "ruin" Elliott's life and career as revenge for his not wanting to continue his relationship with her in the manner she desired (*see, e.g.*, *id.* at 9, 24-25); and

- Thompson considered extorting Elliott with alleged sex videos and took steps to effectuate such a plan (*id.* at 26-27).

47.     The NFLPA and Elliott also demonstrated in their response submission that neither of the two medical expert reports submitted to the NFL established any causal link between Elliott and the injuries Thompson claims he caused, or any reliable basis to even date the bruises depicted in the photos which Thompson claimed showed evidence of Elliott's abuse.  *Id.* at 4. The latter failure was very significant as there were many other possible causes of the bruises shown in the photographs which the experts could not rule out.

48.     It was not until the arbitration hearing that the NFLPA learned, through its examination of NFL lead investigators Roberts and Friel, that, in fact, Roberts agreed with the NFLPA and Elliott that there was no credible evidence to proceed with any discipline.

**D.   The Conspiracy to Conceal Critical Evidence from the Commissioner, the Commissioner's Outside Expert Advisors, the NFLPA, Elliott, the Arbitrator, the Cowboys, and NFL Fans**

49.    It was only through the examination of Roberts and Friel at the subsequent arbitration hearing that the conspiracy to conceal critical evidence was exposed.

50.    For example, on the first day of the three-day arbitration hearing:

- Roberts revealed that "I had concerns about [Thompson's] credibility" (Arb. Hr'g Tr. (Aug. 29), Ex. C at 172:24) because "[i]t seemed like there were **numerous witnesses** who what they had to say was in, you know—**diametrically opposed** to what [Thompson] stated" (*id.* at 173:19-22) (emphasis added).  Roberts could not recall from her time as a prosecutor ever "put[ting] on the stand" a witness that "had this many inconsistencies in their testimony that was going to be used to attack their credibility."  *Id.* at 226:19-25.  *See also id.* at 175:13-19 ("As I was looking through that additional evidence . . . there were concerns that I had about her credibility"); *id.* at 188:10-25 (Roberts did not find credible Thompson's explanation for a text message that asked her friend to lie about an alleged incident of abuse by Elliott);

- In the course of the Elliott Investigation, Roberts regularly found "inconsistencies in what Ms. Thompson" said (*see, e.g.*, *id.* at 142:2-6; 143:9-23) and created an entire document called "Inconsistency Transcripts" to catalogue some of them "[b]ecause . . . things that [Thompson] said . . . were inconsistent with each other" (*id.* at 143:3-7); someone at the NFL attempted to cross out the words "Inconsistency Transcripts," but was not successful in doing so.  *Id.* at 142:21-143:2;

- The NFL learned that Thompson lied to police and to Roberts about critical details, such as whether Thompson had been involved in a fistfight with another woman during the week of the alleged domestic violence, which could have caused some of the bruises of which she took pictures (*see, e.g.*, *id.* at 147:2-150:19), and Roberts admitted that from evidence of the fight "[s]tanding on its own," she "wouldn't draw the conclusion Ms. Thompson was telling the truth" (*id.* at 153:7-12);

- Likewise, Roberts found that other witnesses, including Thompson's own friends and third parties, offered different versions of events that were not "consistent with what Ms. Thompson told" the NFL (*id.* at 156:17-25) and compelled Roberts to question Thompson about why someone who was not "a particular friend of Elliott" would offer contradictory testimony (*id.* at 179:5-180:24); and

- Roberts testified that one of Thompson's friends said that "she was told to lie by Ms. Thompson to police" (*id.* at 159:21-23), and that it was not credible when Thompson tried to explain it away (*id.* at 188:10-25).

51.     Ultimately, it was revealed that Roberts had concluded that Thompson's credibility was so damaged that no discipline should be pursued against Elliott for allegations that could not be supported with sufficient credible evidence.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 301:22-302:4.

52.     Roberts testified on the first day of the arbitration that she shared her credibility concerns about Thompson with Friel and others on the League investigative team (Arb. Hr'g Tr. (Aug. 29), Ex. C at 172:21-173:22; 163:11-165:16), including with her boss, Cathy Lanier.  *Id.* at 165:1-7.  It was later revealed that Lanier agreed with Roberts' assessment that there were "issues of credibility" with respect to Thompson.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 319:4-10.

53.     The conspiracy to suppress Roberts' conclusions then came into play.  First, Friel and NFL counsel decided that the Elliott Report would not include any conclusions (*id.* at 265:15-21)—but Roberts did not know who decided this.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 137:22-138:7.  Omitting these conclusions was a necessary step in concealing Roberts' determinations from the Commissioner and others.  Prior to the Elliott Report, it was routine for NFL investigator reports submitted to the Commissioner to contain summaries of what the investigators had concluded about the evidence.

54.     Second, Roberts was never included in any meeting with the Commissioner to present her conclusions about the investigation, the lack of sufficient evidence, and her conclusion that discipline should not be imposed on Elliott.  *Id.* at 163:11-13.

55.     Third, Roberts was not invited to the meeting with the Commissioner's outside expert advisors, and she did not know who made the decision to exclude her from that critical meeting either.  *Id.* at 161:16-19; 162:22-25.  Nor was she given any other opportunity to convey

her conclusions to the outside expert advisors that the accuser was incredible and that there was insufficient corroborating evidence to find a PCP violation and impose discipline. *Id*. at 161:20-22.

56.     The conspiracy to conceal Roberts' conclusions as the co-lead investigator were especially harmful because she, and not Friel, had conducted all six interviews of Thompson, as well as all but one of the more than 20 other witness interviews in the investigation. *Id*. at 161:23-162:5.[4]  Roberts also served as the co-author of the Elliott Report, where her conclusions would have been revealed but for the decision by Friel and unidentified NFL counsel to exclude any investigator conclusions from the report. *Id.* at 136:18-21; *See also* Ex. A-NFLPA-44.

57.     On the second day of the hearing, Friel testified, and the conspiracy became further exposed.  First, after repeated questioning, Friel admitted that it was Roberts' conclusion that after reviewing the totality of the evidence, there was ***insufficient evidence to corroborate Thompson's version of events***.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 301:22-302:4.  Friel also admitted that the investigators' conclusions were excluded from the Elliott Report as a result of a decision that she made with NFL counsel. *Id.* at 265:15-21.

58.     Further, Friel testified that she attended a meeting with Commissioner Goodell and other top NFL Executives to present the findings of the investigation. *Id.* at 274:22-25.  But Roberts was not invited to this meeting.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 163:11-13.  Since Roberts was the only lead investigator to interview Thompson, and was the co-author of the Elliott Report, it is inexplicable as to why an experienced lawyer like Pash, for example, would not have

---

[4] Roberts acknowledged that Kim Janke, an NFL Security Representative, was also present at the interviews with Thompson.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 162:3-11.

insisted that Roberts attend this meeting to inform the Commissioner about what the investigators had concluded.

59.     After first asserting attorney-client privilege, Friel eventually revealed that she told the Commissioner it was her view that there was sufficient evidence to impose discipline.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 275:1-19; 339:2-5.  Roberts, however, could not express her contrary conclusions to the Commissioner because she was excluded from the meeting.  When asked what the Commissioner was told about Roberts' conclusions at the meeting to present the investigative findings, Friel repeatedly changed her testimony, in the space of just a few minutes, leaving an utterly incoherent record about what the Commissioner knew or did not know about this.  *Id.* at 275:1-19 (refusing to discuss her communications with the Commissioner on the basis of attorney client privilege); *id.* at 322:10-12 (Friel: "That's not to say that [Roberts'] views were not communicated to [the Commissioner] in some other fashion.  I don't know the answer to that."); *id.* at 322:15-25 (Friel: "I don't know if [Roberts' views] were or they weren't [communicated to the Commissioner] I'm just saying that's certainly possible."  Q: "They weren't communicated to him by you, right?"  Friel: "Yeah, they were."); *id.* at 323:17-19 (Friel: "I can't tell you precisely how Roberts' views were presented to the Commissioner, but "I can tell you that [they were] presented to him. . ."); *id.* at 324:21-325:4 (Friel: "Cathy Lanier may have" communicated Roberts' conclusion to the Commissioner).  *See also* PI Order at *9 (collecting Friel's "varying testimony" and noting that "[w]hile Friel expressed her opinions and conclusions at this meeting [with Commissioner Goodell], the Court is less than convinced that the same can be said for Roberts's opinions.").

60.     Friel testified that she "didn't think it was that important" for Roberts to meet with the outside expert advisors.  *Id.* at 278:13-21.  Roberts, on the other hand, testified that it would be

"important to talk to the person who has interviewed the accuser if you're going to make a determination as to whether or not the accuser is telling the truth."  Arb. Hr'g Tr (Aug. 29), Ex. C at 163:1-7.

61.     At no point during the June 26 meeting were the outside expert advisors informed of Roberts' conclusion that there was insufficient evidence to corroborate Thompson's version of events with respect to any of the five alleged incidents at issue.  *See generally* Ex. A-NFLPA-45.

### E.     Arbitrator Henderson Denies Elliott and the Union Access to Pertinent and Material Evidence Necessary for a Fundamentally Fair Hearing

62.     Elliott and the Union timely filed an appeal of his suspension pursuant to Article 46 (Ex. A-NFLPA-50).  The arbitration appeal hearing was conducted from August 29-31.  Arb. Hr'g Trs., Ex. C.

63.     Prior to the hearing, the NFLPA and Elliott requested that the NFL produce, among other things, all documents related to the Thompson interviews, including the investigation notes of the interviews.  NFLPA Request for Documents and Witnesses, Ex. A-NFLPA-51 at 1-2.  The NFLPA and Elliott also requested that the NFL produce, among other critical witnesses, Thompson, whose credibility went to the very core of the arbitration proceeding.  *Id.* at 3-4.

64.     In an August 22 response letter, the NFL refused to produce Thompson or the notes of the investigators who interviewed her.  Ex. A-NFLPA-52 at 2.  The NFL also refused to produce Roberts, arguing that her testimony would be "cumulative and unnecessary" since Friel would be present to testify at the hearing.  *Id.* at 4.  And the NFL made the unsubstantiated claim that it could not obtain Thompson's testimony (*id.* at 3), notwithstanding the fact that she had already voluntarily submitted to *six* interviews by NFL investigators and also provided the League with numerous photographs, access to two of her cellphones, and hundreds of text messages.  *See* Ex. A-NFLPA-44 at 1-2.  Roberts would later candidly testify that in her nine years as a prosecutor,

she had never "cho[sen] to put a witness on the stand knowing that they had this many inconsistencies in their testimony" (Arb. Hr'g Tr. (Aug. 29), Ex. C at 226:19-25)—offering the most likely explanation for why the NFL refused to produce Thompson to provide pertinent and material evidence at the hearing.  Friel later testified that she could not identify any efforts made by the NFL to even find out if Thompson would agree to testify at the hearing.  Arb. Hr'g (Aug. 30), Ex. C at 277:22-278:12.

65.     On August 25, 2017, following a telephonic hearing, Henderson denied all of the NFLPA's evidentiary requests, except he ordered Roberts to testify at the hearing.  Ex. A-NFLPA-55.  Even though, as arbitrator, Henderson was required by the CBA to assess, under the "fair and consistent" standard, the Commissioner's determination that there was sufficient "credible evidence" against Elliott to find a PCP violation, he inexplicably found that Thompson's "testimony and availability for cross examination" was not "essential to Mr. Elliott's defense," and he ruled that the NFL was also not obligated to produce investigation notes of interviews with Thompson or anyone else.  *Id.* at 2-3.

66.     Henderson's decision was flatly at odds with Article 46 appeal hearing precedent in which arbitrators had compelled the production of witnesses by the NFL who could provide pertinent and material testimony—none of whom were more important to the player's ability to have a fundamentally fair hearing than Thompson, the sole eyewitness besides Elliott to the alleged claims of abuse.  *See Brady* Decision on Hearing Witnesses and Discovery (June 22, 2015), Ex. F at 2 (ordering testimony of Ted Wells, who "supervised the investigation and preparation of the Investigative Report that serve[d] as the basis for Mr. Brady's discipline"); *Rice* Order on Discovery and Hearing Witnesses (Oct. 22, 2014), Ex. A-NFLPA-14 at 2 ("compelling the witnesses necessary for the hearing to be fair"  by providing information on the "central issue in

the case," including testimony from Commissioner Goodell); *New Orleans Saints ("Bounty")* Pre-Hearing Order No. 4 (Nov. 9, 2012), Ex. G at 1 (ordering testimony of lead investigator Jeff Miller for "reasonable cross-examination"). More significantly, this ruling deprived Elliott and the NFLPA of "pertinent and material" evidence which was necessary for a fundamentally fair hearing, pursuant to the LMRA and the FAA.

67.     On the first day of the hearing, the Union and Elliott reiterated their request for the testimony of Thompson and the investigator notes of her interviews. That request was again denied by the arbitrator. Arb. Hr'g Tr. (Aug. 29), Ex. C at 32:3-15.

68.     At the hearing, Elliott testified—categorically, unequivocally, and under oath—that he had not committed any acts of abuse against Thompson. *See e.g.*, Arb. Hr'g Tr. (Aug. 30), Ex. C at 86:4-10; *see also* Ex. A-NFLPA-45 at 135:2-3 ("I've never assaulted Tiffany Thompson. I would never do that."); Ex. A-NFLPA-44 at 28, 44, 48 (examples from Elliott Report of Elliott denying any abusive acts). Moreover, although there was no other witness to the alleged incidents besides Elliott and Thompson, Alvarez Jackson was present in Elliott's apartment during the time of the alleged incidents, and he testified that he neither saw nor heard any evidence of abusive conduct and did not hear of any complaints of abuse from Thompson. *See* Arb. Hr'g Tr. (Aug. 30), Ex. C at 222:1-5.

69.     The NFLPA and Elliott also presented expert evidence at the hearing, completely debunking the claim that the League's medical experts could reliably determine the date of bruises from the photographs they reviewed, or determine what caused the bruises. Arb. Hr'g Tr. (Aug. 29), Ex. C at 91-132. These fatal deficiencies in the NFL's expert reports were ultimately confirmed by the NFL's experts themselves. *See* Arb. Hr'g Tr. (Aug. 31), Ex. C at 5-120; 129:24-135:3.

70.     During the hearing, when the conspiracy to conceal Roberts' conclusions was uncovered, it became evident that Commissioner Goodell himself had become a critical witness for the proceedings.  A major issue in the arbitration was whether the arbitrator should defer to the fact determinations of the Commissioner—as the League argued—when it appeared that critical facts had been concealed from the Commissioner.  The only way to get to the bottom of the conspiracy to conceal evidence from the Commissioner, and to determine what he knew or did not know about the evidence that was suppressed, was to get testimony from the Commissioner himself.  But Henderson denied any access to this critical witness as well.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 348:18-349:15.

**F.     The Award**

71.     On September 5, 2017, Henderson issued the Award affirming Elliott's six-game suspension.  Ex. H.

72.     Turning a blind eye to the fundamental unfairness that plagued the proceedings, Henderson simply rubber-stamped Commissioner Goodell's discipline, ruling that there was "sufficient credible evidence to support ***whatever*** determinations [Commissioner Goodell] made." Ex. H at 8 (emphasis added).   In other words, Henderson afforded "deference [to the Commissioner's] judgments" (*id.*) without even knowing what those judgments were, or how they were impacted by the League executives' cover-up of critical evidence.

73.     Henderson also resolved the central credibility issue by adopting Thompson's version of events over Elliott's, concluding that the Commissioner fairly and consistently found "credible evidence" to support discipline under the PCP.  Henderson, however, had already denied Elliott his fundamental right—under the unique circumstances of this case—to obtain pertinent

and material evidence on the central credibility issue by depriving Elliott the right to confront his accuser and access to the investigator notes of her six interviews.

### G.    The Texas Action

74.    In light of the "[f]undamental unfairness [that] infected this case from the beginning" (PI Order at 10), the NFLPA, on its own behalf and on behalf of Elliott, filed a Petition to Vacate the Award in the Eastern District of Texas on August 31, 2017. *See* Case No. 4:17-cv-00615 (E.D. Tex.) (filed Aug. 31, 2017) (ECF No. 1).  The next day, the NFLPA also filed an Emergency Motion for Temporary Restraining Order or Preliminary Injunction ("Motion").  *See id.*, ECF No. 5.

75.    On September 5, 2017, during a hearing before the Eastern District of Texas on the NFLPA's Motion (*See* Ex. I), Henderson issued the Award sustaining Elliott's six-game suspension and immediately thereafter, the NFL filed the barebones Complaint to affirm the self-effectuating arbitral award in this Court (without advising the Eastern District of Texas of its intention to do so).  *See* Complaint, *NFL Mgmt. Council v. NFLPA*, No. 1:17-cv-06761 (S.D.N.Y. Sept. 5, 2017) (ECF No. 1).

76.    On September 8, 2017, based on the "unique and egregious facts" of this case, the Eastern District of Texas granted the NFLPA and Elliott's Motion and issued a preliminary injunction to maintain the status quo by enjoining the Commissioner's discipline, which under the CBA, would not go into effect until sustained by a valid arbitral award.  PI Order at *10, 11. Specifically, the court held that "Henderson breached the CBA" by denying the NFLPA and Elliott "access to the investigators' notes, Thompson's cross-examination, and the examination of Commissioner Goodell" because "each was of utmost importance and extremely relevant to the hearing." *Id.* at *5.  As the court further held, "the set of facts presented in this case are everything

26

but ordinary and are such that the denial of key witnesses and documents amounts to serious misconduct by the arbitrator." *Id.* at *8.  The court also concluded that "Elliott is likely to suffer irreparable harm if he is improperly suspended based on a fundamentally unfair arbitration proceeding." *Id.* at *10.

77.     On September 15, 2017, the NFL sought an emergency stay of preliminary injunction in the United States Court of Appeals for the Fifth Circuit and "request[ed] a stay ruling ideally by September 19, 2017 . . . but no later than September 26, 2017" due to the purported harm the NFL would suffer if it were unable to enforce Elliott's suspension.  Emergency Mot. for Stay Pending Appeal, *NFLPA v. NFL*, No. 17-40936 at 22 (5th Cir. Sept. 15, 2017).

78.     In recognition of the absence of any demonstrable harm to the NFL while Elliott played the first five weeks of the NFL season, the Fifth Circuit disregarded the NFL's proposed timeline and on October 12, 2017, a divided panel issued an unpublished decision holding that the Eastern District of Texas lacked subject matter jurisdiction to issue the preliminary injunction because the NFLPA's Petition to Vacate the Award was filed before the Award was issued.  *See* Fifth Circuit Order.  The majority, however, declined to analyze the merits of the NFLPA and Elliott's fundamental fairness claim other than to say that although the "arguments and concerns about the arbitration process may have merit, they must be considered by a court with proper jurisdiction." *Id.* at 9 n. 8.  Fifth Circuit Judge James E. Graves Jr.—who found in dissent that the District Court did have jurisdiction and thus reached the merits of the NFLPA's case—wrote, "[t]his is a case about undisclosed information, uninformed decisions, and an arguably unfair process in determining whether . . . Elliott should be punished for allegations of domestic violence made by an accuser who was found not credible by the NFL's lead investigator. . ." *Id.* at 11. Judge Graves also found that "the NFLPA and Elliott were arguably denied the right to present,

27

by testimony or otherwise, any evidence relevant to the hearing," (*id.* at 18) and that "the investigative notes [from Roberts' interviews with Thompson] likely should have been exchanged." *Id.* at 19. According to Judge Graves, this denial of pertinent and material evidence "impugned the integrity of the arbitration process." *Id.* (citation omitted).

79.     On October 13, contrary to its own internal operating procedures and an express confirmation by a Fifth Circuit clerk to counsel for the NFLPA that the mandate would not be issued for twenty-two days while the NFLPA determined whether to file a petition for rehearing en banc on the jurisdiction issue, the Fifth Circuit issued the mandate. Mandate, *NFLPA v. NFL*, No. 17-40936 (5th Cir. Oct. 12, 2017). The NFLPA immediately filed a Motion to Recall the Mandate and the Eastern District of Texas issued an Order that it would "defer[] dismissing the case pursuant to the mandate until the Fifth Circuit decides the NFLPA's motion for recall, unless otherwise instructed." *NFLPA v. NFL*, No. 17-cv-00615 (E.D. Tex. Oct. 14, 2017) (Doc. No. 45). The Fifth Circuit, however, has not yet acted on the NFLPA's Motion to Recall the Mandate, and the NFL has taken the position that it is no longer bound by the preliminary injunction issued by the Eastern District of Texas. The NFLPA and Elliott, therefore, are stuck in procedural limbo and must turn to this Court for preliminary injunctive relief to prevent imminent and irreparable harm to Elliott, whose next game is this Sunday, October 22.

80.     The NFL follows a procedure in which it requires teams to set final rosters (listing active player employees) for that week's game at 4:00 p.m. EDT on Tuesday, so for this week's game, on Tuesday October 17.

81.     Upon information and belief, the NFL today informed the Cowboys that Elliott will not be permitted to participate in this week's game (on Sunday) or practices (commencing tomorrow, the team's first work day since the Fifth Circuit ruled).

**GROUND FOR VACATUR:**

**DENIAL OF FUNDAMENTAL FAIRNESS**

82.     Judicial review of an arbitration award is narrowly circumscribed and deferential. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).  That deference does not mean, however, that arbitration awards are inviolate.  *See Leed Architectural Prods, Inc. v. United Steelworkers of Am., Local 6674*, 916 F.2d 63, 65 (2d Cir. 1990).

83.     Bare minimum standards of fairness must be complied with by every labor arbitration award under both the LMRA and the FAA.  Where the arbitral process falls short of those standards and deprives a party of a full and fair hearing, the resulting award must be vacated. *See Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16 (2d Cir. 1997).

84.     Thus, the court has authority to vacate an award "where fundamental fairness is violated."  *Id.* at 20.  While the broadest boundaries of this fairness requirement may be disputed, courts look to the text of the FAA for guidance in giving content to when a labor arbitration award must be vacated.  *See Trs. of New York City Dist. Council of Carpenters Pension Fund, et al. v. Port Parties*, 2017 WL 3267743 (July 31, 2017) ("federal courts have often looked to the [FAA] for guidance in labor arbitration cases especially in the wake of the holding that § 301 of the [LMRA] empowers the federal courts to fashion rules of federal common law to govern 'suits for violation of contracts between an employer and a labor organization.") (citations omitted; alterations in original); *NFLPA v. NFL*, 523 Fed. Appx. 756, 760 (2d Cir. 2013) (Courts look to the FAA "for guidance about arbitration conducted under section 301."); *HRH Constr., L.L.C. v. Local No. 1, Int'l Union of Elevator Constructors, AFL-CIO*, No. 03 Civ. 8944 (DC), 2005 WL 31948, at *4 (S.D.N.Y. Jan. 5, 2005) (collecting cases); *Otis Elevator Co. v. Local 1, Int'l Union of Elevator Constructors*, No. 03 Civ. 8862 (DAB), 2005 WL 2385849, at *4 (S.D.N.Y. Sept. 23,

2005) ("Particularly in the context of a petition to confirm or vacate an arbitration award, '[t]he policies of [S]ection 301 and the FAA are analogous' . . . As such, the Court considers the instant case in light of the body of law developed under Section 301 and draws on the FAA for guidance.") (citations omitted).

85.     Specifically, it is clear from the text of the FAA that vacatur is warranted "where the arbitrators were guilty of misconduct in . . . refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced."  9 U.S.C. § 10(a)(3).

86.     Courts across jurisdictions have recognized that, irrespective of collectively bargained terms, a fundamentally fair hearing requires that a party is afforded an "adequate opportunity to present its evidence and argument," (*Tempo Shain*, 120 F.3d at 20) or the resulting award is subject to vacatur.  *See, e.g.*, *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (affirming vacatur procured from "fundamentally unfair" labor arbitration proceedings when arbitrator refused to consider "pertinent and material" evidence); *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39-40 (1st Cir. 1985) (affirming vacatur, in part, on fundamental fairness grounds where "the exclusion of relevant evidence 'so affect[ed] the rights of a party that it may be said that he was deprived of a fair hearing'") (citation omitted); *cf. El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) ("each party must be given the opportunity to present its arguments and evidence.").

87.     This Circuit is no exception, holding that the "exclu[sion of] evidence plainly 'pertinent and material to the controversy'" "amounts to fundamental unfairness." *Tempo Shain*, at 20-21; *Kaplan v. Alfred Dunhill of London, Inc.*, 1996 WL 640901, at *5 (S.D.N.Y. Nov. 4,

1996) ("[i]f the arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the arbitration award may be set aside."); *accord LJL 33rd Street Assocs. V. Pitcairn Props, Inc.*, 725 F.3d 184, 194 (2d Cir. 2013) (holding that refusal to hear hearsay evidence did not amount to fundamental unfairness but agreeing with "the general proposition that an arbitrator's unreasonable exclusion of pertinent evidence, which effectively deprives a party of the opportunity to support its contentions, can justify vacating an award."). *Cf. NFL Mgmt Council v. NFLPA*, 820 F.3d 527, 546 (2d Cir. 2016) (finding that fundamental unfairness was not shown because the testimony and evidence denied by the arbitrator was merely "collateral to the issues at arbitration.").

88.     Indeed, this Court and others have held that an arbitrator has an "an affirmative duty . . . to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other party" before the hearing is closed. *Home Indem. Co. v. Affiliated Food Distribs.*, 1997 WL 773712, at *4 (S.D.N.Y. Dec. 12, 1997) (identifying investigative files as subject to this affirmative duty) (quotation omitted).  Parties "must be allowed to present evidence without unreasonable restriction . . . and must be allowed to confront and cross-examine witnesses," or the award will be subject to vacatur.  *ICAP Corporates, LLC v. Drennan*, 2015 WL 10319308, at *6 (D.N.J. Nov. 18, 2015) (citation omitted).  *See also Ostrom v. Worldventures Mktg., LLC*, 160 F. Supp. 3d 942, 950 (M.D. La. 2016).

89.     The arbitration proceedings below do not satisfy these most rudimentary elements of fundamental fairness.  As chronicled above, Elliott was the victim of a deliberate conspiracy to conceal critical evidence, denied access to critical testimony from his accuser, Thompson, and denied access to the NFL's investigator notes of Thompson's interviews, four of which were not even transcribed.  The evidence excluded from the hearing was thus not only "pertinent and

material" per the statutory language of the FAA, it was critical to the NFLPA's and Elliott's ability to have a fair opportunity to present their defense.

90.     Elliott and the Union were also deprived of the critical testimony of Commissioner Goodell, when it became evident that it was essential to determine what he knew about the conspiracy to conceal evidence.  Without such testimony, it was not possible for Elliott and the Union to effectively challenge whether any deference should be paid by the arbitrator to the Commissioner's fact findings, when it was unknown whether the Commissioner was shielded from Roberts' conclusions based on her six interviews of the accuser.  As the Eastern District of Texas found, "where the evidence that was in front the Commissioner still remains unclear, it is material and pertinent to question Commissioner Goodell."  PI Order at *9.

91.     Henderson's refusal to consider all of this pertinent and material evidence "effectively deprived [the NFLPA] and Elliott of any chance to have a fundamentally fair hearing." *Id.* at *11.

92.     And, in this case, we now know that there was a conspiracy to conceal the fact that the NFL's own co-lead investigator had concluded that the accuser's claims were incredible and were not sufficiently supported by any corroborating evidence.  As a result, "the ability to cross-examine Thompson [was] both material and pertinent" to Elliott's defense (PI Order at *9), but the arbitrator denied the NFLPA and Elliott this opportunity and did not even require the NFL to ask Thompson to testify at the arbitration hearing.

93.     Although investigators Friel and Roberts were made available (only after the NFL tried to prevent Roberts from testifying), *their* testimony about Thompson's credibility issues simply reinforced the critical importance of the NFLPA and Elliott being afforded the opportunity to cross-examine Thompson.  Their testimony also underscored why the arbitrator could not fairly

determine whether the Commissioner had fairly and consistently found that there was "credible evidence" to impose discipline under the PCP without giving the player and the NFLPA the opportunity to cross-examine Thompson.

94.     The fundamentally unfair arbitration proceedings conducted by Henderson here can be analogized to a judge (and a partial one at that) making assessments about the accuser's credibility and the events in question based solely upon the hearsay testimony from *the prosecutors*, and no testimony or cross-examination of the accuser herself.  While this is not a criminal case, fundamental fairness, which applies to all arbitrations, requires that the accuser be available in a case like this, where credibility is the essence of the issue to be determined in the arbitration, and the player bears the heavy burden of proof to show that the Commissioner's discipline was not fair or consistent and based on credible evidence in accordance with the PCP. Nor should the NFL be heard to argue that Thompson was beyond their control.  The record demonstrates that Thompson has been fully cooperating with all of the NFL's requests—having provided numerous photographs as well as her cellphones, and having sat for six interviews with the NFL's investigators.  Further, the record is clear that the NFL has made no showing that Thompson would refuse to appear, as Friel testified that she was not aware of any efforts by the NFL to even ask her to do so.  Arb. Hr'g. Tr. (Aug. 30, 2017), Ex. C at 277:22-278:12.

95.     The NFLPA and Elliott are not asking the Court to substitute its own judgments for the arbitrator's concerning Elliott's and Thompson's respective credibility.  Rather, the NFLPA and Elliott ask the Court to conclude that arbitrator Henderson could not, as a matter of law, conduct a fundamentally fair hearing into the existence of "credible evidence" to justify a six-game suspension in the absence of the pertinent and material testimony of Thompson and investigator notes of her prior interviews.

96.     Further, it was not possible for Elliott and the Union to have a fundamentally fair hearing in light of the uncovered conspiracy by the NFL to conceal critical exculpatory facts from the player, the Union, the Commissioner and his outside expert advisors, and the refusal to compel Commissioner Goodell to testify to provide pertinent and material evidence concerning what he knew and did not know about the conclusions of his investigators when he made his disciplinary findings.  *See Tempo Shain*, 120 F.3d at 20-21 (vacating award where panel "excluded evidence … pertinent and material to the controversy") (citation omitted); *Gulf Coast*, 70 F.3d at 850; *ICAP Corporates*, 2015 WL 10319308, at *6 ("[P]arties to an arbitration 'must be allowed to present evidence ***without unreasonable restriction*** . . . and must be allowed to confront and cross-examine witnesses . . . .  Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award.'") (citation omitted; emphasis added).

97.     In light of the foregoing, and from the face of the arbitral record submitted herewith, as well as further submissions to be made in support of this Counterclaim, the Court should conclude that Elliott and the NFLPA were denied the fundamental fairness guaranteed to them under the LMRA, as guided by the terms of the FAA.  The Award should thus be set aside.

## PRAYER FOR RELIEF
## VACATUR OF AWARD

98.     The NFLPA and Elliott repeat and re-allege Paragraphs 1-97 as if set forth fully herein.

99.     The NFLPA and Elliott petition to vacate the Award on the ground that Elliott was deprived of his labor and arbitral law rights to a fundamentally fair proceeding.

100.    WHEREFORE, in light of the foregoing, and in accordance with Section 301 of the LMRA and Section 10 of the FAA, the NFLPA and Elliott respectfully request that the Court deny any motion to confirm the Award by the NFLMC, and instead issue an order vacating the Award.

## ANSWER

The NFLPA hereby answers the Complaint filed by Plaintiff on September 5, 2017, ECF No. 1 as follows:

1.      The NFLPA admits the allegations of Paragraph 1.

2.      The NFLPA denies the allegations of Paragraph 2.

3.      The NFLPA admits the allegations of Paragraph 3.

4.      The NFLPA admits the allegations of Paragraph 4.   "Some" of the NFLPA's members reside in this judicial district, but Elliott does not.

5.      The NFLPA admits the allegations of Paragraph 5.

6.      To the extent Paragraph 6 purports to quote or describe the CBA, the NFLPA refers the NFL to that document, which speaks for itself.

7.      To the extent Paragraph 7 purports to quote or describe the CBA, the NFLPA refers the NFL to that document, which speaks for itself.

8.      To the extent Paragraph 8 purports to quote or describe the CBA, the NFLPA refers the NFL to that document, which speaks for itself.

9.      To the extent Paragraph 9 purports to quote or describe Elliott's discipline letter, the NFLPA refers the NFL to that document, which speaks for itself.

10.      The NFLPA admits the allegations of Paragraph 10.

11.      The NFLPA admits the allegations of Paragraph 11.

12.      The NFLPA admits that Henderson issued the Award on September 5, 2017.

13.      The NFLPA admits the allegations of Paragraph 13.

14.      To the extent Paragraph 14 purports to quote or describe the CBA, the NFLPA refers the NFL to that document, which speaks for itself.

**COUNT 1 – CONFIRMATION OF ARBITRATION AWARD**

1.      The NFLPA repeats and incorporates by reference its responses to Paragraphs 1 through 14 of the Complaint as if fully set forth herein.

2.      The allegations contained in Paragraph 2 include conclusions of law to which no responsive pleading is required and are otherwise denied.

3.      The allegations contained in Paragraph 3 include conclusions of law to which no responsive pleading is required and are otherwise denied.

**<u>AFFIRMATIVE DEFENSE</u>**
**IMPROPER VENUE**

The Eastern District of Texas is the proper venue for this action because it is the court where this dispute was first-filed, is the plaintiff-in-interest's chosen forum, and judicial economy and the balance of convenience weighs in favor of that court presiding over this action.

Dated: October 16, 2017                         Respectfully submitted,


                                    By:     s/ Jeffrey L. Kessler
                                            Jeffrey L. Kessler
                                            David L. Greenspan
                                            Jonathan J. Amoona
                                            Angela A. Smedley
                                            Isabelle Mercier-Dalphond
                                            **WINSTON & STRAWN LLP**
                                            200 Park Avenue
                                            New York, New York 10166
                                            Tel: (212) 294-6700
                                            Fax: (212) 294-4700
                                            jkessler@winston.com
                                            dgreenspan@winston.com
                                            jamoona@winston.com
                                            asmedley@winston.com
                                            imercier@winston.com

                                            *Counsel for the National Football League*
                                            *Players Association and Ezekiel Elliott*