# EXHIBIT I

```
1                    UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF TEXAS
2                          SHERMAN DIVISION

3   NATIONAL FOOTBALL LEAGUE     :
    PLAYERS ASSOCIATION, on its  :
4   own behalf and on behalf of  :
    EZEKIEL ELLIOTT              :
5                                :
    VS.                          :  DOCKET NO. 4:17-cv-00615
6                                :
    NATIONAL FOOTBALL LEAGUE and :
7   NATIONAL FOOTBALL LEAGUE     :
    MANAGEMENT COUNCIL           :
8
                            MOTIONS HEARING
9            BEFORE THE HONORABLE AMOS L. MAZZANT, III
                     UNITED STATES DISTRICT JUDGE
10
    APPEARANCES:
11

12
    FOR THE PETITIONERS:          Mr. Jeffrey L. Kessler
13                                Ms. Angela A. Smedley
                                  Mr. Jonathan Amoona
14                                WINSTON & STRAWN
                                  200 Park Avenue
15                                New York, New York 10166
                                  (212) 294-4745
16                                Fax (212) 294-4700
                                  jkessler@winston.com
17                                asmedley@winston.com
                                  jamoona@winston.com
18

19                                Mr. Thomas M. Melsheimer
                                  Mr. Lane M. Webster
20                                WINSTON & STRAWN
                                  2501 N. Harwood Street,
21                                17th Floor
                                  Dallas, Texas  75201
22                                (214) 453-6500
                                  Fax (214) 453-6400
23                                tmelsheimer@winston.com
                                  lwebster@winston.com
24
    PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY,
25  TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

```
1    APPEARANCES (CONTINUED):

2    FOR RESPONDENTS NATIONAL FOOTBALL
     LEAGUE and NATIONAL FOOTBALL
3    LEAGUE MANAGEMENT COUNCIL:      Mr. Daniel L. Nash
                                     Mr. Nathan J. Oleson
4                                    AKIN GUMP STRAUSS HAUER
                                     & FELD
5                                    1333 New Hampshire Ave NW
                                     Suite 400
6                                    Washington, DC 20036
                                     (202) 887-4000
7                                    Fax (202) 887-4288
                                     dnash@akingump.com
8                                    noleson@akingump.com

9                                    Mr. John Eric Gambrell, I
                                     Mr. Patrick Gregory O'Brien
10                                   AKIN GUMP STRAUSS HAUER &
                                     FELD LLP-Dallas
11                                   1700 Pacific Avenue,
                                     Suite 4100
12                                   Dallas, Texas  75201-4675
                                     (214) 969-4727
13                                   Fax (214) 969-4343
                                     jgambrell@akingump.com
14                                   pobrien@akingump.com

15                                   Mr. Adolpho A. Birch, III
                                     ATTORNEY AT LAW
16                                   345 Park Avenue
                                     New York, New York 10154
17                                   (212)450-2399
                                     Fax (212) 847-0819
18                                   Adolpho.Birch@nfl.com

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS
 2                COURT SECURITY OFFICER:  All rise.
 3                THE COURT:  Please be seated.
 4                Okay, we're here on Case 4:17-cv-615,
 5   National Football League Players Association, on its own
 6   behalf and on behalf of Ezekiel Elliott, Petitioner,
 7   versus National Football League and National Football
 8   League Management Council, Respondents.
 9                    For the Petitioner?
10                MR. MELSHEIMER:  Good afternoon, Your
11   Honor.  May it please the Court, I'd like to introduce
12   my partner, Jeff Kessler, who will be handling the
13   argument for the Petitioner, as well as Ms. Angela
14   Smedley, here at counsel table, as well as John Amoona,
15   both with the Winston Strawn law firm; and Mr. Ezekiel
16   Elliott, as well.
17                THE COURT:  Okay.  Very good.
18                    For the Respondents?
19                MR. KESSLER:  Good afternoon.
20                MR. GAMBRELL:  Your Honor, if it please
21   the Court, Eric Gambrell with Akin Gump, and here with
22   me today are my partners Dan Nash, who will be handling
23   the argument today, along with Nathan Oleson and Pat
24   O'Brien of my law firm, along with Adolpho Birch of the
25   NFL.
```

1                    Thank you, Your Honor.

2                    THE COURT:  Very good.  Thank y'all.

3                    And I guess the first matter I wanted to

4  address is, I know that, I guess this morning or last --

5  after I went to bed last night, at some point the NFL

6  filed a Motion to Dismiss.

7                    Of course, that motion is not a ripe

8  motion before the Court, because Petitioners have two

9  weeks to go ahead and file a response to that.

10                   However, the Court still has to take up

11 the issue, we're here on a hearing on the request for

12 TRO or preliminary injunction; but as part of that, the

13 Court still has to address whether it has jurisdiction

14 over the matter.

15                   So I'm not taking up the issue of the

16 Motion to Dismiss, but we still have to address the

17 issue of jurisdiction.  So I would like to start with

18 that first.

19                   And, also, if someone could answer the

20 question, because I've been in trial today, has a

21 decision come down from Mr. Henderson?

22                   MR. KESSLER:  Not yet, Your Honor.

23                   THE COURT:  Okay.  So based upon -- does

24 that mean, since a decision has not come down,

25 Mr. Elliott can play this week without -- without the

1   Court from the NFL.  Is that correct?

2                    UNIDENTIFIED PERSON:  Your Honor --

3                    THE COURT:  Well, you don't have a mic,

4   sir.  That's one thing, the acoustics in the courtroom

5   have a lot to be desired, so everyone has to have a mic

6   when they are speaking.

7                    MR. NASH:  I can speak to that, Your

8   Honor.

9                    Yes, I believe that is the case.

10                    THE COURT:  Okay.  And so what is the

11   next, like, timeline, assuming Mr. Henderson doesn't

12   issue a decision?  Is that next Tuesday as well, at some

13   point?

14                    MR. NASH:  I -- I believe that he will be

15   eligible to practice this week and play in this

16   weekend's game.

17                    Depending upon the timing of Arbitrator

18   Henderson's decision, if it comes out before next week

19   and if it denies the appeal, my understanding is that

20   the suspension would go into effect next week.

21                    THE COURT:  Okay.  So no matter what --

22                    MR. NASH:  That's not an issue.

23                    THE COURT:  Right, I understand.

24                    So if he issues any affirmance of the

25   decision by the Commissioner, anything short of tossing

1  it out, for whatever reason, even if he reduces it one

2  game, that wouldn't impact this week now; it would only

3  impact starting after this game is over?

4                    MR. NASH:  That's correct, Your Honor.

5                    THE COURT:  Okay.  So, the first thing I

6  would like to address is the issue of having

7  jurisdiction over the Motion for -- for the TRO, or the

8  preliminary injunction.

9                    MR. KESSLER:  Good afternoon, Your Honor.

10  My name is Jeffrey Kessler, as Mr. Melsheimer indicated,

11  and I'm going to speak on behalf of the NFLPA and

12  Mr. Elliott today.

13                    I will turn to the jurisdiction ripeness

14  standing issues first, since Your Honor would like to

15  address them.

16                    THE COURT:  Well, I'm only doing that

17  because the Court can't proceed to take up the question

18  of injunctive relief unless I have jurisdiction, so it

19  is something I will have to deal with, if we get that

20  far.

21                    MR. KESSLER:  Completely understood, Your

22  Honor.

23                    And while we had to scramble, as you can

24  imagine, since we received these arguments last night,

25  we filed today at about noon a reply paper which covers

1  each of these points, but I will cover them now as well.

2            So, first, Your Honor, the principal

3  argument the NFL made for lack of jurisdiction was based

4  on an entirely false premise, and frankly, Your Honor,

5  one which they should know better about, based on the

6  history between these parties and prior positions.

7            They present an argument that there's no

8  jurisdiction under the Federal Arbitration Act until

9  after a decision is rendered, and they even go so far as

10  to say, and venue has to be the place of the decision.

11            Now, that's a very interesting argument

12  except we are not premising jurisdiction in this case

13  under the Federal Arbitration Act, and the NFL knows

14  that.  How do I know this?

15            Because we have been parties in numerous

16  cases together where we both have consistently taken the

17  position that jurisdiction in this type of a proceeding

18  is based on the Labor Management Relations Act, for

19  which there is clearly jurisdiction the moment that a

20  breach of the Collective Bargaining Agreement took

21  place, which has already taken place in this hearing,

22  and that there is no issue of jurisdiction at all.

23            Moreover, the Labor Management Relations

24  Act provides for venue in any District Court in the

25  United States.  So it's not limited to the arbitration

1   at all.

2                The FAA is relevant on deciding issues of

3   vacatur.  There's a lot of cases, including in this

4   Circuit, that when you are deciding, when you get to the

5   issue of fundamental fairness, for example, to look to

6   case law interpreting the FAA, even in a labor

7   arbitration.  But with respect to jurisdiction, the FAA

8   jurisdictional limitations have nothing to do with this.

9                So what is applicable?

10              When they finally get to the LMRA, even

11   they do not argue there's no jurisdiction; instead, they

12   make two other arguments.

13              Argument number one is that you must

14   exhaust your remedies under the LMRA before you go to

15   court; which is not a jurisdictional argument, it's an

16   argument that we haven't exhausted our remedies.

17              The problem with that argument, as we've

18   set forth in our brief with case law citation, is that

19   what exhaustion requires is that you invoke the arbitral

20   process, which we did; that you go through the

21   arbitration hearing, which we did; that to present the

22   issues to the Arbitrator, which we did; and that the

23   Arbitrator rules on the issues, which he did, that are

24   relevant to our petition.

25              Because our arguments about being

1  deprived witnesses, about being deprived documents,

2  about the fundamental unfairness of the arbitration have

3  all been decided by the Arbitrator.  The arbitral record

4  is closed, so there's nothing more to exhaust.

5              And that is all that the case law

6  requires.

7              Mr. Henderson is not reconsidering, or

8  given any indication he's reconsidering, his issues when

9  he decided that we're not going to get the accuser as a

10  witness; that we're not going to get the Commissioner as

11  a witness; that we're not going to get the documents we

12  requested.  So all those issues are in the can and has

13  been exhausted.

14              If this were not the law, then you would

15  have a situation where you could use this issue of

16  exhaustion as a means of inflicting injury before you

17  even have a chance to get to judicial review.

18              Had Mr. Henderson's decision come out one

19  hour ago and had we not filed, then the player would

20  have been suspended for the entire week before we could

21  get into court to seek redress.  So there's no way that

22  exhaustion of remedies in this case works here.

23              That's a case where they cited, for

24  example, the *Pennel* case, when the Union asserted

25  exhaustion of remedies.

1                    In that case, a player sought to enjoin
2    the arbitration hearing from even taking place.  So, of
3    course, that's a failure to exhaust.  Akin to that, none
4    of the arguments had been presented to the Arbitrator.
5    In this case, everything was presented to the Arbitrator
6    and was exhausted.
7                    The second argument they make is the
8    Norris-LaGuardia Act.  This is another red herring.
9                    They -- to read their brief, you would
10   think that the Norris-LaGuardia Act bars every
11   injunction involving an employer and an employee when
12   there's a Collective Bargaining Agreement in place.
13   That is absolutely not what the Norris-LaGuardia Act
14   does.
15                   As we set forth in our brief, the
16   Norris-LaGuardia Act bars injunctions in cases like a
17   strike or a lockout or something done in the broad
18   collective bargaining process.
19                   It actually was developed, in its
20   legislative history, as protection for unions, because
21   employers were filing antitrust cases to enjoin Union
22   strikes.  That's the policies of that.
23                   Otherwise, under Section 101 of the
24   Norris-LaGuardia Act, you are completely authorized to
25   grant injunctions in the labor context as long as you

1   meet the normal standards for a preliminary injunction.

2   You have to find likely success on the merits; you have

3   to find irreparable harm; you balance the hardships.

4             The best decision on this that I would

5   commend to Your Honor is the *Starcaps* decision, which we

6   cite in our brief, where the NFL made an identical

7   argument.  That was a drug suspension policy case with

8   several players.

9             And the Court went through and basically

10  said, as long as we find the factors that warrant

11  preliminary injunctive relief and this is enjoining the

12  infliction of a suspension on specific employees, not

13  some big NFL policy, not some collective bargaining

14  agreement, the Norris-LaGuardia Act is not a bar at all.

15            And this is not just one case that's held

16  this.  We've gone through this, Your Honor, so we've

17  cited *Starcaps*, we cited *Mackey*, we cited *McNeil*, we

18  cited *Jackson*.  Everyone of these cases, as well as

19  others, have come up in the context of sustaining

20  injunctive relief, sustaining injunctive relief against

21  the NFL.

22            These are all NFL cases in the context of

23  players being suspended in particular cases, or getting

24  an injunction imposed for antitrust relief on a

25  preliminary-injunctive basis.

1        So the Norris-LaGuardia Act is not a bar

2   here.

3        What's left?

4        They argue that it's not ripe.  Well,

5   interestingly, ripeness is a doctrine that you look at

6   not just at the time of the complaint, but you look at

7   ripeness on events subsequent to the complaint.

8        Now, first of all, we had a ripe dispute

9   because the violation of the CBA, the deprival of the

10  fair hearing has already taken place, and the player has

11  already had that dispute over this arbitration.  That

12  exists right now.  But, secondarily -- so, it's ripe

13  from day one.

14       Secondarily, since Mr. Henderson has

15  indicated in an e-mail he sent to counsel today on both

16  sides, that his goal was to issue a decision by close of

17  business today, but that he said it could go a little

18  bit longer because of the volume of materials.

19       Well, even if he issues it tonight or

20  tomorrow or the next day, all of that goes to your

21  ripeness determination at the time you decide this

22  motion.  That's what the case law says.  That's what we

23  cited.

24       So there's going to be no question that

25  this is going to be ripe under any set of standing.

1          Finally --

2          THE COURT:  So are you -- are you saying

3    that it's not ripe until he actually,

4    "Henderson," issues a decision?

5          MR. KESSLER:  No, Your Honor.  I say it's

6    ripe right now, because he already violated the CBA by

7    not providing a fundamentally fair hearing under the

8    LMRA and the player has already suffered that breach, as

9    has the Union.

10         But if you were to accept the NFL's

11   argument that it should not be ripe until the decision

12   is entered -- so assuming, arguendo, you accepted that,

13   the cases say you decide ripeness not at the time of

14   filing of the lawsuit, but at the time at which you

15   would look at the issue of ripeness on this motion.

16         And what I'm saying is, by the time you

17   would have to enter a motion (sic) now, especially since

18   the NFL said that Mr. Elliott is playing this week no

19   matter what; you know, next week is an issue, now that

20   they've gone on the record on making that concession --

21   when you issue your decision, which I would suggest

22   should be shortly after Mr. Henderson rules in the next

23   day or two -- because now, there isn't the urgent need;

24   and it could be tonight, but we'll see when he enters it

25   -- at that point, it will unquestionably be ripe.

1  Because you, even under their view, would have a

2  completed dispute then under the most extreme view they

3  take.  And the case law says you look at ripeness at the

4  time that the decision's made.

5              All these cases also talk about the fact

6  that when you consider things like ripeness, when you

7  consider things like exhaust your remedies, you're

8  supposed to balance the potential injustice of the Court

9  not acting versus the practical consideration as to

10 whether there's a concrete controversy.  And we believe

11 on that record, it will be clear that this is ripe.

12             The final argument they make, because

13 they make six different arguments about this point, is

14 they also say we have no standing under Article 3.

15             Well, the case law we cited makes it very

16 clear that injury, in fact, can be incurred or imminent.

17 It can be imminent.  Now, why -- we cite a Supreme Court

18 authority on that in our brief.  Why is that intuitive?

19             Well, Your Honor knows that virtually

20 every preliminary injunction case where a case starts

21 that way, the litigant is seeking to enjoin a threatened

22 injury.  When the bulldozer is about to invade your

23 property and knock down your house without authority,

24 you don't have to wait for your house to fall down to

25 say you have Article 3 standing.

1          The imminent injury of that bulldozer

2  plowing forward towards your house gives you standing to

3  seek an injunction against the threatened harm.  It

4  gives you standing to go to court.  Otherwise, none of

5  this would work.

6          In fact, there are -- there are many

7  cases where litigants in arbitrations go to court

8  because the employer is seeking to impose discipline

9  before the arbitration even takes place, to try to

10  circumvent the arbitration process.  And the courts

11  always find they have standing there.

12          So none of these doctrines save the NFL.

13          And, you know, it's quite interesting,

14  because they accuse us of gamesmanship, when what this

15  really is is the NFL's desire to sneak their -- their

16  suspension in and evade judicial review, or to pick the

17  forum of their choice and then argue that, okay, says,

18  you have to go because we beat you to the courthouse.

19          What we did here was properly assert a

20  claim for a breach under the LMRA that was concrete at

21  the time, it was ripe, the Court has jurisdiction, we

22  had exhausted all the remedies, we had standing, and

23  there was nothing left to do.

24          So unless Your Honor has further

25  questions about this set of issues, I would propose to

1  move on to the injunction; but however you'd like to

2  proceed.

3           THE COURT:  Well, let's -- before we go

4  on to the injunction, I'm going to give the NFL a chance

5  to respond.

6           But I do have a question in dealing

7  with -- in looking at some Labor Management Relation Act

8  cases, now, they are in the employee context, there's

9  case law out there that indicates that you have to

10  exercise the administrative process or grievance system,

11  and then there is a body of case law says that we

12  have -- in those cases, you have to wait till the award

13  or decision on the grievance process.

14           How -- I know that's not in the same

15  context that we have here, but that is a body of law in

16  the employee context.

17           How do you factor in what you've done if

18  I look at that body of case law in relation to this

19  case?

20           MR. KESSLER:  So that body of case law

21  involves situations where the litigant did not present

22  the issue to the Arbitrator at all.  In other words, it

23  was a litigant who was trying to go to court directly,

24  when there is a requirement to arbitrate, and didn't

25  present the issue to the Arbitrator.

1                      This is the exact opposite situation.  In

2    this case, we filed our arbitration.  We appeared before

3    the Arbitrator.  We presented these issues to the

4    Arbitrator.  The Arbitrator ruled against us on each of

5    the issues.  So on each of the issues of fundamental

6    fairness that we are complaining about, the record is

7    closed.  The Arbitrator has ruled.  There's nothing left

8    for us to do or exhaust.

9                      There's not a single case that has ever

10   indicated that exhaustion, that you have to do something

11   more than go to the Arbitrator, present the issues, let

12   him decide.

13                     If Mr. Henderson did not get to decide

14   whether to order the accuser to testify, if Mr.

15   Henderson did not get to decide whether Commissioner

16   Goodell was to testify, if Mr. Henderson did not get to

17   decide the various document issues where we've been

18   deprived, then we would not have an exhaustion.  Because

19   the idea is to give the Arbitrator time on those issues,

20   to see if that gives you a remedy.

21                     Well, we've already exhausted that

22   remedy.  And what we're here to complain about is

23   exactly the adverse decisions of the Arbitrator.

24                     This proceeding, to be clear, is an

25   attack on the fundamental fairness of the Arbitrator's

1 conduct in these proceedings.  So this can't be a

2 failure to exhaust before the Arbitrator is done.

3           So some cases, for example, someone goes

4 into court first and says, "Okay, we think this

5 Arbitrator is going to be biased, he should be recused,

6 step aside," but they don't go to the Arbitrator.  So

7 the courts say you have to first go to the Arbitrator

8 and argue that to the Arbitrator and then the Arbitrator

9 has it.  That's exhausting your remedies.

10          The Arbitrator then could decide, "Okay,

11 I'm going to recuse myself," and he'll step aside for

12 conflict.  If he doesn't, then you have exhausted your

13 remedy.

14          So, again, I think when you look at every

15 one of the cases on exhaustion, you will find those are

16 cases where the issue wasn't presented to the Arbitrator

17 or the Arbitrator had not yet had an opportunity to

18 provide a remedy.

19          Here, we are going solely and completely

20 on issues the Arbitrator's already decided and which the

21 record is closed on and it's finished.

22          THE COURT:  Okay.  Thank you, Mr.

23 Kessler.  I will call you back in a few minutes after we

24 hear their response.

25          Mr. Nash, you want to give the response

1   on issue of jurisdiction for the TRO and preliminary

2   injunction.

3                MR. NASH:  Thank you, Your Honor.  May it

4   please the Court.

5                I'm going to start with what counsel just

6   said are the sole issues in their injunction request,

7   and I believe he -- he identified the procedural

8   decisions that the Arbitrator made during last week's

9   proceeding.  And one of them you should know, I think we

10  point out in our papers, was in a written decision

11  before the hearing on a Motion to Compel Witnesses.

12               And so as I understand what he just said,

13  they can come into court now and seek interlocutory

14  review of the Arbitrator's procedural rulings before

15  there is a final award.

16               I think saying that, Your Honor, makes it

17  absolutely clear how improper and inappropriate not only

18  the Petition here is, but the -- but the TRO motion.

19               What -- what he just said, I would submit

20  respectfully, is akin to Your Honor conducting a trial;

21  during the trial, making various evidentiary rulings

22  about documents and evidence and witnesses; and -- and

23  the case comes to a close; and at the end of the case,

24  counsel makes the closing argument -- and which is what

25  we did, which we had last week -- and the case is

1   submitted, whether it's to a jury or whether it's to a

2   Judge, and before that decision is rendered, they can

3   run to the Court of Appeals and say, "We've done

4   everything, those rulings have harmed us, and we now

5   have a ripe dispute to -- that the Court of Appeals can

6   weigh in on."

7              I think saying it proves the point.

8   Quite obviously, that's not something that is

9   permissible.

10             And the main reason --

11             THE COURT:  Those aren't really

12  comparable examples; because there's a whole bevy of

13  relief where things can happen in a civil context in a

14  case, if a case is submitted to the jury versus -- and

15  other relief.

16             Here, they're asserting that if a

17  decision is issued -- now, of course, we're past the

18  window for this week; but if a decision is issued, even

19  if he's immediately suspended, or if that's affirmed,

20  any part, he's going to be band from practice and such.

21             So it's not the same situation about

22  trying to -- I just don't think it's the same.  I

23  understand the example, but I just don't think it's

24  equivalent to what we have here.

25             MR. NASH:  Well, I would -- I would -- I

1  would suggest, Your Honor, that it is the same in the

2  sense that one of the reasons, whether it's in court or

3  in arbitration, you don't even get to interlocutory

4  review of those kinds of rulings, is that they could get

5  all of the relief that they ask for.

6         He's right, we don't -- we don't have a

7  decision.  It is quite true that the Arbitrator could

8  uphold the suspension.  But just last week, counsel

9  asked him to, based on the very same arguments that they

10 have made in their petition, to either reduce or vacate

11 the suspension.  And that's critical, I think, for the

12 standing and jurisdictional question.

13        Now, let -- let me go back to what he

14 said at the beginning, because I do think it's important

15 for -- for Your Honor, in terms of resolving this

16 jurisdictional question, as a threshold matter.

17        At the end, he said they filed an action

18 under the FAA; but at the beginning, he said, our

19 principal argument with respect to jurisdiction was

20 based on the FAA, and I think he was somewhat critical

21 of our papers.

22        Let me be clear, our papers addressed

23 what they said in their Petition.  In the very first

24 page of their Petition, they -- they -- they were

25 seeking to vacate a future arbitration award under both

1   the FAA and the LMRA.  And the last page of their

2   Petition, their only prayer for relief is to -- is for

3   the Court to vacate the future arbitration award

4   under -- under the FAA and the LMRA.

5              So, of course, in filing our papers, we

6   address both of those statutes, and I think we

7   demonstrated -- and I don't know if Your Honor has had

8   an opportunity to read them -- but I think we

9   demonstrated --

10             THE COURT:  I have.

11             MR. NASH:  That under either, under

12  either, I think the law is clear that there's no

13  jurisdiction, there's no standing, there's no ripe

14  controversy for a litigant to come in and seek judicial

15  review of an arbitration proceeding before the award is

16  issued.

17             THE COURT:  So what happens if he issues

18  the award tomorrow?  So then this case is ripe, under

19  your view?

20             MR. NASH:  If -- if -- if -- if --

21             THE COURT:  If Henderson issues a

22  decision tomorrow -- apparently the parties thought he

23  was going to -- y'all thought he was going to issue it

24  today; he didn't.  So if he issues it tomorrow, isn't

25  the dispute then ripe --

1          MR. NASH:  I think --

2          THE COURT:  -- for the Court, before this

3 Court?

4          MR. NASH:  Well, I -- I -- I think we're

5 talking about different things, so maybe I should -- I

6 should break it down.  Let me first talk about

7 jurisdiction, because I think that that's the most

8 important point to make.

9          And I am going to take counsel's point

10 that this case is governed by the LMRA.  I completely

11 agree.  He cited the position we've taken in other

12 cases.  I completely agree, this case is absolutely

13 governed by the LMRA, including the exceedingly narrow

14 standard of review that we'll get to when we get to --

15 if we get to the merits of their -- their TRO request.

16 But under the LMRA, he said it's not jurisdictional.

17          Well, I think, Your Honor, on Page 7 of

18 our brief, we cite the Circuit cases that say that it

19 is.

20          So I don't agree.  I think it is

21 completely jurisdictional.  I think the law -- and this

22 is an area of law -- and let me -- let me just say this

23 about this argument, as well as a number of the other

24 points that I think we try to make in our briefs and we

25 may be interested in today.

1                 I don't know that there is an area of

2  law, Your Honor, that is more well-settled, that has

3  more Supreme Court decisions on -- on the review of

4  arbitration awards, on the propriety of doing what

5  they're trying to do here.

6                 It's been answered by the Supreme Court;

7  it's been answered by the Fifth Circuit; and as we point

8  out in our -- in our briefs, it's been answered in every

9  case that where -- where the Players Association or a

10 player has tried to challenge a suspension or challenge

11 the collectively-bargained disciplinary appeals process

12 in imposing a suspension.  And every single time, every

13 single time, it's been rejected.

14                 But as far as the jurisdictional

15 question, I think the law is quite clear that it is

16 jurisdictional.

17                 Now, as far as this argument goes, well,

18 all you have to do is -- he distinguishes the *Pennel*

19 case.  And I would commend Your Honor to -- we cite the

20 position that the Players Association took in the *Pennel*

21 case this last year, and it's not quite, I think, how he

22 described it.

23                 He said, well, you have -- the cases that

24 we're relying on are just situations where the employee

25 didn't pursue or the Union didn't pursue arbitration at

1  all.  That's not -- that's just simply not the case.

2              And, in fact, what they said on Page 5 of

3  their submission, and it's cited at Page 8 of our brief,

4  what they said last year to a different Judge, Your

5  Honor, is that Plaintiff has failed to exhaust his

6  administrative remedies, further compelling dismissal.

7  Dismissal, jurisdictional.  You can't come into court

8  and sue under the LMRA if you haven't exhausted your

9  administrative remedies.

10              And that means you have to not just

11 pursue arbitration, you have -- you can't start an

12 arbitration and then say, "You know, I'm not happy with

13 the way it's going.  I might win, but I might not win.

14 I'm going to run to court."  That's not exhaustion under

15 any -- under any of the cases.

16              And, in fact, Your Honor, they don't cite

17 a single case that supports that argument, not -- not a

18 single case.  They cite one case, I think the *Frost*

19 case.  But in that case, the case had gone through to an

20 award, and -- and there was no claim that the employee

21 hadn't exhausted his remedies.

22              They don't have a single case -- and you

23 can go from the Supreme Court on down, Your Honor, I

24 mean, this is just a bedrock principle of labor law, and

25 that's why they told the Judge in Ohio last year that --

1  you know, a very different story.

2              And, in fact, what they said is, as to

3  the point that you just made about, well, what happens

4  if the Arbitrator rules tomorrow, but they said, the

5  player -- the player is not suspended now -- I'm quoting

6  them at Page 7 of their brief, "Player is not suspended

7  now and will not be suspended until and unless the

8  Arbitrator hears the appeal and issues an award

9  affirming the discipline.  As such, Plaintiff's claim of

10 irreparable harm is not ripe and may never be."

11             That's what they said last year, Your

12 Honor, on ripeness.

13             So --

14             THE COURT:  Remind me in the *Pennel* case.

15 Was it dealing with the same situation of assertion of

16 unfairness in the procedure?

17             MR. NASH:  It was -- it was -- I would

18 argue it was very similar.  It was a player who

19 individually was dissatisfied with -- with -- with his

20 case.  He went to court before the -- before the

21 arbitration.

22             He actually sued both the -- the League

23 and the Players Association, which is why they had to

24 take a different position than they're -- they're taking

25 now.

1              But he was making the very same kinds of

2  preemptory challenges under -- under Section 301 of the

3  Labor Management Relations Act before an award is

4  issued.

5              So, I -- I -- Your Honor, I just don't

6  think it could be clearer -- and I actually have copies

7  for the Court's convenience of their written submission,

8  if you would like to look at it, because it is -- it is

9  quite remarkable, it's quite remarkable the extent to

10  which they made, last year, the arguments that they're

11  making this year.

12              What an interference with the public --

13  they actually said the relief there would undermine

14  public policy concerning judicial deference to labor

15  relations, as well as to enforcing arbitration

16  agreements according to their terms.

17              So, the contrast, Your Honor, could not

18  be more stark.  And that's true for -- for the

19  jurisdictional question.  It's true for the ripeness

20  question.

21              And I think when we talk about standing,

22  I don't know -- I know that courts normally want to get

23  to Constitutional questions last.  I think if there's

24  another basis to rule, there's not a need, I think, to

25  get to the Constitutional question.  But there is no

1  case or controversy here.

2          This -- this -- this example that he

3  talked about of imminent harm is completely undermined,

4  it's undermined by the -- the obvious fact, the obvious

5  fact that they could win.

6          So when they say things like they said

7  today in their reply brief, that there's nothing that

8  the Arbitrator can do to remedy their fairness arguments

9  that they're asserting in support of this lawsuit and

10 injunction request, this is -- this is not correct.

11 They could win.

12         And, again, I think it's --

13         THE COURT:  Nobody can fix the procedure

14 errors that they're asserting.  I mean, they're

15 asserting that because the procedures to be

16 fundamentally unfair, the Arbiter can't fix those.

17         MR. NASH:  Well --

18         THE COURT:  Those -- those have already

19 happened.

20         MR. NASH:  They -- well -- but they're

21 claiming that because of the procedural errors, it has

22 prevented Mr. Elliott from having a fair hearing to

23 overturn his discipline.

24         If the Arbitrator, for whatever reason --

25 and I think this is sort of, again, another bedrock

1  principle, judicial principle; it's not arbitral -- it's

2  certainly not arbitral -- if the Arbitrator can give

3  them all the relief that they are requesting, then I

4  would -- I would -- I would submit that there is no

5  harm, there is no imminent harm, there's no harm at all,

6  and there is no case or controversy.

7          It's not -- this is a -- this is an

8  important principle that courts guard against, I think,

9  Your Honor, and I think it's -- it's quite important

10  here.

11          And as far as getting a remedy, and I'm

12  going to -- I'm spilling over a little bit into the --

13  sort of the merits of their claim; but remember,

14  their -- the other thing that I think we all have to

15  keep in mind in this case, because there's a lot of

16  allegations getting thrown around, but this is an action

17  that has one prayer for relief.

18          The only prayer for relief, it's not to

19  fix the procedural rulings, it's not to stop the

20  Arbitrator or force the Arbitrator to change what he

21  did.  So, it's not -- it's not a question of -- they're

22  not asking you to tell the Arbitrator to do something

23  different.  They're seeking to vacate his award, that

24  hasn't even yet issued.  And -- and the -- so again, I

25  think it makes obvious how -- there's simply no

1  jurisdiction and no controversy here for you at this

2  point.

3              And as far as whether he does it tomorrow

4  or he does it -- Your Honor, that's always the case.

5  This is -- that's a temporal issue.  I mean, they're --

6  they're free to file a proper action.  And -- and -- and

7  let's -- let's put into context here what they are

8  really saying.

9              So if -- if they can only -- if it takes

10  them another day or two to get to court and -- and --

11  and Mr. Elliott misses a practice or something, that's

12  imminent harm that warrants prematurely involving the

13  Federal Courts in what I would suggest is an

14  interlocutory, internal arbitration process?

15              That, again -- I think the other side to

16  this argument, that we haven't talked about, is how, if

17  you consider the merits of what they're claiming -- and,

18  again, it's -- it's -- these are arguments seeking to

19  vacate the ultimate award -- they are completely

20  foreclosed by the LMRA, and I can address those.

21              THE COURT:  Wouldn't you agree with me

22  that the procedural issues they're raising, that record

23  is complete.  There is nothing else in terms of anything

24  developed, and really nothing that the Arbiter can

25  decide unless he throws the whole award out, I mean, if

1  he vacates it completely.

2              But no matter whether he reduces it or

3  affirms it, everything that the Court has to decide in

4  terms of what's being asserted in the Petition are the

5  defects or procedural errors, there's nothing else that

6  has to be decided to decide that issue.

7              That's all before the Court, is it not?

8              MR. NASH:  I don't think it is, Your

9  Honor.

10             THE COURT:  So what's not before the

11 Court on the issues they're raising?

12             MR. NASH:  Well, I think you -- I think

13 you just had a little misdirection, to be honest with

14 you, Your Honor.

15             I think what they are throwing around in

16 this Petition is this idea that suspending Mr. Elliott

17 would -- would be unfair.  Okay, they talk about

18 fairness.

19             And we spent three long days last week,

20 all of us in New York, before the Arbitrator

21 presenting --

22             THE COURT:  I spent my weekend reading it

23 all, so...

24             MR. NASH:  And -- and, Your Honor, they

25 submitted the issue.  So -- so let's start -- I think

1  it's important to be specific about what they're

2  complaining about.

3              The first point that they're challenging

4  --

5              THE COURT:  We don't have to talk about

6  the merits of those, but just in terms of --

7              MR. NASH:  No, I think it related to your

8  question.

9              THE COURT:  Go ahead.

10             MR. NASH:  So -- so the principal, the

11 principal argument I think that they're making is, they

12 filed a Motion to Compel before the arbitration

13 proceeding and they argued that the -- that Ms. Thompson

14 should have been compelled to testify, okay.  And we had

15 a hearing about that.

16             And -- and the Arbitrator issued a

17 written decision, making a number of points, and -- and

18 concluding that under this Collective Bargaining

19 Agreement, he was not persuaded that -- that that was

20 appropriate.  That's one of their main arguments.

21             In closing, okay -- and really their

22 entire, their entire argument about the suspension from

23 the beginning, was -- was to challenge the credibility

24 of Ms. Thompson, okay.

25             And in closing, Counsel right here argued

1  you should -- it's not fair to -- to discipline if we

2  don't get to confront the accuser.  So they have made

3  that argument.  They have made that argument.  And it is

4  something that is under advisement by the Arbiter.  I

5  don't think it has any merit.

6               And if we get to the LMRA standards for

7  your review of the decision that the Arbitrator made on

8  the Motion to Compel, there's no basis.  And the courts

9  have repeatedly said that -- from the Supreme Court,

10 again, on down, that procedural questions, like, what

11 witness gets to testify and what documents or discovery

12 is appropriate, those are for the -- for the Arbitrator

13 to make.  And even if the -- even if the Court

14 disagrees, those cannot be second-guessed absent some

15 sort of misconduct.  Okay?

16              So absent a situation -- the *Gulf Oil*

17 case that is really is only one of the cases they can

18 point to where the Arbitrator refused to hold a hearing.

19 Okay, I get that.

20              But there's no dispute here that

21 Mr. Elliott had the hearing.  He got to present numerous

22 witnesses.  He actually, through witnesses through

23 affidavits were accepted into evidence by the

24 Arbitrator, and he got to argue it wouldn't be fair

25 without the accuser appearing.

```
 1                    So I would submit, Your Honor, that no,
 2   this is not the time.  I think you have to -- at a
 3   minimum, a court would have to have an award to look at
 4   and understand what the basis of the Arbitrator's
 5   ultimate decision is.
 6                    So I just don't -- I don't -- and that's
 7   true for the other -- other arguments that they're --
 8   that they're making here.  And, in fact, one of the
 9   arguments is -- is -- is just -- is really completely
10   the basis of their -- their appeal to reduce
11   Mr. Elliott's dismissal.  We -- we don't know what the
12   Arbitrator is going to do.
13                    I don't know -- I argued against.  I
14   argued that it was just wrong.  I don't think it was
15   either appropriate for Ms. Thompson to be -- first of
16   all, the NFL -- she is not employed by the NFL.  The NFL
17   can't force her to testify.  I don't think under the
18   Collective Bargaining Agreement that applies, and this
19   is well established that -- that she should be
20   compelled, particularly in a case like this --
21                    THE COURT:  Well, we will talk about that
22   in a minute.
23                    MR. NASH:  Yeah.  But so --
24                    THE COURT:  Let me give them an
25   opportunity to speak first on the merits.
```

1              MR. NASH:  Okay.  Sure.

2              But unless you have any other

3   questions...

4              THE COURT:  No, I don't have.  Thank

5   you.

6              MR. NASH:  Thank you.

7              THE COURT:  And then, Mr. Kessler, do you

8   want to respond to all the jurisdictional arguments

9   before we --

10             MR. NASH:  Only -- only to two.

11             THE COURT:  Go ahead.

12             MR. KESSLER:  So, Mr. Nash talks about

13  the *Pennel* case, that's the case last year in which the

14  NFLPA was a defendant, as well as the Management

15  Council, and said that shows how we should apply the

16  exhaustion of remedies.

17             Well, it does, but not in a way that Mr.

18  Nash would like it.

19             So in that case, to be very specific,

20  there was an arbitration that should have gone forward

21  to review a drug suspension.

22             And the player argued there were only two

23  arbitrators available to select from, when the

24  Collective Bargaining Agreement, in his mind, said there

25  should be three.

1                     And he went into court and said, "I don't
2     even want to go to this Arbitrator -- or have an
3     arbitration, because there should have been three, not
4     two."
5                     In that context, yes, the Union's
6     position was, and would be today, that you have to first
7     go to the Arbitrator and say, "The Collective Bargaining
8     Agreement provides for three, there were only two," and
9     give the Arbitrator a chance to rule on that specific
10    procedural defect.
11                    That is why there was no exhaustion in
12    that case.
13                    This, again, is the opposite case.  And
14    Your Honor said it very well, says the Arbitrator's
15    ruled already on these -- on these issues; twice he's
16    ruled on this.
17                    And Mr. Nash is wrong.  These issues are
18    not before the Arbitrator right now.  What's before the
19    Arbitrator right now is his ultimate decision on the
20    merits of the arbitration.  But he has rejected all of
21    the things we are complaining about, the fundamental
22    fairness, and it can't be fixed.
23                    Your Honor is correct:  You have
24    everything you need as a Court to decide that issue
25    right now.

1          The only last thing I'll say in response

2    to this is, Mr. Nash said, well, we didn't cite any

3    cases where there wasn't already an award issued.

4          In fact, that's wrong.  Right on Page 2

5    of our brief, we cite a case where the Plaintiff tried

6    to do an arbitration and the arbitration never took

7    place, and the Court said he had exhausted simply by

8    trying to do the arbitration and had tried to invoke the

9    process, even though that process never went forward at

10   all.

11         And that is the case, I believe, of

12   *DelCostello versus International Board of -- of*

13   *Teamsters*.

14         And what the Court said there -- that's a

15   Supreme Court case; a pretty good case, says Plaintiff

16   must attempt to exhaust any grievance arbitrations

17   provided in a collective bargaining agreement before

18   seeking relief in Federal Court.

19         And actually that -- I can't tell from

20   the citation -- no, I think that is *DelCostello*.  You

21   will forgive me, Your Honor.  It also might be *Scott*

22   *versus Anchor Motor Freight*.  Since we put together this

23   brief in literally two and a half hours, I'm not sure

24   which of the two cases.  But the point is here, we have

25   given you citation that even when the process doesn't

1  happen, as long as the Plaintiff made the required steps

2  to exhaust, after that, the exhaustion issue is over.

3                So unless Your Honor has further

4  questions, I think I've covered this subject, and I will

5  move on to the TRO issues.

6                THE COURT:  Yes.  Because, I mean, I'll

7  have to decide that threshold issue, but we will go

8  ahead and proceed with the argument on the injunctive

9  relief.

10                And I believe that both sides were all in

11  agreement of what is before the Court and what is not,

12  in terms of what the Court has to decide, and it's not

13  the issue of credibility or what happened or not

14  happened, it's about the -- whether the proceeding was

15  fundamentally fair or not.  That's the question before

16  the Court, if I reach that question.  So...

17                MR. KESSLER:  You have said it very well,

18  Your Honor.  The issue here is whether or not the basic

19  standard, which every labor arbitration in this country

20  must go through of fundamental fairness has been applied

21  in this case.

22                And the importance here is that this

23  principle applies, it's well established in the Fifth

24  Circuit, no matter what the Collective Bargaining

25  Agreement says, they like to argue -- and I'm sure you

saw it in their brief, and you will hear it again --
well, we should have bargained for fundamental fairness
in the Collective Bargaining Agreement, and where is the
provision that says you're entitled to confront your
accuser in a case like this?  They go, it's not in the
CBA, so therefore, we don't get it.

That's not the issue.  We're not asking
you to second-guess the CBA.  We're not asking you to go
into the findings of facts.  The issue here is uniquely
for the Court.  That's what the Fifth Circuit said in
*Gulf Coast Industries*; it's still the leading case on
this in the Fifth Circuit.  Which is that there must be
a fundamentally fair process.

You know, because we're in a rule of law
where there -- where basically for Federal Courts to
allow arbitration to be the exclusive remedy.  And as
Your Honor knows, the courts today give broad scope to
arbitrations.  But underlying that is the fundamental
requirement that it must meet basic standards of
fairness.

So what's very significant here, Your
Honor, is that the issue must be looked at in the
context of the specific arbitration before you.  In
other words, there is no abstract right.  In other
words, I wouldn't say that in every possible case you're

1  entitled to every possible witness as an issue of

2  fundamental fairness.  That's not the issue.

3                   The issue is, in this particular case for

4  this particular policy in the context of the issues

5  here, what did fundamental fairness require.  And that's

6  where I'm going to go to.

7                   And, Your Honor, we're starting first

8  with the -- with the preliminary injunction standard of

9  likelihood of success on the merits.

10                  I know Your Honor knows these standards

11 very well.  You -- you articulated them exactly right

12 recently in the *Dickey's Barbecue Pit* case, so I am not

13 going to purport to tell you what the standards are.

14                  And you know from your review of the case

15 law that likelihood of success doesn't mean that we have

16 to show we're entitled to summary judgment now.  What we

17 have to show -- and this is what I'm going to get to --

18 that in order to preserve the status quo, which is all,

19 by the way, we're seeking to do: a status quo

20 injunction.

21                  So, Mr. Elliott has been playing for the

22 Cowboys for the last year, even though he's been under

23 investigation, even though this has all gone on, we're

24 simply seeking to maintain that status quo until Your

25 Honor can decide the ultimate question in the case,

1   which is whether or not this arbitration was

2   fundamentally unfair and therefore must be vacated.

3              And interesting, Mr. Nash said, well, the

4   only relief we're seeking is to vacate the arbitration.

5   Well, let's be very clear.  If you vacate the

6   arbitration, the suspension does not ever go into

7   effect.  And so that it's not like vacating the

8   arbitration is some abstract proposition.

9              The way in which the CBA is set up is

10  so when the Commissioner imposes discipline, it has to

11  be subject to an appeal.  And if the appeal was

12  improper, then there's no suspension in effect.

13             Now, I guess the Commissioner could try

14  to start over and do something again in the future; but

15  this suspension would never go forward if you vacate the

16  arbitration.  That's why -- that's why this is so

17  important.

18             So our preliminary relief is simply to

19  give the Court the time to decide these complex,

20  important, difficult questions, which are worthy of

21  judicial review, to ensure fundamental fairness.  And I

22  use those words because those are the words from the

23  Fifth Circuit case law that's in our brief.

24             So we don't have to show we're definitely

25  going to win or even that it's overwhelmingly likely

1  we're going to win, we just have to present substantial,

2  difficult, important questions for review, if we satisfy

3  the other elements of the preliminary injunction.

4           So let me talk now about likelihood of

5  success in this context, but with the view that all we

6  have to show are there substantial questions there.

7           First of all, I start with the denial of

8  the right to have Ms. Thompson come in and testify and

9  be subject to cross-examination.

10          As I said, that issue has to be decided

11  in the context of this specific case.  So what does the

12  record show?  And you have a complete arbitral record

13  before you.  What does the record show in regard to

14  that?

15          First of all, we have a player who has

16  not been criminally charged, certainly not been

17  criminally prosecuted or convicted.  And under the

18  Personal Conduct Policy that the NFL promulgated, they

19  put in a special requirement -- doesn't exist if you

20  have pled guilty or if you've been prosecuted and you've

21  done a plea agreement, it doesn't exist -- but when that

22  doesn't take place, they said there must be, quote,

23  credible evidence to support the charges.

24          And I would say, by the way, that it's a

25  very important requirement, because it's a recognition

1  that if the authorities didn't see a reason to go

2  forward with anything and you have no admission from the

3  player -- in fact, you have here the most strenuous

4  denials under oath -- there needs to be credible

5  evidence before you wreck this player's career, before

6  you wreck the team's competitive abilities, before you

7  intervene in this way.

8              So the Arbitrator's decision was:  Did

9  the Commission of Discipline comply with the policy in a

10 fair and consistent way upon which the player and the

11 Union had the burden of proof.  And that's very

12 significant now, Your Honor.

13             How are we going to be able to fairly

14 discharge our burden of proof to challenge the essential

15 issue of credible evidence if you can't present the

16 accuser in the hearing to be cross-examined, so that

17 just as the Arbitrator got to see Mr. Elliott testify

18 for hours and hours, he also will get the accuser to

19 testify and be able to do that.

20             Now, the NFL sort of makes two arguments

21 about this, or they made it to the Arbitrator.  One,

22 they said, well, we don't control her.  You know, she's

23 like an independent person.

24             Well, the problem with that, Your Honor,

25 is that they didn't try, and no one asked them to try,

even though she voluntarily was interviewed by them six

times; she voluntarily gave them her cell phone to be

examined; she did everything they asked for this.

So we have every reason to believe that

had the Arbitrator said, "You have to ask this witness

to testify," that she would have said yes.

And I asked Ms. Friel, who's in charge of

this whole disciplinary process, whether or not she was

aware of any efforts made to even ask the accuser if she

would come in and do this.  And, of course, the answer

on the record was no, there were no such efforts.

And the reason there were no such efforts

is very obvious.  I asked Ms. Kia Roberts, who was a

very truthful witness in this proceeding, very truthful

witness, who is the Director of Investigations, whether

in her nine years as a prosecutor she had ever presented

a witness with so many credibility issues as

Ms. Thompson had, for being subject to cross-examination

in a case, did she ever choose to have such a witness,

in her entire career as a prosecutor of nine years, and

her answer was, "No."  Okay?  Her answer was, "No."

And that goes to why this witness, had

she been available, we are convinced would have been

essential to our ability to go to this issue of

credibility, which is at the essence of this

1  case-specific issue.  There may be cases where the

2  League never interviews the witness and doesn't -- the

3  accuser, and doesn't rely on it.

4              Here, virtually the entire complaint, the

5  entire discipline is based on the allegations of

6  Ms. Thompson.

7              Now, it's interesting because the

8  Commission of Discipline letter says, "Well, I knew she

9  had credibility issues, so I rely on other things."

10             But when you look at those other

11 things -- and we'll do this when we get to the Petition

12 to vacate -- they don't possibly fill the gap here, they

13 don't possibly -- other things they rely on is they got

14 two doctors to ultimately say that perhaps the pictures

15 of injuries she had could be consistent with several

16 alternative causes, but they couldn't really reliably

17 date when they were from, in any event.  That's the

18 forensic evidence they had to try to say they weren't

19 relying on the accuser.

20             It is crystal-clear:  If you don't rely

21 on the credibility of this accuser, you couldn't

22 possibly meet the credible evidence test.  And we didn't

23 get a chance to cross-examine her, to have her as a

24 witness, to have the Arbitrator see that.

25             Secondarily, to compound the injury, they

1  refused to produce the notes of the investigator who

2  interviewed her six times.

3              Now, the reason this is important is not

4  just, of course, they have said things that weren't

5  recorded.  Out of the six interviews, two were

6  transcribed and four were not.  So four, whatever we

7  know about them, is not based on a transcript.  But

8  even when you have --

9              THE COURT:  Mr. Kessler, you know,

10 Ms. Roberts testified that two of them were interviews

11 and then she said the other four were follow-ups.

12             MR. KESSLER:  Yes, Your Honor --

13             THE COURT:  The nature of -- they

14 weren't -- it seems like they weren't full-blown

15 interviews.

16             MR. KESSLER:  What she did in her

17 testimony, is first she said two were full interviews

18 and four were follow-ups.

19             When I questioned her and pointed out

20 that she wrote that there were six interviews in her

21 report, she ultimately answered and said, "Yes, I guess

22 they're interviews."

23             So I don't want to quibble over words,

24 but she was distinguishing between follow-ups, you know,

25 as opposed to the basic interviews.

1                     But the follow-ups were clearly, and Your

2     Honor can look at them yourself, were interviews

3     extensively about different issues that went to her

4     credibility.  And, in fact, frequently the follow-ups

5     were Ms. Roberts' probing about the inconsistencies in

6     her testimony.

7                     In other words, the reason she did the

8     follow-ups, in part, is because Ms. Roberts had so many

9     doubts about the credibility of this witness, that she

10    kept going back and saying, "Well, this person, who was

11    a complete neutral, said this.  What do you have to say

12    to that?"  Or, "This person is inconsistent with what

13    you said the first two times."

14                    So, for example, in her first two big

15    interviews, she never mentioned one of the five alleged

16    incidents at all, at all.  It didn't come up until one

17    of the follow-ups that was there.  Which also, of

18    course, goes to credibility.

19                    My point here is, the investigator's

20    notes would have not just the words she said, but the

21    contemporaneous impressions of the investigators.

22                    Because, if you know experienced

23    investigators, they would write "Inconsistency."

24    "Doesn't seem credible."  You know, other points that

25    would have perhaps, perhaps cured a little bit of the

1  harm, and really wouldn't have overcome the harm of not

2  having her.

3          But the combination of denying both in a

4  case -- in a classic he-said/she-said case, and a policy

5  that requires credible evidence where the Arbitrator is

6  going to rule, as Mr. Nash said, he's going to rule on

7  whether or not she was credible, we know he's going to

8  rule on that in this hearing, and he's going to do it

9  without seeing her, without her being cross-examined,

10  without anything else, it utterly defies fundamental

11  fairness.  So that's number one.  And it's occurred now.

12  It can't be fixed.  It's been denied twice.

13          THE COURT:  Well, Ms. Roberts got to

14  testify, so the Arbiter certainly had the opportunity to

15  hear her and what her views were and what her opinions

16  were in deciding that.  Because I don't think the

17  Commissioner, he never actually saw live testimony from

18  anybody.

19          MR. KESSLER:  That is absolutely correct

20  about the Commissioner.

21          But with respect to the Arbitrator, we

22  heard Ms. Roberts give her testimony, and I will talk

23  about that in a minute.

24          And you also heard Ms. Friel separately

25  say, well, *she* thought that it was credible for all but

1  one of the five incidents.

2              So, really, that's not a substitute,

3  that's not a substitute for the Arbitrator being able to

4  decide whether there was credible evidence in this case.

5  And it's certainly not a substitute for my being able to

6  cross-examine this witness about many things, for

7  example, that may speak -- that she wasn't even asked by

8  the investigators but which would go directly to whether

9  or not --

10             And, a lot of times, the issue on these

11  appeals to the Arbitrator is whether you can induce new

12  evidence that the Commissioner did not even have before

13  it, because I will come to this next.

14             Their big argument to Mr. Henderson in

15  everyone of these arbitrations is that you should defer

16  to the fact-finding of the Commissioner, and only

17  disturb it if it really is arbitrary and capricious.

18  That's Mr. Nash's favorite refrain in his closings and

19  all of his arguments about that.

20             Well, how can the Arbitrator decide, how

21  can we argue what you should defer to if you don't know

22  what the Commissioner actually knew?  And this is the

23  second point.

24             When it became clear that Ms. Roberts'

25  conclusion -- which, frankly, was somewhat, as you might

imagine, earthshaking, came out that not only did she

think, quote, that the accuser had credibility issues,

but that in a review of all the evidence by the Lead

Investigator -- and I call her the Lead, because Kia --

Kia Roberts was the investigator who interviewed all 26

fact -- fact witnesses; Ms. Friel interviewed none.

Kia Roberts is the one who ran this

investigation.  She's the one that knew all the

evidence.  She was the co-author of the report.  And she

concluded there was insufficient evidence to pursue any

violation at all.  But that was not put into the

168-page investigative report.

Now, that then raised, well, what did the

Commissioner know?  Because she did not get to meet with

the Commissioner.  And this is undisputed.  There was a

meeting with the Commissioner to discuss the findings of

the investigation in which Ms. Friel went and expressed

her view that she thought that there should be a

prosecution, that she did think it should go forward.

And Ms. Roberts, the one who interviewed all 26

witnesses, was excluded, not invited to that meeting.

And she testified she doesn't know why

she was excluded.  She doesn't even know who made the

decision.  She certainly thought it would be important

to talk to her.

1              Even more telling, more telling under the

2    PCP policy, they have four advisors who -- and it could

3    be four -- but they have expert advisors who are

4    supposed to review what happened and give the

5    Commissioner advice whether to impose discipline.

6    That's another part of the process.

7              So you have the big evidentiary report.

8    And in that report, 168 pages, and, by the way,

9    thousands of pages of exhibits, there's no conclusion.

10             Why is there no conclusion?  Because if

11   Kia Roberts had to write a conclusion, she would write,

12   "I conclude, don't go forward."  And they didn't want

13   anyone to know that.

14             So you get down to the meeting of the

15   four expert advisors.  Ms. Friel is in attendance, but

16   not Ms. Roberts.  She doesn't know why she's excluded

17   from that.

18             And why is that important?  Well, the

19   expert advisors are going to advise the Commissioner,

20   right?

21             So, Mary Jo White, who is a former U.S.

22   Attorney, former head of the SE -- Chair -- Chair of the

23   SEC, someone who knows what questions to ask, asked Ms.

24   Friel at this meeting of the advisors, the only meeting

25   of the advisors we believe took place about this:  Can

```
 1   you tell me not that what you, Ms. Friel, conclude; she
 2   says, can you tell me what did you and your
 3   investigators include -- conclude about the credibility
 4   of these allegations and what the evidence show?
 5              And Ms. Friel flatly misrepresents the
 6   truth to the four advisors.  Flatly.  What does she do?
 7              She says, oh, July 22nd, one of the five
 8   incidents, we thought was incredible.
 9              Well, she had to say that, because there
10   were e-mails showing that Ms. Thompson had asked her
11   friend to lie to the police about that incident.  Not a
12   very credible way of alleging an allegation of abuse.
13              So she said, that's fine.
14              Then she goes, as for the others --
15   because Mary Jo White says, well, what about the others?
16   As for the others -- and Your Honor should read this --
17   it's a big question.
18              THE COURT:  I have read it.
19              MR. KESSLER:  And you know, she never
20   answers what should have been the answer, what would
21   have been the answer had Ms. -- had -- had Ms. Roberts
22   been in the room, Ms. Roberts would have said, well, I
23   personally concluded in my investigation, we didn't find
24   any of it to be credible.
25              Maybe Ms. Friel would have disagreed, and
```

1    then the four advisors could say, well, you're the one

2    that interviewed the 26 witnesses; and you're not.  What

3    causes you, Ms. Friel, to draw a different conclusion?

4    And then they would be in a position to tell the

5    Commissioner what happened.  But they were cut off, too.

6                      So then -- and this is the most

7    incredible stuff of all.  So we get to this issue of

8    what did the Commissioner know?  And I commend Your

9    Honor -- actually, I shouldn't commend you; it's a hard

10   duty -- to read the testimony of Ms. Friel in this.

11                      Ms. Friel is an experienced prosecutor

12   herself.  She's a trained lawyer.  I submit to you she

13   understands questions.  She knows the significance of

14   the oath.  She knows how to testify.  Okay?

15                      In the space of eight minutes of

16   examination, she changed her testimony five to six times

17   as to what the Commissioner was told.  She gave every

18   variation from "I don't remember," to "I said something

19   about credibility," to "Maybe Ms. Kia Roberts said

20   something about credibility," to "I don't actually

21   remember what was said," to "Attorney-client privilege,"

22   to "Oh, yes, I told him about Kia's conclusions."

23                      I mean, you look at that mess.  Talk

24   about inconsistencies and incredible testimony.  And,

25   again, Your Honor, just read it, just read it.

1          If your clerk goes through it, you're

2  going to be scratching your heads, "Say what!"  This

3  changes every two minutes.

4          And I ask, I ask --

5          THE COURT:  Mr. Kessler, so it's clear, I

6  have read it myself.

7          MR. KESSLER:  Thank you.  I apologize,

8  Your Honor.

9          THE COURT:  You want to see my

10  transcript, I have marked those passages.

11          MR. KESSLER:  You will see then -- you

12  will see that I asked -- finally, I got exasperated.  I

13  said, "Well, you seem to have suddenly changed your mind

14  about what you remember from a few minutes ago.  Did it

15  suddenly pop into your head?"

16          And her answer as a trained lawyer was,

17  "Well, my testimony speaks for itself."  Okay.

18          Now, because of that uncertainty, we

19  needed Commissioner Goodell.  Because Commissioner

20  Goodell could have told us, here's what I knew.  Did I

21  know that Ms. Roberts had reached this conclusion or did

22  I just know that there were credibility issues?

23          In the -- in their brief and in the

24  public statement issued by the NFL in the last week,

25  what they say is, "The Commissioner knew everything."

Why?  Well, because all the facts are in the report.
And, of course, what's not in the report is the
conclusion of Ms. Roberts.  So the report is useless.

And this argument is, well, the
Commissioner could have read the 3000 pages of exhibits
and the 168 pages and all the backup and had reached his
own conclusion.

That's very different from the process
when you hire experienced criminal prosecutors to do an
investigation, to give you advice, and you have four
expert advisors and you expect them to know what's going
on, and to have all that, that's very different from
what's in the report.

And, number two, they say, well, I heard
there were credibility issues.  Credibility issues as
Ms. Friel said, as she told the Commissioner, there was
credibility issues with everybody, so, therefore, you
can't decide on that.  So here's another basis to impose
discipline.

So when you needed to know -- because the
argument, and I guarantee you as I'm sitting here now --
I give a lot of guarantees, okay -- when you see this
decision, whenever it comes out -- right now, the next
hour, tomorrow morning -- it's going to have a long
discussion about the standard of deferring to the

1  Commissioner, his fact-finding, and how we have to show

2  that his fact-finding is arbitrary and capricious.

3          How could we meet our burden on that

4  argument when we can't demonstrate, well, the

5  Commissioner didn't know any of this, it's new; so,

6  therefore, you don't defer on that at all.  That's what

7  we needed to be able to do in this hearing, and we were

8  deprived on that as well.

9          So we believe under the fact-specific

10  standards of fundamental fairness, the combination of

11  these issues, okay, the combination of not knowing how

12  this conspiracy suppressed evidence of Commissioner

13  Goodell and what was involved and the scope of it, or

14  what he knew, and the inability on the fundamental issue

15  of credibility, this goes to fundamental fairness.

16          At the very least, Your Honor, at the

17  very least these are significant, difficult, important

18  questions that are worth maintaining the status quo

19  until you can have a whole hearing on these issues with

20  full briefing and discussion.

21          Obviously, we filed a 15-page TRO brief

22  and a Petition, but we have not yet fully briefed here

23  today, the full scope of these issues, which you are

24  entitled to do.  So that's on the likelihood of success.

25          The other aspects of preliminary

1  injunction here, frankly, Your Honor, are overwhelming

2  and compelling.  First, is irreparable injury.  I don't

3  even know how they seriously contest this.

4          So we have cited to you decision after

5  decision after decision.  I'm going to read to you the

6  list that's in our brief.  *Brady*, *Starcaps*, *Virginia*

7  *Squires*, *Jackson*, *Bowman*, *Haywood*, *Linseman*, decision

8  after decision that recognize that when a professional

9  athlete is going to miss games, this is inherently

10  irreparable.  Why?  Because these careers are short.

11          God forbid, Mr. Elliott could go down to

12  an injury at any time.  You can never recover these lost

13  moments of competitive opportunity, number one.

14          Number two, Mr. Elliott last year was in

15  the Pro Bowl his rookie year.  Wouldn't it be incredible

16  if he could be in the Pro Bowl two years in a row; or

17  try doing that when you're missing six games, which is

18  almost half the NFL regular season.  That might be too

19  much even for Mr. Elliott to try to achieve.  All of

20  those honors, that recognition is lost.  No money can

21  make that up.

22          The possibility of getting to the

23  playoffs, going deep into the playoffs, getting to the

24  Super Bowl, perhaps this is the Cowboys' year.  I know I

25  have a few people back here that would like that to be

1 the case.  Okay?

2            That opportunity in the NFL comes up

3 briefly for a moment.  You don't know if this would be

4 the Cowboys' year, with their star running back for all

5 16 games, as opposed to not having him for six of these

6 games at the start of the NFL season.  So that's why

7 case after case after case say this is irreparable in

8 terms of that.

9            That goes beyond even the fact that,

10 obviously, being suspended, you know, it's like Your

11 Honor knows this, when someone, you know, gets convicted

12 of something, that gets a lot of press, okay; when you

13 get acquitted, not so much.

14            So the damage to Mr. Elliott's reputation

15 of letting it go forward, that Mr. Henderson has -- if

16 he has, and I believe he will likely do this, says fine;

17 because when we're deprived of our opportunity, he will

18 probably sustain the discipline; because we didn't get a

19 chance to cross-examine the witness, because we couldn't

20 depose the Commissioner because of the high deference

21 standard he's going to apply, that's reputational harm,

22 that is very hard to ever get back again, in terms of

23 this.

24            He was vindicated by the police going

25 forward.  As a matter of fact, the police didn't just go

1  forward, and the prosecutor, they said because of the

2  conflicting evidence and accounts on all incidents; in

3  other words, insufficient basis to conclude to go

4  forward.  Now, I'm not saying a criminal standard

5  applies, it sure doesn't; but credible evidence applies,

6  and that's what we need to go back to.

7         So, I think irreparable harm is

8  self-evident here.  Mr. Nash wants to spend time to

9  argue this, that's his choice.  I don't think it's a

10  close question.  Then you get the balance of hardship.

11         Balance of hardship is very important.

12  Because what the case law says in the Fifth Circuit, as

13  you know, is that if the harm to the Plaintiff here,

14  Mr. Elliott, is going to be irreparable, and the harm

15  claimed by the adversary is something that could be

16  easily remedied if it turns out that the injunction

17  should not have been granted, if, in fact, you decide to

18  affirm the arbitration, says then the balance of harm

19  overwhelmingly favors granting the relief.

20         Again, I commend the *Starcaps* decision on

21  this.  It has a very well-reasoned decision about this,

22  pointing out that if it turns out the arbitration should

23  have been affirmed.  In fact, in *Starcaps* ultimately the

24  arbitration was affirmed.  They pointed out that the

25  players could then serve their suspension then.  There's

1    no harm to any interest of the NFL.  There's no harm to
2    anything that happens there.

3                    And, in fact, in *Starcaps*, they did serve
4    their suspension then.  But the point was, the Court
5    said, if I have significant fundamental questions that
6    need to be answered, then I'm not going to allow
7    irreparable harm, because, first, when there's no real
8    harm to the other side.  The other part of this balance
9    is not just Mr. Elliott, it's the Cowboys.

10                    So we have two affidavit and declaration
11   in this case.  One is from Mr. Elliott's agent, Mr.
12   Arceneaux, that details the facts of irreparable harm
13   and what it means to a NFL player and how this would
14   impact him irreparably.  And then we have the affidavit
15   and declaration of Mr. Cohen, who is General Counsel of
16   the Cowboys, that I believe is sitting out in the
17   audience here in court today.

18                    There are two significant things about
19   the Cohen declaration.  One, it establishes
20   unequivocally the harm that will be caused, in addition
21   to Mr. Elliott, to the Dallas Cowboys in an irreparable
22   way if they are deprived of his services; and, in fact,
23   not just to the Cowboys, but to their fans, their season
24   ticketholders, others whose hearts and minds are locked
25   up into this team, in terms of that.  That's all set

 1   forth in the Cohen declaration in terms of that.

 2                  And, secondarily, Mr. Cohen was at the

 3   arbitration and he heard and he saw and he reported that

 4   the revelation from Kia Roberts about what her

 5   conclusion was and how it wasn't something given to the

 6   advisors and how it was not something she gave to the

 7   Commissioner and how the Cowboys didn't know about it.

 8   The Cowboys didn't know about it.  He confirmed that in

 9   his declaration.  So why is that significant?

10                  In the context of this arbitration

11   hearing, this was clearly an effort to suppress

12   evidence:  The most fundamentally unfair thing.  Now,

13   how do I know that?

14                  We didn't only ask for Ms. -- Ms. Roberts

15   to testify -- I'm sorry.  We didn't only ask for

16   Ms. Thompson to testify before the Commissioner, we

17   asked that Kia Roberts testify, but the NFL said no.

18                  Here's what counsel said when they didn't

19   want Ms. Roberts to testify.  We're -- we're producing

20   Lisa Friel and, therefore, Ms. Roberts' testimony will

21   be cumulative of Ms. Friel's testimony.

22                  Your Honor, you've been in courts a long

23   time.  What would you do if a counsel made that

24   representation in your court and tried to use that to

25   keep Ms. Roberts from testifying about what her

1  conclusions are, which they knew were diametrically

2  opposed to Ms. Friel, and that Ms. Friel was the one who

3  decided, with counsel, that Ms. Roberts or anyone's

4  conclusions would not be in that evidentiary report so

5  it would be kept from the player, from the Cowboys, from

6  the Commissioner, I would assert, from the advisors?

7  What does that do to the fundamental fairness here?

8              So, the balance of hardships, we believe,

9  precisely favor maintaining the status quo; give this

10  Court the time to study these issues; to have full

11  briefing; to have argument, and then justice will be

12  done.

13              I am going to conclude, Your Honor, by

14  simply saying the following:  The last fact is the

15  public interest.  And, again, I commend you to the

16  *Starcaps* decision.

17              The public interest is vindicated when

18  employees are not improperly suspended, disciplined

19  without a fundamentally fair process.  This is the rule

20  of law.

21              You know, I noticed, when the crowd was

22  coming in, we have some children in this room.  I assume

23  they're little Cowboys fans who came here to see

24  Mr. Elliott.

25              Before Mr. Elliott gets suspended, and

1   everything that means for him as a player and his team

2   and his reputation, before anyone in this process of

3   arbitration can suffer those types of consequences,

4   particularly in a policy like this, where the

5   allegations are quite severe -- and, frankly, if someone

6   engages in domestic violence, this Union believes there

7   should be significant penalties.  That's not the issue

8   in this case.  I would hope everybody would think that.

9                   This is about somebody wrongly accused,

10  where the investigators concluded there was no basis to

11  go forward, and was denied a fair process.

12                  I believe Your Honor should issue this

13  TRO after the decision is rendered.  You don't have to

14  issue it now.  I think it would be quite proper for you

15  to wait till tomorrow; because now we have a

16  representation from the League that the decision will

17  not go into effect until next Tuesday, so therefore --

18  and by the way, that's a new representation from the

19  League.  But now that they have said that -- because I

20  guess it's past their limit, in terms of that.  Now that

21  we know that.

22                  Then you can issue your decision, and you

23  will decide for yourself the time to carefully decide as

24  a Court whether fundamental fairness existed here or

25  whether it did not.

```
 1                    I believe that's the only just outcome,
 2   and I think it's the one that every Cowboys fan, every
 3   person, but most importantly and especially the accused,
 4   Mr. Elliott, deserves from the arbitral process.
 5                    Thank you very much.
 6                    THE COURT:  Mr. Kessler, before you sit
 7   down, there's one question that you didn't really
 8   address just generally.
 9                    Because looking -- judicial review of
10   these kind of decisions is extremely narrow, and you
11   didn't really talk about that.
12                    And I went back and read, which I had
13   never read before, the *Brady* decision.  Of course, the
14   District Judge sided with you and your client.
15                    Then the Second Circuit -- now, that's
16   not binding upon this Court -- in reading the Second
17   Circuit decision, I don't know one would ever have
18   survived a District Judge vacating an award of the
19   Second Court, based on reading that decision.
20                    Now, we don't have that in our Court
21   because the Fifth Circuit hasn't done -- I don't think
22   they've ever reached the issue regarding the NFL.  But
23   it is extremely narrow what the Court looks at.
24                    And so the Court, especially as Mr. Nash
25   pointed out, and I think he's correct, he's got
```

1  evidentiary decisions, it has to be pretty severe to get

2  over that hump.

3              So in terms of the small, narrow window

4  the Court looks at, why -- why is this case -- that case

5  that is of such a fundamental error that he was denied a

6  fair hearing?  If you don't mind just answering that

7  question, considering because my review, if I reach that

8  decision, is so narrow.

9              MR. KESSLER:  Your Honor, I'm glad you

10  raised *Brady*.  I meant to cover it, so I thank you for

11  raising it.

12              I believe the decision in *Brady* is not

13  only completely distinguishable, but it actually

14  supports finding fundamental unfairness here, and I will

15  explain why.

16              The fundamental fairness argued in *Brady*

17  related to two things:  The fairness to order the

18  deposition of Jeffrey Pash, who was the General Counsel

19  of the NFL, and the failure to produce certain of the

20  investigator notes of the Paul Weiss law firm.

21              In that, those were the two fundamental

22  issues.  Everything else in *Brady*, in the notice issue,

23  have nothing to do with the issues here.

24              What the Second Circuit did is they

25  reaffirmed, they didn't deny, that where the Arbitrator

refused to hear evidence pertinent and material to the

controversy, there would be vacatur.  In other words,

the law in the Second Circuit is there would be.

But they looked at the specific facts

there and they found two things.  They found that Mr.

Pash's testimony was collateral testimony because he had

only minimum involvement in the investigative report.

And Mr. Wells, who was the principal investigator, who

had testified at length, and, therefore, what they said

is that this was an issue that was collateral, and,

therefore, didn't meet the standard of being evidence

pertinent and material to the controversy.

Second, when they got to the investigator

notes, they said the same things, that the League had

already produced all of the NFL documents considered by

the Investigators and that no material factual disputes

that could be revealed by the Paul Weiss notes, in

addition, had been identified.

So what the Second Circuit did is

specifically accept the principle that if it was

material and pertinent, they would have overturned the

Arbitrator on that ground; but they said, these

complaints were not.

Now, compare those issues, Mr. Pash's

testimony, when he had his name in a press release

1    saying he was the co-investigator, but he then testified

2    to Mr. Wells he never really did anything.  So,

3    therefore, the Court said his testimony was collateral,

4    when all he did was review a draft and give some

5    comments.  So the Court said, well, that's not -- that's

6    not central or pertinent or material.

7                   And in Paul Weiss' investigative notes

8    there, which the Court said had already been covered by

9    everything else produced by the League, and compare that

10   to the fundamental issue of credibility?  Number one.

11   When the Policy says credible evidence is the test and

12   our burden, there could not be another witness more

13   pertinent, more necessary, more material than Ms.

14   Thompson.  That is the fundamental difference on her.

15                   Secondarily, because we uncovered this

16   conspiracy to suppress evidence and we had this burden

17   to show what the Commissioner knew and didn't know, so

18   that we -- so that you wouldn't defer to him for things

19   he didn't know, the Commissioner Goodell's testimony was

20   directly essential.

21                   So this came up in another proceeding

22   involving Ray Rice, where instead of appointing Mr.

23   Henderson as the Arbitrator, the League appointed a true

24   neutral, because we were alleging bias, and they

25   appointed former Judge Barbara Jones of the Southern

District of New York.

And Barbara Jones ruled that there
Commissioner Tagliabue had to testify -- I'm sorry,
Commissioner Goodell had to testify.  She compelled it.
She said why?  Because his testimony -- and Judge Jones,
in light of fundamental fairness, and she sat like you,
in a District Court -- she said his testimony went to a
central issue in the case of what the Commissioner knew
and didn't know in the context of that dispute, because
there, that was a controlling issue there, and she
ordered the testimony, Commissioner Goodell testified,
we met our burden, and the discipline was vacated.

That's what we've been deprived of here.

So I am happy for Your Honor to review
the specific context of *Brady* and those rulings.  And I
would submit that had this case been before that panel
in the Second Circuit, applying their own standards,
they would have reached a very different conclusion on
material and necessary, even though I agree with Your
Honor, obviously that's another Circuit and does not in
any way control, in any event.  But the point here is,
it's a fact-specific inquiry.

They also argue the *Adrian Peterson* case
in the Eighth Circuit there the issue was retroactive
application of a policy.  And the Court of Appeals in

1  the Eighth Circuit ended up saying that the Eighth

2  Circuit doesn't even recognize fundamental fairness as a

3  separate grounds.  So it differs from the Fifth Circuit.

4  So, therefore, it's not applicable for that.  And

5  there's been a split in the circuits about that.

6           But secondarily said, what was argued

7  there as being fundamentally unfair was just all being

8  the retroactivity of the Policy, which they had already

9  said was for the Arbitrator to decide under the

10  agreement, which is why we lost in *Peterson*, having

11  nothing to do with anything here.

12           So, Your Honor, as you know, as it may

13  well turn out to be the case, the standards are what

14  they are.  And we believe the clear issue is how do you

15  apply them to the specific facts here.

16           We believe that at the very least we have

17  raised substantial, difficult, important issues as to

18  whether this testimony was material and pertinent.  I'm

19  using now the words of the FAA, which the Court of

20  Appeals has said you look to, in interpreting the

21  vacatur rules of fundamental fairness, that's the *Gulf*

22  *Coast Industries* case.

23           THE COURT:  Thank you, Mr. Kessler.

24           MR. KESSLER:  Thank you.

25           Mr. Nash.

1                  MR. NASH:  Thank you, Your Honor.

2                  It's been a long time.

3                  Well, you just heard a lot of arguments

4  about the evidence and the hearing, the testimony of

5  various witnesses, the meeting of the standard under the

6  Personal Conduct Policy that the Arbitrator is supposed

7  to apply.

8                  These are all arguments, Your Honor,

9  that -- and I think you said you -- you read the

10  transcript.  It probably sounded familiar.  And the

11  reason they probably sounded familiar is that they were

12  virtually a repeat of the very lengthy closing argument

13  that counsel made at the end of the arbitration

14  proceeding.  And I would submit a couple of things about

15  that.  One is, it proved the point that I made earlier.

16  These arguments are before the Arbitrator.  These are

17  the arguments that he made.

18                  I got a chance to respond and that's also

19  in the transcript.  And, in responding, I got a chance

20  to point out that the factual claims that he made about

21  the so-called conspiracy about Ms. Roberts and what was

22  provided to the Commissioner were not correct.  That if

23  the Arbitrator looked at the evidence, if he read the

24  testimony or remembered the testimony of both Kia

25  Roberts and Lisa Friel -- who, by the way, I believe

testified completely consistently -- they gave the same testimony.

Ms. Roberts was quite clear, because she was asked quite directly, she had concerns about credibility of -- of the witness.  She expressed those concerns.  She -- she documented those concerns.  She put them in the investigative report.  And both Ms. Roberts and Ms. Friel said directly, that was all included.

In fact, Ms. Roberts prepared a memo, which was Exhibit 99 to the investigative report, that counsel got to cross-examine her about, in which she outlined here are the credibility problems with Ms. Thompson.

Now, she also said she had a number of credibility problems with -- with what Mr. Elliott had to say, and that was also included in the report.

And to the point about the notes, and you correctly pointed out about the -- about the interviews that she conducted of Ms. Thompson, she did have the two interviews and then follow-up calls.  She actually had -- they had recordings of those interviews.  They had absolute verbatim transcripts of those interviews, and she had notes of the others, and -- and she was asked, I think it's on Page 249 and 250 of the -- of the

transcript:  Did you include everything from your notes
concerning your conversation with Ms. Thompson into the
report?

She made summaries.  It wasn't a verbatim
transcript, but she actually summarized exactly what
Ms. Thompson had told her.  And she said, I included
everything, everything.

So -- and -- and as far as the -- the
information that went to the Commissioner, Ms. Friel
testified that she, in fact, made sure all of that was
included in the report to the Commissioner and that she
herself told the Commissioner about Ms. Roberts'
concerns.

We had this back-and-forth argument.  I
don't -- I would suggest, Your Honor, it -- it wouldn't
be the Court's role to resolve those sort of factual
questions:  Whether I'm right, whether Mr. Kessler is
right.  He may get back up here and say, "Oh, no, no.
She said this." But that's what the point of the
arbitration hearing was about, and that is why we don't
know, until the award is issued, how the -- how the
Arbitrator is going to resolve that; nor do we know, nor
do we know how the Arbitrator is going to resolve Mr.
Kessler's arguments about this so-called credible
evidence standard and whether it is, in his view, unfair

1  that the information that was provided to the

2  Commissioner only had the interview summaries, he didn't

3  meet directly with Kia Roberts, all of those -- all of

4  those things, whether that was unfair.

5              And that, I would submit, Your Honor,

6  whether this one was fair and consistent is a question

7  about how the Policy is to be applied.  And in that --

8  and I think we made this point in our -- in our papers

9  and I think one thing is particularly clear.

10              I understand that Counsel believes that

11  it wasn't sufficient in his view for all of the evidence

12  about the credibility of Ms. Thompson and the

13  credibility of Mr. Elliott to be put in the report

14  that -- that, you know, Kia Roberts had to meet with the

15  Commissioner; something like -- but that's a question

16  about how the Policy is to be administered.

17              And in that respect and as I pointed out

18  in my closing argument to Arbitrator Henderson and I

19  think we pointed out somewhat in our brief, the thing

20  that they leave out -- leave out is, is that after

21  Ms. Roberts had expressed those concerns about

22  credibility, there was -- there was additional

23  proceedings, there was additional -- an additional

24  interview of Mr. Elliott.

25              Now, keep in mind, when Mr. Elliott,

1  before I argue the case again, I feel some need to make

2  a few of these points.

3              When Mr. Elliott was first interviewed by

4  Kia Roberts at the beginning of the case, at that point,

5  she didn't have all of the text messages that the League

6  was able to collect.

7              She didn't have all of the photographs of

8  the injuries that Ms. Thompson provided.

9              She didn't have the expert metadata that

10  confirms Ms. Roberts' story -- I'm sorry, Ms. Thompson's

11  story that the photographs were taken that week when she

12  said they were taken.

13              And she didn't have all of the text

14  messages that -- between -- between Ms. Thompson and

15  others, where Ms. Thompson reported these things

16  contemporaneously, making her arguably more credible.

17              And also the text messages that show that

18  Mr. Elliott was not truthful to the police, was not

19  truthful with Ms. Roberts when she first interviewed

20  him, she didn't have that.

21              Ms. Friel had that after all of this

22  when -- after these -- after the concerns that

23  Ms. Roberts had about the witness' credibility or

24  Ms. Thompson's credibility was put in the report.  It

25  was given to the Players Association, it was given to

1  Mr. Elliott's representatives, and then they had a

2  further meeting where -- where Ms. Friel then had the

3  opportunity to question Mr. Elliott about those --

4  those -- that additional evidence.  That's information

5  that Ms. Roberts didn't have.  And there's a transcript

6  of that in the record.

7              And, also, there's testimony from

8  Ms. Friel in the arbitration hearing about the

9  significance of that injury.  How she found, and

10 presumably the Commissioner found when he got to review

11 the transcript -- because his letter, by the way, said

12 that was one of the things he reviewed in making the

13 disciplinary determination.  It wasn't just the original

14 investigative report, but it was also the subsequent

15 transcript of the -- the meeting with Mr. Elliott and

16 his advisors in which Ms. Friel was able to put before

17 Mr. Elliott a number of contradictions and -- and to

18 further develop the evidence, which leads --

19             THE COURT:  Wasn't Ms. Roberts the only

20 one to actually interview Ms. Thompson?

21             MR. NASH:  Yes.

22             THE COURT:  And so as a former

23 prosecutor, she made certain findings about credibility

24 there.

25             MR. NASH:  She did not.  She said she

1  didn't make any findings, that wasn't her role.  She --

2  she -- she had -- and actually what she said, and this

3  is important, this is -- one of their arguments has been

4  that in order -- the only way anyone can make a

5  credibility determination is to meet personally with the

6  witness.  And this goes to their confront-the-accuser

7  argument, which I will get to in a minute.

8              But Ms. Roberts testified, as did

9  Ms. Friel, that no, that's not the -- necessarily the

10  way you can determine whether someone's telling the

11  truth.

12              I think Ms. Roberts said, I don't know

13  Tiffany Thompson.  I don't know Ezekiel Elliott.  He's

14  not my husband, she is not my husband.  I know when my

15  husband is lying, but I can't just look at somebody and

16  determine.  So what I have to do is get their story and

17  then I have to do all the legwork, which included all

18  the other work that -- that she and Ms. Friel did over

19  the course of the year, and -- and that was put into the

20  report.  So there's no question that she examined what

21  Ms. Thompson had to say.

22              One of the reasons she brought it up is

23  she wanted to make sure she had all of the evidence, one

24  way or the other, so that the Commissioner -- so it

25  could be put into the report for the Commissioner.  So

1   it -- it -- and it was not her responsibility to make,

2   and she said that quite directly as well.

3                    Now, which leads to the, what I think

4   will be, if we ever get there, Your Honor, if we ever --

5   if we ever get -- you know, once we get an award, if

6   you're inclined to review it.  What -- what the -- what

7   one of the issues is going to be is what are the

8   Arbitrator's findings about these issues.  Which I

9   think, under standard review, I think you know, is

10  something that we shouldn't be in here retrying the

11  case.

12                   But maybe even more importantly, what is

13  the Arbitrator's interpretation of the Collective

14  Bargaining Agreement.  And -- and that's where you get

15  into when Counsel says, oh, this is not consistent with

16  the CBA.

17                   I mean, I think they say, by the way, in

18  their -- in their brief that they submitted today, on a

19  number of -- number of occasions, they say injunctive

20  relief is required because he's being deprived of his

21  CBA rights.

22                   Well, the question of whether Mr. Elliott

23  has been deprived of his CBA rights is for the

24  Arbitrator.  That's fundamentally an issue of contract

25  interpretation.

1              So, you know, if Mr. Kessler is right

2    about his interpretation of the Policy, the Arbitrator

3    can agree with him.

4              Now, again, on that point, and we point

5    this out, under the Policy, only the Commissioner may

6    decide, make the ultimate decision that he says, you

7    know, well, you should -- he should have -- it should be

8    Kia Roberts, it should be Lisa Friel.

9              The investigators can have a

10   disagreement, the members of the Commissioner's staff

11   can have a disagreement about how to look at things, but

12   ultimately, under the Collective Bargaining Agreement,

13   under Article 46, it's the Commissioner's judgment that

14   matters.

15             And -- and under the Personal Conduct

16   Policy, it says quite clearly that the Commissioner can

17   rely on a variety of information.

18             And the reason we know that, we submitted

19   a decision to Your Honor attached to Mr. Gambrell's

20   declaration.  This was an issue we just had last year,

21   when Commissioner Goodell announced the Personal Conduct

22   Policy, he had originally contemplated using a

23   disciplinary officer to make some of these decisions.

24   And they said, you can't do that.  Under Article 46 of

25   the Collective Bargaining Agreement, only the

1  Commissioner can do that.  That cannot be delegated to

2  the staff.

3            So, one of the arguments I made to the

4  Arbitrator, and I don't know if he's going to agree with

5  me or not, it's going to be up to him to review the

6  arbitration decision that we submitted to you, and he's

7  going to determine the significance of all of these

8  arguments under the Policy.

9            And that's where the *Brady* and the

10 *Peterson* cases matter so much.

11           Now, I -- I -- when we talk about -- when

12 we talk about fundamental fairness, I think I suggested

13 earlier and, you know, when he relies on *Gulf Coast*,

14 that's -- that's just fine.  Arbitrator didn't hold a

15 hearing.  That's fine.  I think that's a pretty extreme

16 case.

17           But there are other Fifth Circuit cases,

18 I think including the chemical company case we cite,

19 where the Fifth Circuit says it's not the Court's rule

20 to look over the shoulder of the -- of the Arbitrator

21 and second-guess these kinds of judgments.

22           The Supreme Court has said this

23 repeatedly.  They said it in the *Misco* case, they said

24 it in the *Garvey* case.  It is not for the Courts to come

25 in and say, "Did you get this procedural question

right?"

And -- and this is -- and so in terms of there -- I understand that they want to -- and I think your point about the *Brady* case is exactly right.  I -- I think it highlights the very important -- I mean, I think the Court there made it clear.

And there was a case where the District Judge reversed an arbitration decision, the Commissioner's decision in that case based on the FAA. Second Circuit said, no, no, no.  In all of our cases -- their review is exceedingly high.  It is not our job to review the merits in the dispute, the equities in dispute, and the procedural questions that arise out of the dispute.

And I would submit, Your Honor, no matter how they try to distinguish the *Brady* case, the issue that they challenged, we didn't get the notes, that's what they say about Kia Roberts.  We didn't get the testimony of a particular witness.  That's what they say.

And I don't think the Second Circuit could be clearer, and they did so in terms that while it's not a Fifth Circuit case, I would submit, it is -- it's full of Supreme Court's authority.  I think it's grounded in Supreme Court authority.  And I think it is

1   directly applicable here.

2                    And -- and, again, they say -- and this

3   gets to the very first point that Mr. Kessler said,

4   these questions have to be evaluated in context.  Well,

5   I agree with that.  And -- and they have to be evaluated

6   in the context of the Collective Bargaining Agreement.

7                    And so when he -- his essential argument

8   is, he talks broadly about fundamental fairness that

9   applies in all labor arbitration decisions.  But he, I

10  think, ignores how narrow that concept has been applied.

11                   So in -- in both *Brady* and *Peterson*, the

12  courts actually wrestle with whether fundamental

13  fairness is even a basis to vacate an arbitration award.

14  And the reason they do that, Your Honor, I think you can

15  see, would be obvious.

16                   You start talking about fairness.  You're

17  down the road of sort of second-guessing the Arbitrator,

18  and you're doing the things that the Supreme Court has

19  repeatedly said, you know, a court ought not to do.

20                   So -- and -- and in each of those cases,

21  they said, you have -- and what's required is what's

22  required under the Policy.  So discovery, for example,

23  witnesses.  It's not a criminal case.  It's not this

24  idea that you -- you -- it's not fair if you don't get

25  to confront your accuser.

```
 1                    By the way, one of the arguments that I
 2    made on this point to the Arbitrator was under the
 3    Policy, his -- his decision not to compel Ms. Thompson
 4    was fully -- not only is it fully consistent with the
 5    Policy because -- and I think he explains it in his
 6    decision and I think it speaks for itself -- but I
 7    pointed out to him in my closing argument, it's also
 8    consistent with the Policy that makes clear that victims
 9    who come forward and complain about domestic or dating
10    violence are to be protected against harassment and
11    bullying and the like.
12                    And I -- and I argued to the Arbitrator
13    not -- you know, not forcing her to come in and go
14    through the kinds of things that we're -- we're talking
15    about here today, which is fully consistent.
16                    And so there's no -- there's no -- I
17    think his decision was clearly grounded in the Policy.
18    And it's not akin to *Gulf Coast* or cases where, you
19    know, there's Arbitrator misconduct.
20                    Keep in mind this whole fundamental
21    fairness, it's borrowed, and I think he did identify the
22    section of the FAA where it talks about Arbitrator
23    misconduct.
24                    THE COURT:  Mr. Nash, what is the NFL's
25    position on -- in domestic violence situations?  Is it
```

1  the NFL's position that a witness should never be -- the

2  alleged accuser ever be -- come to testify?

3              I mean, is it -- is it the NFL's position

4  that there's never a situation where that testimony

5  should be at a hearing by the Arbiter?

6              MR. NASH:  Well, I would -- I would -- I

7  don't know that I can answer in every single case, I can

8  answer in this case; where as the -- as the Arbitrator

9  held, the Commissioner's decision did not depend just

10 upon Ms. Thompson's testimony or -- or interviews

11 with -- with Ms. Roberts, it depended upon the entire

12 record.

13             And that's why they went through the

14 lengthy and detailed investigation that they did.

15 That's why they got medical experts.  That's why -- to

16 confirm that the -- that the photos showed injuries that

17 were consistent with what Ms. Thompson said happened.

18 And -- and that's why they got Mr. Elliott's text and

19 all that.

20             So, I think for purposes of certainly

21 this case, it was well within -- and I think the

22 question, the legal question is whether there's some,

23 you know, right to the accuser -- right to confront the

24 accuser that applies in every arb -- disciplinary

25 arbitration..

1      Your Honor, there are disciplinary

2 arbitrations that happen all the time where you don't

3 get to necessarily confront your -- your accuser.

4      And the question is what -- whether under

5 this particular Collective Bargaining Agreement that is

6 something that is required.  And that is a question of

7 contract interpretation.

8      And one of the -- and so I understand

9 your point that's a Second Circuit case and *Peterson* is

10 in the Eighth Circuit.  We also have other cases that we

11 pulled up.

12      But we do have a case in Texas, Your

13 Honor.  We do have a case in the Northern District of

14 Texas on this very point.  It's Judge Fitzwater's

15 decision in the *Holmes* case.

16      And I'm dating myself, because I -- I

17 argued that case long ago.  But there was a case where a

18 player challenged his suspension under Article -- under

19 this -- virtually -- now -- now, it was under the drug

20 policy, and so things have changed somewhat, but the --

21 but the issue there was he was challenging his

22 suspension.

23      His appeal was heard by the Commissioner.

24 In that case, Commissioner Tagliabue.  And he argued

25 that he had a right to confront his accuser, he had a

1   right to all sorts of other evidence, and Commissioner

2   Tagliabue made the judgment -- he made judgments.  No,

3   under that circumstance and those facts, he didn't grant

4   those motions, and so he sued in Federal Court.

5                   And Judge Fitzwater, in language -- and I

6   think we quoted it, and I think we even have a block

7   quote in language that's directly applicable here -- he

8   rejected this very right-to-confront argument that he

9   says applies to all labor arbitrations.

10                  THE COURT:  I'm not aware of that case.

11  But I presume that case did not have a credible evidence

12  standard that the Arbiter -- or the Commissioner would

13  have to apply to find a violation of the drug policy?

14                  MR. NASH:  Well, whether it's a credible

15  evidence case -- we are now also arguing about what

16  the -- what the Policy -- what the -- you know, what the

17  contract requires.

18                  But it had a -- it certainly had a burden

19  for finding a violation that had to be met.  Okay?  And

20  so -- and the player argued, well, in order for me to

21  meet, you know, my burden, I need certain -- you know, I

22  need to confront witnesses, and the like.

23                  And Commissioner Tagliabue said, no,

24  that's not the way it works under this Policy.

25                  And Judge Fitzwater said that's entirely

consistent -- that's -- that's a decision grounded in

the Policy -- in the -- in the contract.  And he said

the only way, the only way for the -- for a Federal

Judge to second-guess that kind of a decision is if he

determines that the Arbitrator committed misconduct.

And then he goes on to say, "And that would be a very

rare circumstance indeed."

            There is no allegation here that in

making these procedural judgments that Arbitrator

Henderson engaged in any kind of misconduct.  He made a

judgment.

            And -- and one of the things is he said

you've been given all this voluminous evidence.  The

purpose of this disciplinary appeal, it's not a de novo

hearing on the -- on the underlying violations.  There

had been lots of prior meetings and evidence developed

upon which the -- the Commissioner made his judgment.

You've been given everything that -- that you're

entitled to.  And that's true for his decision not to

compel testimony from -- from Com -- from Commissioner

Goodell.

            Those are just purely procedural

questions, Your Honor.

            THE COURT:  Well, Mr. Nash, you know,

looking at this issue, I would agree generally with this

premise that an accuser, in most situations, wouldn't
have to be compelled to testify; but you have this
additional fact, this theory that the Petitioner argues,
about Ms. Roberts.  And, of course, we have to look at
that question in relation to was it fundamentally unfair
not to have Ms. Thompson testify.

When we consider that the person who did
the investigation -- and let's be fair to them -- is the
NFL knew what she knew, but they did not know until the
hearing.

I mean, and of course, their first -- you
have the NFL saying that they don't want to produce her,
saying she's cumulative.  Clearly, she was not
cumulative.  And so that was wrong.

Second, you know, Ms. Roberts has certain
opinions and she was kept out of certain meetings,
including the meetings with the four advisors.  She was
kept out of any meeting with the Commissioner.  And even
with the four advisors, it is correct, Ms. Friel, the
way she -- she crafts her answer like a lawyer does.

And so I don't think her answers, looking
at her testimony, doesn't fully -- doesn't fully
disclose to an -- being asked a question by one of the
advisors, doesn't fully express the opinions given by
Ms. Roberts.

1              Then we also have a situation of

2    Ms. Roberts not -- her conclusions.  And -- and I'll

3    give you, none of the conclusions were in the report by

4    Ms. Friel or by Ms. Roberts, but it's been represented

5    in the past, the Com -- past reports have included that.

6              So their argument is there's some kind of

7    suppression of this -- of this dissenting opinion.

8              And then we go to the question what did

9    the Commissioner know.  I know that's a separate issue,

10   but it's the same fundamental issue here we're dealing

11   with, is whether he should have been allowed to testify.

12             And that's -- the question is, is that

13   fundamentally unfair that he wasn't forced to testify;

14   when the fact is, we don't fully know what he was --

15   what he knows.

16             Ms. Friel's testimony is far from clear

17   about every single aspect of Ms. Roberts' opinions.

18             So, yes, maybe he knows something, but we

19   don't know the full extent.

20             So when you look at everything there,

21   doesn't that change the situation about whether --

22   whether or not it is fundamentally unfair that

23   Ms. Thompson and the Commissioner aren't forced to

24   testify?

25                  MR. NASH:  I would suggest, Your Honor,

```
 1  it's not, and I -- and I would most importantly say,

 2  those are -- you just outlined Counsel's arguments.

 3  Those are arguments that were made to the Arbitrator.

 4  Again --

 5              THE COURT:  And the Arbitrator -- I mean,

 6  the issue's ripe for me, at least for the purposes of

 7  the record.  The Arbiter made decisions on that.

 8              And so he denied Ms. Thompson appearing

 9  or ask the NFL to try to make that happen, and he denied

10  the request to have the Commissioner come testify at the

11  arbitration hearing.

12              The fact that Mr. Kessler made some

13  argument about that, in terms of mitigation, well, that

14  may lower -- that may lower the award maybe, or whatever

15  he does on his -- if doesn't -- if he affirms the award

16  but lowers the penalty.  But those issues are already

17  decided for this Court, in terms of examining whether

18  that's fundamentally fair or not.

19              MR. NASH:  Well, again, just a few

20  things.

21              First of all, on the point about

22  Ms. Roberts, the Arbitrator did compel her testimony,

23  and I would --

24              THE COURT:  Right.  But over the -- I

25  mean -- but -- and I'm not saying there is a conspiracy
```

1  or not.  I'm just saying that that's their argument.

2               When you look at the whole series of

3  events -- I mean, the NFL knows what Ms. Roberts knows,

4  but they excluded her from the hearing.

5               MR. NASH: Your Honor, I have to -- one of

6  the things that I think is unfortunate is how that

7  accusations fly, and I think it's -- and I think it's

8  just wrong.

9               You have to understand the context of --

10  of the internal appeals procedures that are followed

11  here.  These are expedited procedures.  This -- the

12  argument about, you know, what witnesses, how many

13  witnesses, these are arguments that get -- that get

14  resolved.

15               And, by the way, I think this is -- this

16  may be the first time that more than one -- typically,

17  it's the Lead Investigator; that's -- that's the

18  practice.  That was that basis of the NFL's objection

19  not to have both; you can have Ms. Friel.

20               And, again, I think what -- what

21  Ms. Roberts said was completely consistent with what Ms.

22  Friel said.

23               So, I think the suggestion that there's

24  some sort of conspiracy there is really wrong.  And it

25  was their argument they made to the -- to -- they made

1  that to the Arbitrator and -- and he can certainly

2  resolve it.  But it's simply wrong.

3            But again, Your Honor, the -- the other

4  thing that I think has to be, you know, I think is just

5  sort of wrong about this premise, is that their --

6  Ms. Roberts had -- had -- had a view about things before

7  the end of everything, right before Mr. -- Mr. Elliott

8  was questioned again.  And she went out of her way not

9  only to include all of that -- all of the evidence that

10 supported the views that she had, but she prepared a

11 memo on it.

12            And -- and when -- when I think you said

13 that they didn't know.  They were given all of this.

14 And -- and I don't -- and so it's now up to the

15 Arbitrator to decide whether -- you know, whether that

16 was sufficient under the Policy.  I would argue that it

17 absolutely was, because it was not Ms. Roberts' decision

18 to make, it was the Commissioner's decision to make.

19            And I think I would argue that the fair

20 reading of Ms. Friel's testimony is, is that all of that

21 was provided to the Commissioner.  I just -- I mean, you

22 may have a different way to read it, but I argue that

23 she absolutely --

24            THE COURT:  No, I think her words are,

25 well, not in so -- "not in the words they're using," or

1    "not in so many words," or something of that nature.

2                    I mean, I've read it.

3                    And so Ms. Friel, again, gives very

4    lawyer-like answers and clearly does a good job of that.

5                    But it is unclear reading that exactly

6    what was told to the Commissioner in terms of the

7    details of what Ms. Roberts said.

8                    And, again, you haven't answered the

9    question; and maybe because I spoke so long and it

10   wasn't clear.

11                   The question I'm asking you is, is that

12   why does not the fact of all of these series of events

13   about the handling of Ms. Roberts, why doesn't that make

14   it fundamentally unfair and change the situation where

15   nobody would bring the accuser into a hearing, well,

16   then it becomes fundamentally unfair when you have all

17   those sequence of events.

18                   Those are events that are very different

19   that you normally wouldn't see.

20                   So why doesn't that change it and make it

21   fundamentally unfair to both the Commissioner and

22   Ms. Thompson, when the ultimate decision is credibility?

23                   MR. NASH:  Well, again, this is the

24   argument that they made to the Arbitrator.  And the

25   standard of review hearing in arbitration --

```
1                    THE COURT:  What I am saying is, I mean,
2     for me -- I'm not saying what the decision is.  What I'm
3     saying is, let's assume I accept that argument, accept
4     that -- I accept that argument.  You're right, the
5     Arbiter, Mr. Henderson, made a decision.  And if I make
6     that decision, it's an error.
7                    The question is:  Is the error so much
8     that it's fundamentally unfair?
9                    Because procedural errors are fine unless
10    it becomes fundamentally unfair and causes prejudice.
11                   So assume for me that that's the case.
12    So tell me why that wouldn't be fundamentally unfair if
13    I -- if we presume there are some conspiracy or -- and
14    why those two witnesses shouldn't have been forced to
15    testify.
16                   MR. NASH:  Well, I think the answer is in
17    the Arbitrator's written decision on this very point.
18                   He issued a written decision as to why
19    Ms. Thompson would not be required to testify.  First of
20    all --
21                   THE COURT:  But he also made that
22    decision before everything got flushed out regarding
23    Ms. Roberts, too.
24                   MR. NASH:  Well, they were free to -- I
25    mean, they made that argument.  I mean, they -- I mean,
```

1   all of these arguments were made.

2              I think if you go through the record,

3   they have made all of these arguments, they renewed

4   those arguments.  So I don't think there's any ques --

5              And, again, for all I know, the

6   Arbitrator will agree with your assessment of what's

7   fair, or he'll agree with your way of reading

8   Ms. Friel's testimony, or he'll have a different way of,

9   you know, reading Ms. Friel's testimony.  I -- I don't

10  know the answer to that.

11             What I can say, Your Honor, is -- and

12  this -- again, this gets back to, I think it's Judge

13  Fitzwater's decision, but I think it gets really back to

14  what the Second Circuit said in *Brady*.

15             I mean, I have to say, I had a similar

16  conversation like this with the District Court Judge in

17  the *Brady* case, where the Court was trying to evaluate

18  the evidence and try to figure out what was fair, and

19  I -- and I gave some of the same answers.

20             And I think -- I think that, frankly, the

21  Second Circuit said, yeah, that is for the Arbitrator.

22             So I would submit, Your Honor, the

23  answer -- we don't know the answer until you have --

24  until -- until the award is issued.  We're arguing about

25  what the Arbitrator might do.

1                  But I would suggest that certainly what

2  he's already done, as long as -- as long -- and the law

3  is clear on this, as long as his decision is grounded in

4  the Policy.  Okay.  Which it clearly was.  He says that

5  quite clearly about what's required under Article 46.

6                  THE COURT:  And I understand, Mr. Nash,

7  that these procedural errors they're asserting have to

8  rise to a certain level, and that's the reason I'm

9  asking these questions of why -- and I think I started

10 by questioning, saying that I agree that generally

11 having an accuser come testify probably wouldn't be

12 necessary.

13                  But the question is, is that looking at

14 the whole body of the work here, it raises questions.

15 And so --

16                  MR. NASH:  Well, let -- let me -- let me

17 follow up on that point with this, Your Honor.

18                  And that goes to --

19                  THE COURT:  And, Counsel, remember, we're

20 here on injunction.  So this is not whether I -- I can

21 grant summary judgment.  Which, if this case stays here

22 and everything, I mean, at some point, that could be the

23 case where I have to decide it on competing summary

24 judgments.

25                  We're not there yet.  That's not the --

```
 1  it's not that high of a standard for likelihood of

 2  success on the merits.

 3              MR. NASH:  Well, that's what I was going

 4  to address --

 5              THE COURT:  Go ahead.

 6              MR. NASH:  -- is likelihood of success on

 7  the merits.

 8              I think that Counsel did not accurately

 9  state the standard.  This idea that they just have to

10  raise substantial questions, this idea that they just

11  can come in and try to have confusion about who said

12  what and this might not be fair and, you know, all --

13  all these kinds of arguments, that is not the standard

14  in the Fifth Circuit.  They rely on the *Terex* case for

15  that.  And that's an unpublished decision, Your Honor,

16  in which, you know, the Court noted, I think at the

17  time -- this was from 2006 -- that the standard for

18  likelihood of success was not as -- not that settled.

19              Since -- it has since actually been quite

20  settled, and we -- and we point that out with a number

21  of cites.  I think the *Voting for America* case that we

22  cite makes it clear that they have to make a clear

23  showing, not just raise some --

24              THE COURT:  The Court is well aware of

25  what the standard is in this Court and the Fifth Circuit
```

1    and the Court has had a number of opportunities to issue

2    injunctions or deny injunctions.  So I understand

3    what the -- what the standard is.

4                    MR. NASH:  Okay.  I just wanted to --

5    because I just think the way Counsel described it

6    wasn't -- wasn't -- wasn't quite accurate.

7                    THE COURT:  I understand.

8                    MR. NASH:  Your Honor, I -- I -- I --

9    what -- what I -- what I want, I guess, to address in

10   the remaining time, unless you have further questions on

11   this point, is the argument that you heard at the end

12   about -- well, there are two points.  One, just a point

13   of clarification.

14                    He started his argument about the

15   *DelCostello* case.  It is *DelCostello*, the part about

16   exhausting remedies under the LMRA.  And that -- that's

17   a case where it involved whether an employee tried to

18   pursue arbitration.  That's not our case.

19                    Under labor law, you may know from other

20   cases, employees generally don't have the right

21   themselves to pursue a case to arbitration; it's usually

22   the Union under a Collective Bargaining Agreement that

23   gets to decide.

24                    So in DelCostello what was at issue

25   there, if an employee goes to his Union and says I want

1  to grieve and the Union says no, we're not going to

2  grieve, that's exhausting the remedy.  That's not what

3  we have here, where they go through the arbitration and

4  they want to, you know, look -- they don't get an award

5  and they run to court.

6              But the last point is this balance of

7  harms issue.  And I guess what I want to say about that

8  is that -- and I want to present this -- I understand

9  that Mr. Elliott is a star player.  I think we cite the

10 case -- the Supreme Court case, the *Brown* case that, you

11 know, football players are not different than -- than

12 other employees, they don't -- they don't get different

13 standards in these matters.

14             But in terms of the balance of harms --

15 and I think they said this themselves in the *Pennel*

16 case -- that this time -- an injunction at -- at this

17 stage would be a blatant interference with the

18 Collective Bargaining Agreement that we have.

19             And when they talk -- I thought it was

20 interesting that Mr. Kessler talked about the *Starcaps*

21 case, and that's the *Wlliams* case, by the way, in the

22 Eighth Circuit, and he talked about how, I think the

23 District Judge, Judge Magnuson, granted him a

24 preliminary injunction.

25             What he didn't tell you -- and he's got

1  convinced by these arguments about, you know,

2  irreparable harm -- what he didn't tell you is several

3  months later, the Court granted summary judgment and

4  dismissed the case and said that the representations

5  made at the injunction hearing were not borne out by the

6  record.

7            And then that went on to the Eighth

8  Circuit.  And, again, that's -- the Eighth Circuit's

9  decision in *Starcaps*, the *Williams* case, is one of the

10  consistent line of cases, the consistent line of cases

11  that under this Collective Bargaining Agreement, under

12  this article of the Collective Bargaining Agreement,

13  that says that the Courts should not interfere with the

14  disciplinary process.

15            And I would -- I would submit, Your

16  Honor, that there is absolutely a harm to -- to the NFL.

17  Because if you get to improperly use the Courts to

18  interfere with the appeals proceedings -- procedures

19  that the parties have agreed to, you get to manipulate

20  the suspension; you get to -- you get to determine

21  what -- what teams the player gets to play against.

22            There are other teams that have issues.

23  I mean, there is a very strong -- and this is a

24  fundamental, I think, interest of -- in labor law.

25  And -- and -- and I guess it's particularly obvious

1  here, I would submit.  It's obvious here for the simple

2  reason that, as I said before, this is not the first

3  time we've been here.

4              This is a, frankly, an attack that the

5  Players Association has used in many of these

6  suspensions.  And in every case, every case, it was

7  ultimately determined -- and we have a decision from the

8  Tenth Circuit in the *DJ Williams* case; two cases in the

9  Eighth Circuit; the *Brady* decision in the Second

10 Circuit, as I said, the *Holmes* case in the Northern

11 District of Texas, in every case, either at the District

12 Court level or ultimately, ultimately it was determined

13 that the Federal Courts are not sitting here to make the

14 kinds of decisions about who gets to play against what

15 team; or who should be suspended for how many games

16 or -- or the like.  And so I would submit that --

17              THE COURT:  That's not what the Court is

18 being called upon to decide.

19              The Court is -- although *Gulf Coast* is a

20 very different opinion in terms of the facts, it's

21 whether or not the arbitration proceedings were

22 fundamentally unfair.  That's what the Court is being

23 asked to do.

24              MR. NASH:  Well, I -- I would submit,

25 Your Honor, that that's not quite that far, only because

```
 1  what you are currently being asked to do is interfere

 2  with the enforcement of the Collective Bargaining

 3  Agreement.  Ultimately --

 4                THE COURT:  Right, but that is my

 5  question -- that is a question, likelihood of success of

 6  on the merits, is I do believe, under the standard of

 7  likelihood of success, is it enough to at least grant

 8  the injunction and then go to full briefing on the

 9  summary judgment later?

10                MR. NASH:  And I would submit, Your

11  Honor -- and again, I'm glad you've looked at *Brady*.

12                I think if you looked at *Peterson*, if you

13  looked at the *Holmes* decision, I think, Your Honor, this

14  is -- and if you compare it -- compare it to the cases

15  that they say is the standard --

16                THE COURT:  I have read *Brady* and

17  *Peterson*, but I didn't see any of these cases having the

18  facts that are in this case.  It's a different set of

19  facts.

20                And I keep coming back to it, asking you

21  to tell me why the whole Roberts situation doesn't

22  change the situation of a normal case.

23                And I know you want to minimize that; but

24  there's just a series of events that I can't necessarily

25  ignore.
```

1                MR. NASH:  Your Honor, with respect -- I

2    would submit you're getting a very distorted view of the

3    facts.

4                And -- and this is what was argued.

5    And -- and under -- under federal labor law, the

6    determination of the facts are within the province of

7    the Arbitrator.

8                And, again, this could not be -- and the

9    Supreme Court said this, I think, in the *Garvey* case.

10   Even if the Court thinks what the Arbitrator decides on

11   the facts was wrong, if you disagree, if you might say,

12   you know what, I don't think these facts are exactly --

13   you know, I don't -- I don't agree with this, you can't

14   second-guess that.

15               So, again, I think, look, for all I know,

16   their version of the facts may carry the day with the

17   Arbitrator; but I think, respectfully, that is -- the

18   law is quite clear that it's -- that it's for him to

19   decide.

20               THE COURT:  Well, I mean, the issues that

21   have been raised before this Court in the injunction and

22   in the complaint are issues he's already decided.  So

23   the issue of denying the witness -- either of those

24   witnesses to testify.

25               MR. NASH:  Well, I think on denying the

1   witnesses to testify, I -- I take your point.  I don't

2   disagree.

3               I think I would just suggest if you look

4   at his decision, the basis for his decision, I -- I

5   think that under -- under the law, it's clear that

6   that's the kind of decision that -- it's clearly

7   grounded in the Policy.  It's clearly grounded -- by the

8   way, based on his lengthy experience, and I think Mr.

9   Kessler said this in his opening statement, that he was

10  happy to have Mr. Henderson do this.  He had a lot of

11  experience in these cases.  Sometimes Mr. Henderson has

12  changed the discipline, sometimes he's affirmed it.

13              But based on his experience and

14  understanding of the Policy and his interpretation of

15  the Policy in the CBA, as long as he makes a judgment

16  about who gets to testify or who should testify,

17  respectfully, that really has to be, under the law, the

18  end of the matter.

19              The other arguments about, you know, Kia

20  Roberts and the like, he hasn't decided yet.  This

21  argument about whether it was fair, you know, that --

22  that the evidence that she -- or the facts that she

23  based her opinions on was -- was specifically included

24  in the report, it was included in a separate memo.  Her

25  concerns were communicated to the Commissioner.  And --

1    and additional evidence was developed, including

2    evidence from Mr. -- Mr. Elliott that -- that cast out

3    his credibility, all of that, all of that has been

4    before the Arbitrator now.

5                  And -- and so the -- I think the issue

6    that you're wrestling with is certainly an argument, I

7    think it's the primary argument, that counsel here made

8    in his closing arguments about why he didn't think that

9    the suspension was fair.  And maybe the Arbitrator will

10   agree with him, maybe he won't, I don't know.  We don't

11   until -- until he decides.

12                  THE COURT:  Thank you.

13                  MR. KESSLER:  Your Honor, we've been here

14   a long time, and I'm only going to be three minutes, I

15   promise.

16                  First, I have news:  Arbitrator Henderson

17   has issued his decision.  That's why I was looking at my

18   Blackberry, for which I apologize to the Court, and he

19   has sustained the suspension, as I predicted.  And as I

20   predicted, his decision is based on the notion that he

21   must defer to the fact-finding of the Commissioner.

22                  And that would clearly demonstrate that

23   the Commissioner did not have the right information

24   before him.

25                  We were fundamentally deprived of the

1  right to challenge the credibility, to challenge what

2  the Commissioner knew.

3          I think when you see his decision, which

4  obviously we will get to you right away, you will see

5  that precisely what the Arbitrator did is how we were

6  deprived, the burdens we faced under this policy.  So

7  that's important news.

8          This is now obviously ripe.  The

9  suspension will go into effect if you do not rule.  And

10 so I would urge you to rule as promptly as possible.

11         Secondly, you heard from Mr. Nash talk

12 about, well, it's not misconduct.

13         Well, the Fifth Circuit in the *Gulf* case

14 defined what fundamental -- fundamental unfairness was

15 and what the misconduct meant.  And the misconduct is

16 not just corruption or something like that, it is

17 improperly depriving the litigant, the person in the

18 arbitration, of the evidence that's necessary to

19 adequately present your defense.

20         Your Honor's questions were right on

21 point, so I'm not going to argue anything more about

22 that.

23         Finally, with respect to *Holmes*.  *Holmes*

24 was a drug policy case, it wasn't under a

25 he-said/she-said discipline policy, and it was not under

1 a credible evidence standard.

2 　　　　　Your Honor's questions, again, were right

3 on point.  There has never been another case like this.

4 　　　　　Under these facts, under this record, I

5 believe you will find that there's been more than enough

6 here to say this may be fundamentally unfair so that you

7 should maintain the status quo, and let us fully brief

8 and present these important issues to you.

9 　　　　　Unless Your Honor has any other

10 questions, I'm going to sit down.

11 　　　　　THE COURT:  No, I don't.  Thank you.

12 Thank you, Mr. Kessler.

13 　　　　　MR. KESSLER:  Thank you, Your Honor.

14 　　　　　THE COURT:  I would ask that one or both

15 sides, someone submit that and file a supplement.

16 　　　　　And then the question is, now that the

17 decision has been issued -- and especially you've had

18 the advantage over probably all of us -- everyone here

19 with a Blackberry probably also knew -- but any

20 additional briefing you want to do, I'm on a quick

21 timeline now, so the question -- if you want to file

22 anything additional, you can do by 5:00 p.m. tomorrow,

23 either side, if you want -- if you want to.  You don't

24 have to.  I'm not asking you to do so, I'm just giving

25 both sides the opportunity if you want to indicate how

```
 1  the -- how the Mr. Henderson's decision impacts anything

 2  with the Court.

 3             With that being said, I understand I have

 4  a time deadline, so I will issue a decision by probably

 5  5:00 p.m. on Friday, which won't interfere --

 6             Again, I'm asking again, nothing

 7  interferes with his ability to play this weekend, so

 8  those representations were made.  So I will issue a

 9  decision on how I'm going to proceed, whether I have

10  jurisdiction or ultimately the merits of the injunction.

11             Anything further from the Petitioner?

12             MR. MELSHEIMER:  I would just say, Your

13  Honor, thank you.  I know you've been in trial all day.

14  We really appreciate it, on behalf of the Players

15  Association and Mr. Elliott, for all the time -- the

16  two-and-half hours you devoted to this.

17             MR. KESSLER:  I was just going to say the

18  same thing, I'm a guest in your Court, Your Honor, and I

19  am very grateful for the time and effort you put in at

20  the end of a long trial day.  So thank you.

21             MR. GAMBRELL:  Your Honor, I will just

22  say "thank you."

23             THE COURT:  Okay.  Well, you know, it's

24  my job.  So I love my job, so that's not -- I'm just

25  doing my job.
```

1                    Unfortunately, we have to do it so late

2    because I am in the middle of a 12-day trial, so...

3                    But I will thank the parties, because if

4    the decision had come out by 4:00 p.m., I don't know

5    that my staff would have left tonight.

6                    So I have until Friday so it gives me

7    more time to process all these materials.

8                    So we will be -- I guess we'll adjourn

9    for the day until I resume court tomorrow at 9:00 a.m.

10                    Thank y'all very much.

11                    COURT SECURITY OFFICER:  All rise.

12                        (Proceedings concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2              I certify that the foregoing is a correct

3  transcript from the record of proceedings in the

4  above-entitled matter.

5

6  /s/_____                    Date: 9/10/17

7  Judith G. Werlinger
   FAPR CSR RMR CRR CMRS
8  TCRR TMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Concordance

< Dates >
9/10/17 109:6
July 22nd, one 52:7
(212)450-2399 2:32
/s/_____ 109:6


< 1 >
101 10:23
10154 2:31
10166 1:29
12-day 108:2
1333 2:8
15-page 56:21
16 58:5
168 51:8, 55:6
168-page 50:12
17-cv-00615 1:10
17-cv-615 3:4
1700 2:20
17th 1:41


< 2 >
2 37:4
200 1:28
20036 2:10
2006 96:17
202 2:11, 2:12
212 1:30, 1:31, 2:33
214 1:43, 1:44, 2:23, 2:24
249 71:25
250 71:25
2501 1:40
26 50:5, 50:20, 53:2
294-4700 1:31
294-4745 1:30


< 3 >
3 14:25
3. 14:14
3000 55:5
301 27:2
345 2:30


< 4 >
400 2:9
4100 2:21

453-6400 1:44
453-6500 1:43
46 78:13, 78:24
46. 95:5
4: 1:10, 3:4
4:00 108:4


< 5 >
5 25:2
5:00 106:22, 107:5


< 7 >
7 23:17, 26:6
75201 1:42
75201-4675 2:22


< 8 >
8 25:3
847-0819 2:33
887-4000 2:11
887-4288 2:12


< 9 >
969-4343 2:24
969-4727 2:23
99 71:11
9:00 108:9


< A >
A. 1:25, 2:28
a.m. 108:9
abilities 43:6
ability 44:24, 107:7
able 43:13, 43:19, 49:3,
   49:5, 56:7, 74:6, 75:16
above-entitled 109:4
absent 33:14, 33:16
absolute 71:23
absolutely 10:13, 19:17,
   23:12, 48:19, 91:17, 91:23,
   99:16
abstract 39:24, 41:8
abuse 52:12
accept 13:10, 66:20, 93:3,
   93:4

accepted 13:12, 33:23
according 27:16
accounts 59:2
accurate 97:6
accurately 96:8
accusations 90:7
accuse 15:14
accused 63:9, 64:3
accuser 9:9, 17:14, 33:2,
   33:25, 39:5, 43:16, 43:18,
   44:9, 45:3, 45:19, 45:21,
   50:2, 81:25, 83:2, 83:23,
   83:24, 84:3, 84:25, 87:1,
   92:15, 95:11
achieve 57:19
acoustics 5:4
acquitted 58:13
Act 7:8, 7:13, 7:18, 7:24,
   10:8, 10:10, 10:13, 10:16,
   10:24, 11:14, 12:1, 16:7,
   27:3
acting 14:9
action 21:17, 29:16, 30:6
actually 10:19, 13:3, 26:22,
   27:6, 27:13, 33:22, 37:19,
   48:17, 49:22, 53:9, 53:20,
   65:13, 71:21, 72:5, 75:20,
   76:2, 81:12, 96:19
addition 60:20, 66:18
additional 73:22, 73:23,
   75:4, 87:3, 104:1, 106:20,
   106:22
address 4:4, 4:13, 4:16, 6:6,
   6:15, 22:6, 30:20, 64:8,
   96:4, 97:9
addressed 21:22
adequately 105:19
adjourn 108:8
administered 73:16
administrative 16:10, 25:6,
   25:9
admission 43:2
Adolpho 2:28, 3:24
Adolpho.birch@nfl.com 2:34
Adrian 68:23
advantage 106:18
adversary 59:15
adverse 17:23
advice 51:5, 55:10
advise 51:19

advisement 33:4
advisors 51:2, 51:3, 51:15,
   51:19, 51:24, 51:25, 52:6,
   53:1, 55:11, 61:6, 62:6,
   75:16, 87:17, 87:19, 87:24
affidavit 60:10, 60:14
affidavits 33:23
affirm 59:18
affirmance 5:24
affirmed 20:19, 59:23, 59:24,
   103:12
affirming 26:9
affirms 31:3, 89:15
afternoon 3:10, 3:19, 6:9
agent 60:11
ago 9:19, 54:14, 84:17
agree 23:11, 23:12, 23:20,
   30:21, 68:19, 78:3, 79:4,
   81:5, 86:25, 94:6, 94:7,
   95:10, 102:13, 104:10
agreed 99:19
Agreement 7:20, 10:12, 11:14,
   32:19, 34:18, 35:24, 36:8,
   37:17, 38:11, 38:25, 39:3,
   42:21, 69:10, 77:14, 78:12,
   78:25, 81:6, 84:5, 97:22,
   98:18, 99:11, 99:12, 101:3
agreements 27:16
ahead 4:9, 32:9, 35:11, 38:8,
   96:5
Akin 2:6, 2:18, 3:21, 10:3,
   19:20, 82:18
allegation 52:12, 86:8
allegations 29:16, 45:5,
   52:4, 63:5
alleged 47:15, 83:2
alleging 52:12, 67:24
allow 39:16, 60:6
allowed 88:11
almost 57:18
already 7:21, 12:10, 12:11,
   13:6, 13:8, 17:21, 18:20,
   28:18, 36:15, 37:3, 66:15,
   67:8, 69:8, 89:16, 95:2,
   102:22
alternative 45:16
although 100:19
America 96:21
Amoona 1:26, 3:14
AMOS 1:17

an injury 57:12
Anchor 37:22
Angela 1:25, 3:13
announced 78:21
answer 4:19, 44:10, 44:21,
    52:20, 52:21, 54:16, 83:7,
    83:8, 87:20, 93:16, 94:10,
    94:23
answered 24:6, 24:7, 24:8,
    46:21, 60:6, 92:8
answering 65:6
answers 52:20, 87:21, 92:4,
    94:19
antitrust 10:21, 11:24
anybody 48:18
apologize 54:7, 104:18
apparently 22:22
appeal 5:19, 26:8, 34:10,
    41:11, 84:23, 86:14
Appeals 20:3, 20:5, 24:11,
    49:11, 68:25, 69:20, 90:10,
    99:18
APPEARANCES 1:20, 2:1
appeared 17:2
appearing 33:25, 89:8
applicable 8:9, 69:4, 81:1,
    85:7
application 68:25
applied 38:20, 73:7, 81:10
applies 34:18, 38:23, 59:5,
    81:9, 83:24, 85:9
apply 35:15, 58:21, 69:15,
    70:7, 85:13
applying 68:17
appointed 67:23, 67:25
appointing 67:22
appreciate 107:14
appropriate 32:20, 33:12,
    34:15
arb 83:24
Arbiter 28:16, 30:24, 33:4,
    48:14, 83:5, 85:12, 89:7,
    93:5
arbitral 8:19, 9:3, 29:1,
    29:2, 42:12, 64:4
arbitrary 49:17, 56:2
arbitrate 16:24
arbitrations 15:7, 37:16,
    39:18, 49:15, 84:2, 85:9
arbitrators 35:23

Arceneaux 60:12
area 23:22, 24:1
arguably 74:16
argue 8:11, 12:4, 15:17,
    18:8, 26:18, 33:24, 38:25,
    49:21, 59:9, 68:23, 74:1,
    91:16, 91:19, 91:22, 105:21
argued 32:13, 32:25, 34:13,
    34:14, 35:22, 65:16, 69:6,
    82:12, 84:17, 84:24, 85:20,
    102:4
arguendo 13:12
argues 87:3
arguing 85:15, 94:24
arise 80:13
around 29:16, 31:15
Article 14:14, 14:25, 78:13,
    78:24, 84:18, 95:5, 99:12
articulated 40:11
aside 18:6, 18:11
asmedley@winston.com 1:33
aspect 88:17
aspects 56:25
assert 15:19, 62:6
asserted 9:24, 31:4
asserting 20:16, 28:9, 28:14,
    28:15, 95:7
assertion 26:15
assessment 94:6
Association 1:6, 3:5, 24:9,
    24:20, 26:23, 74:25, 100:5,
    107:15
assume 62:22, 93:3, 93:11
assuming 5:11, 13:12
athlete 57:9
attached 78:19
attack 17:25, 100:4
attempt 37:16
attendance 51:15
Attorney 2:29, 51:22
Attorney-client 53:21
audience 60:17
authorities 43:1
authority 14:18, 14:23,
    80:24, 80:25
authorized 10:24
available 35:23, 44:23
Ave 2:8
Avenue 1:28, 2:20, 2:30
award 16:12, 19:15, 21:25,

22:3, 22:15, 22:18, 25:20,
26:8, 27:3, 29:23, 30:19,
30:25, 34:3, 37:3, 64:18,
72:21, 77:5, 81:13, 89:14,
89:15, 94:24, 98:4
awards 24:4
aware 44:9, 85:10, 96:24
away 105:4


< B >
back 18:23, 21:13, 47:10,
57:25, 58:4, 58:22, 59:6,
64:12, 72:18, 94:12, 94:13,
101:20
back-and-forth 72:14
backup 55:6
Balance 11:3, 14:8, 59:10,
59:11, 59:18, 60:8, 62:8,
98:6, 98:14
band 20:20
bar 11:14, 12:1
Barbara 67:25, 68:2
Barbecue 40:12
bargained 39:2
Bargaining 7:20, 10:12,
10:18, 11:13, 32:18, 34:18,
35:24, 36:7, 37:17, 38:24,
39:3, 77:14, 78:12, 78:25,
81:6, 84:5, 97:22, 98:18,
99:11, 99:12, 101:2
bars 10:10, 10:16
based 4:23, 7:3, 7:5, 7:18,
21:9, 21:20, 45:5, 46:7,
64:19, 80:9, 103:8, 103:13,
103:23, 104:20
basic 38:18, 39:19, 46:25
basically 11:9, 39:15
basis 11:25, 27:24, 33:8,
34:4, 34:10, 55:18, 59:3,
63:10, 81:13, 90:18, 103:4
be. 26:10
beat 15:18
became 49:24
becomes 92:16, 93:10
bed 4:5
bedrock 25:24, 28:25
beginning 21:14, 21:18,
32:23, 74:4
behalf 1:7, 3:6, 6:11, 107:14

believe 5:9, 5:14, 14:10,
19:7, 37:11, 38:10, 44:4,
51:25, 56:9, 58:16, 60:16,
62:8, 63:12, 64:1, 65:12,
69:14, 69:16, 70:25, 101:6,
106:5
believes 63:6, 73:10
best 11:4
better 7:5
bevy 20:12
beyond 58:9
bias 67:24
biased 18:5
big 11:13, 47:14, 49:14,
51:7, 52:17
binding 64:16
Birch 2:28, 3:24
bit 12:18, 29:12, 47:25
Blackberry 104:18, 106:19
blatant 98:17
block 85:6
Board 37:12
body 16:11, 16:15, 16:18,
16:20, 95:14
borne 99:5
borrowed 82:21
Bowl 57:15, 57:16, 57:24
Bowman 57:7
Brady 57:6, 64:13, 65:10,
65:12, 65:16, 65:22, 68:15,
79:9, 80:4, 80:16, 81:11,
94:14, 94:17, 100:9,
101:11, 101:16
breach 7:20, 13:8, 15:20
break 23:6
brief 8:18, 10:9, 10:15,
11:6, 14:18, 23:18, 25:3,
26:6, 28:7, 37:5, 37:23,
39:1, 41:23, 54:23, 56:21,
57:6, 73:19, 77:18, 106:7
briefed 56:22
briefing 56:20, 62:11, 101:8,
106:20
briefly 58:3
briefs 23:24, 24:8
bring 92:15
broad 10:17, 39:17
broadly 81:8
brought 76:22
Brown 98:10

bulldozer 14:22, 15:1
bullying 82:11
burden 43:11, 43:14, 56:3,
   67:12, 67:16, 68:12, 85:18,
   85:21
burdens 105:6
business 12:17


< C >
call 18:23, 50:4
called 100:18
calls 71:21
capricious 49:17, 56:2
career 43:5, 44:20
careers 57:10
carefully 63:23
carry 102:16
case-specific 45:1
cast 104:2
caused 60:20
causes 45:16, 53:3, 93:10
CBA 12:9, 13:6, 39:6, 39:8,
   41:9, 77:16, 77:21, 77:23,
   103:15
cell 44:2
central 67:6, 68:8
certain 65:19, 75:23, 85:21,
   87:15, 87:16, 95:8
certainly 29:2, 42:16, 48:14,
   49:5, 50:24, 83:20, 85:18,
   91:1, 95:1, 104:6
certify 109:2
Chair 51:22
challenge 24:10, 32:23,
   43:14, 105:1
challenged 80:17, 84:18
challenges 27:2
challenging 32:3, 84:21
chance 9:17, 16:4, 36:9,
   45:23, 58:19, 70:18, 70:19
change 29:20, 88:21, 92:14,
   92:20, 101:22
changed 53:16, 54:13, 84:20,
   103:12
changes 54:3
charge 44:7
charged 42:16
charges 42:23
chemical 79:18

children 62:22
choice 15:17, 59:9
choose 44:19
circuits 69:5
circumstance 85:3, 86:7
circumvent 15:10
citation 8:18, 37:20, 37:25
cite 11:6, 14:17, 23:18,
   24:19, 25:16, 25:18, 37:2,
   37:5, 79:18, 96:22, 98:9
cited 9:23, 11:17, 11:18,
   12:23, 14:15, 23:11, 25:3,
   57:4
cites 96:21
civil 20:13
claim 15:20, 25:20, 26:9,
   29:13
claimed 59:15
claiming 28:21, 30:17
claims 70:20
clarification 97:13
classic 48:4
clear 14:11, 14:16, 17:24,
   19:17, 21:22, 22:12, 24:15,
   41:5, 49:24, 54:5, 69:14,
   71:3, 73:9, 80:6, 82:8,
   88:16, 92:10, 95:3, 96:22,
   102:18, 103:5
clearer 27:6, 80:22
Clearly 7:19, 47:1, 61:11,
   78:16, 82:17, 87:13, 92:4,
   95:4, 95:5, 103:6, 103:7,
   104:22
clerk 54:1
client 64:14
close 12:16, 19:23, 59:10
closed 9:4, 17:7, 18:21
closing 19:24, 32:21, 32:25,
   70:12, 73:18, 82:7, 104:8
closings 49:18
CMRS 109:8
co-author 50:9
co-investigator 67:1
Coast 39:11, 69:22, 79:13,
   82:18, 100:19
Cohen 60:15, 60:19, 61:1,
   61:2
collateral 66:6, 66:10, 67:3
collect 74:6
Collective 7:20, 10:12,

10:18, 11:13, 32:18, 34:18,
  35:24, 36:7, 37:17, 38:24,
  39:3, 77:13, 78:12, 78:25,
  81:6, 84:5, 97:22, 98:18,
  99:11, 99:12, 101:2
collectively-bargained 24:11
Com 86:20, 88:5
combination 48:3, 56:10,
  56:11
comes 5:18, 19:23, 55:23,
  58:2
coming 62:22, 101:20
commend 11:5, 24:19, 53:8,
  53:9, 59:20, 62:15
comments 67:5
Commission 43:9, 45:8
committed 86:5
communicated 103:25
company 79:18
comparable 20:12
compare 66:24, 67:9, 101:14
Compel 19:11, 32:12, 33:8,
  82:3, 86:20, 89:22
compelled 32:14, 34:20, 68:4,
  87:2
compelling 25:6, 57:2
competing 95:23
competitive 43:6, 57:13
complain 17:22, 82:9
complaining 17:6, 32:2, 36:21
complaint 12:6, 12:7, 45:4,
  102:22
complaints 66:23
complete 30:23, 42:12, 47:11
completed 14:2
Completely 6:21, 10:24,
  18:19, 23:10, 23:12, 23:21,
  28:3, 30:19, 31:1, 34:9,
  65:13, 71:1, 90:21
complex 41:19
comply 43:9
compound 45:25
COMPUTER-AIDED 1:49
concept 81:10
concerning 27:14, 72:2
concerns 71:4, 71:6, 72:13,
  73:21, 74:22, 103:25
concession 13:20
conclude 51:12, 52:1, 52:3,
  59:3, 62:13

concluded 50:10, 52:23, 63:10
concluded. 108:12
concluding 32:18
conclusion 49:25, 51:9,
  51:10, 51:11, 53:3, 54:21,
  55:3, 55:7, 61:5, 68:18
conclusions 62:1, 62:4, 88:2,
  88:3
conclusions. 53:22
concrete 14:10, 15:20
Conduct 18:1, 42:18, 70:6,
  78:15, 78:21
conducted 71:20
conducting 19:20
confirm 83:16
confirmed 61:8
confirms 74:10
conflict 18:12
conflicting 59:2
confront 33:2, 39:4, 81:25,
  83:23, 84:3, 84:25, 85:22
confront-the-accuser 76:6
confusion 96:11
consequences 63:3
consider 14:6, 14:7, 30:17,
  87:7
consideration 14:9
considered 66:15
considering 65:7
consistent 43:10, 45:15,
  73:6, 77:15, 82:4, 82:8,
  82:15, 83:17, 86:1, 90:21,
  99:10
consistently 7:16, 71:1
conspiracy 56:12, 67:16,
  70:21, 89:25, 90:24, 93:13
Constitutional 27:23, 27:25
contemplated 78:22
contemporaneous 47:21
contemporaneously 74:16
contest 57:3
context 10:25, 11:19, 11:22,
  16:8, 16:15, 16:16, 20:13,
  30:7, 36:5, 39:23, 40:4,
  42:5, 42:11, 61:10, 68:9,
  68:15, 81:4, 81:6, 90:9
CONTINUED 2:1
contract 77:24, 84:7, 85:17,
  86:2
contradictions 75:17

contrast 27:17
control 43:22, 68:21
controlling 68:10
controversy 14:10, 22:14,
    28:1, 29:6, 30:1, 66:2,
    66:12
convenience 27:7
conversation 72:2, 94:16
convicted 42:17, 58:11
convinced 44:23, 99:1
copies 27:6
correct 5:1, 6:4, 28:10,
    36:23, 48:19, 64:25, 70:22,
    87:19, 109:2
correctly 71:19
corruption 105:16
Council 1:14, 2:4, 3:8, 35:15
Counsel 3:14, 12:15, 19:5,
    19:24, 21:8, 23:9, 32:25,
    60:15, 61:18, 61:23, 62:3,
    65:18, 70:13, 71:12, 73:10,
    77:15, 89:2, 95:19, 96:8,
    97:5, 104:7
country 38:19
couple 70:14
course 4:7, 10:3, 20:17,
    22:5, 44:10, 46:4, 47:18,
    55:2, 64:13, 76:19, 87:4,
    87:11
court. 25:14
courthouse 15:18
courtroom 5:4
Courts 15:10, 18:7, 27:22,
    29:8, 30:13, 33:8, 39:15,
    39:17, 61:22, 79:24, 81:12,
    99:13, 99:17, 100:13
cover 7:1, 65:10
covered 38:4, 67:8
covers 6:25
Cowboys 40:22, 57:24, 58:4,
    60:9, 60:16, 60:21, 60:23,
    61:7, 61:8, 62:5, 62:23,
    64:2
crafts 87:20
credible 42:23, 43:4, 43:15,
    45:22, 48:5, 48:7, 48:25,
    49:4, 52:12, 52:24, 59:5,
    67:11, 72:24, 74:16, 85:11,
    85:14, 106:1
credible. 47:24

criminal 55:9, 59:4, 81:23
criminally 42:16, 42:17
critical 21:11, 21:20
cross-examination 42:9, 44:18
cross-examine 45:23, 49:6,
    58:19, 71:12
cross-examined 43:16, 48:9
crowd 62:21
CRR 109:8
crystal-clear 45:20
CSR 109:8
cumulative 61:21, 87:13,
    87:14
cured 47:25
currently 101:1
cut 53:5

< D >
Dallas 1:42, 2:22, 60:21
damage 58:14
Dan 3:22
Daniel 2:4
Date 45:17, 109:6
dating 82:9, 84:16
day 12:13, 12:20, 13:23,
    30:10, 102:16, 107:13,
    107:20, 108:9
days 31:19
DC 2:10
de 86:14
deadline 107:4
deal 6:19
dealing 16:6, 26:15, 88:10
decide 12:21, 13:13, 17:12,
    17:13, 17:15, 17:17, 18:10,
    30:25, 31:3, 31:6, 36:24,
    38:7, 38:12, 40:25, 41:19,
    49:4, 49:20, 55:18, 59:17,
    63:23, 69:9, 78:6, 91:15,
    95:23, 97:23, 100:18,
    102:19
decided 9:3, 9:9, 18:20,
    31:6, 42:10, 62:3, 89:17,
    102:22, 103:20
decides 102:10, 104:11
deciding 8:2, 8:4, 48:16
decisions 17:23, 19:8, 24:3,
    64:10, 65:1, 78:23, 81:9,
    89:7, 100:14

declaration 60:10, 60:15,
   60:19, 61:1, 61:9, 78:20
deep 57:23
defect 36:10
defects 31:5
defendant 35:14
defense 105:19
defer 49:15, 49:21, 56:6,
   67:18, 104:21
deference 27:14, 58:20
deferring 55:25
defies 48:10
defined 105:14
definitely 41:24
Delcostello 37:12, 37:20,
   97:15, 97:24
delegated 79:1
demonstrate 56:4, 104:22
demonstrated 22:7, 22:9
denial 42:7
denials 43:4
denied 48:12, 63:11, 65:5,
   89:8, 89:9
denies 5:19
deny 65:25, 97:2
denying 48:3, 102:23, 102:25
depend 83:9
depended 83:11
Depending 5:17
depose 58:20
deposition 65:18
deprival 12:9
deprived 9:1, 17:18, 56:8,
   58:17, 60:22, 68:13, 77:20,
   77:23, 104:25, 105:6
depriving 105:17
described 24:22, 97:5
deserves 64:4
desire 15:15
desired 5:5
detailed 83:14
details 60:12, 92:7
determination 12:21, 75:13,
   76:5, 102:6
determine 76:10, 76:16, 79:7,
   99:20
determined 100:7, 100:12
determines 86:5
develop 75:18
developed 10:19, 30:24,

86:16, 104:1
devoted 107:16
diametrically 62:1
Dickey 40:12
difference 67:14
different 14:13, 23:5, 25:4,
   26:1, 26:24, 29:23, 47:3,
   53:3, 55:8, 55:12, 68:18,
   91:22, 92:18, 94:8, 98:11,
   98:12, 100:20, 101:18
differs 69:3
difficult 41:20, 42:2, 56:17,
   69:17
directly 16:23, 49:8, 67:20,
   71:4, 71:8, 73:3, 77:2,
   81:1, 85:7
Director 44:15
disagree 102:11, 103:2
disagreed 52:25
disagreement 78:10, 78:11
disagrees 33:14
discharge 43:14
disciplinary 24:11, 44:8,
   75:13, 78:23, 83:24, 84:1,
   86:14, 99:14
Discipline 15:8, 26:9, 28:23,
   33:1, 41:10, 43:9, 45:5,
   45:8, 51:5, 55:19, 58:18,
   68:12, 103:12, 105:25
disciplined 62:18
disclose 87:23
discovery 33:11, 81:22
discuss 50:16
discussion 55:25, 56:20
Dismiss 4:6, 4:16
Dismissal 25:6, 25:7, 34:11
dismissed 99:4
dispute 12:8, 12:11, 14:2,
   20:5, 22:25, 33:20, 68:9,
   80:12, 80:13, 80:14
disputes 66:16
dissatisfied 26:19
dissenting 88:7
distinguish 80:16
distinguishable 65:13
distinguishes 24:18
distinguishing 46:24
distorted 102:2
District 1:1, 1:2, 1:18,
   7:24, 64:14, 64:18, 68:1,

68:7, 80:7, 84:13, 94:16,
98:23, 100:11
disturb 49:17
DIVISION 1:3
DJ 100:8
dnash@akingump.com 2:13
DOCKET 1:10
doctors 45:14
doctrine 12:5
doctrines 15:12
document 17:17
documented 71:6
documents 9:1, 9:11, 19:22,
33:11, 66:15
doing 6:16, 24:4, 57:17,
81:18, 107:25
domestic 63:6, 82:9, 82:25
done 10:17, 16:17, 18:2,
20:3, 42:21, 62:12, 64:21,
95:2
doubts 47:9
down 4:21, 4:24, 14:23,
14:24, 23:6, 25:23, 33:10,
51:14, 57:11, 64:7, 81:17,
106:10
draft 67:4
draw 53:3
drug 11:7, 35:21, 84:19,
85:13, 105:24
during 19:8, 19:21
duty 53:10


< E >
e-mail 12:15
e-mails 52:10
earlier 70:15, 79:13
earthshaking 50:1
easily 59:16
EASTERN 1:2
effect 5:20, 41:7, 41:12,
63:17, 105:9
effort 61:11, 107:19
efforts 44:9, 44:11, 44:12
eight 53:15
Eighth 68:24, 69:1, 84:10,
98:22, 99:7, 99:8, 100:9
either 21:10, 22:11, 22:12,
34:15, 100:11, 102:23,
106:23

elements 42:3
eligible 5:15
employed 34:16
employee 10:11, 16:8, 16:16,
24:24, 25:20, 97:17, 97:25
employees 11:12, 62:18,
97:20, 98:12
employer 10:11, 15:8
employers 10:21
end 19:23, 21:17, 70:13,
91:7, 97:11, 103:18, 107:20
ended 69:1
enforcement 101:2
enforcing 27:15
engaged 86:10
engages 63:6
enjoin 10:1, 10:21, 14:21
enjoining 11:11
enough 101:7, 106:5
ensure 41:21
enter 13:17
entered 13:12
enters 13:24
entire 9:20, 32:22, 44:20,
45:4, 45:5, 83:11
entirely 7:4, 85:25
entitled 39:4, 40:1, 40:16,
56:24, 86:19
equities 80:12
equivalent 20:24
Eric 2:16, 3:21
error 65:5, 93:6, 93:7
errors 28:14, 28:21, 31:5,
93:9, 95:7
especially 13:17, 64:3,
64:24, 106:17
essence 44:25
essential 43:14, 44:24,
67:20, 81:7
established 34:19, 38:23
establishes 60:19
evade 15:16
evaluate 94:17
evaluated 81:4, 81:5
event 45:17, 68:21
events 12:7, 90:3, 92:12,
92:17, 92:18, 101:24
everybody 55:17, 63:8
Everyone 5:5, 11:18, 49:15,
106:18

Everything 10:5, 20:4, 31:3,
    36:24, 44:3, 63:1, 65:22,
    67:9, 72:1, 72:7, 86:18,
    88:20, 91:7, 93:22, 95:22
everything. 54:25
evidentiary 19:21, 51:7,
    62:4, 65:1
exact 17:1
exactly 17:23, 40:11, 72:5,
    80:4, 92:5, 102:12
examination 53:16
examined 44:3, 76:20
examining 89:17
example 8:5, 9:24, 18:3,
    20:23, 28:2, 47:14, 49:7,
    81:22
examples 20:12
exasperated 54:12
exceedingly 23:13, 80:11
except 7:12
excluded 50:21, 50:23, 51:16,
    90:4
exclusive 39:16
exercise 16:10
exhaust 8:14, 9:4, 10:3,
    14:7, 17:8, 18:2, 25:5,
    37:16, 38:2
exhausted 8:16, 9:13, 10:6,
    15:22, 17:21, 18:12, 25:8,
    25:21, 37:7
exhausting 18:9, 97:16, 98:2
exhaustion 8:19, 9:16, 9:22,
    9:25, 17:10, 17:18, 18:15,
    25:14, 35:16, 36:11, 38:2
Exhibit 71:11
exhibits 51:9, 55:5
exist 42:19, 42:21
existed 63:24
exists 12:12
expect 55:11
expedited 90:11
experience 103:8, 103:11,
    103:13
experienced 47:22, 53:11,
    55:9
expert 51:3, 51:15, 51:19,
    55:11, 74:9
experts 83:15
explain 65:15
explains 82:5

express 87:24
expressed 50:17, 71:5, 73:21
extensively 47:3
extent 27:9, 88:19
extreme 14:2, 79:15
extremely 64:10, 64:23
Ezekiel 1:8, 3:6, 3:15, 76:13


< F >
FAA 8:2, 8:6, 8:7, 21:18,
    21:20, 22:1, 22:4, 69:19,
    80:9, 82:22
faced 105:6
fact 14:5, 14:16, 15:6, 25:2,
    25:16, 26:2, 28:4, 28:5,
    34:8, 37:4, 43:3, 47:4,
    50:6, 58:9, 58:25, 59:17,
    59:23, 60:3, 60:22, 62:14,
    71:10, 72:10, 87:3, 88:14,
    89:12, 92:12
fact-finding 49:16, 56:1,
    56:2, 104:21
fact-specific 56:9, 68:22
factor 16:17
factors 11:10
facts 39:9, 55:1, 60:12,
    66:4, 69:15, 85:3, 100:20,
    101:18, 101:19, 102:3,
    102:6, 102:11, 102:12,
    102:16, 103:22, 106:4
factual 66:16, 70:20, 72:16
failed 25:5
failure 10:3, 18:2, 65:19
fair 12:10, 13:7, 28:22,
    33:1, 33:24, 38:15, 39:13,
    43:10, 62:19, 63:11, 65:6,
    73:6, 81:24, 87:8, 89:18,
    91:19, 94:7, 94:18, 96:12,
    103:21, 104:9
fairly 43:13
fairness 8:5, 17:6, 17:25,
    28:8, 31:18, 36:22, 38:20,
    39:2, 39:20, 40:2, 40:5,
    41:21, 48:11, 56:10, 56:15,
    62:7, 63:24, 65:16, 65:17,
    68:6, 69:2, 69:21, 79:12,
    81:8, 81:13, 81:16, 82:21
fall 14:24
false 7:4

familiar 70:10, 70:11
fan 64:2
fans 60:23, 62:23
FAPR 109:8
far 6:20, 7:9, 24:14, 24:17,
    29:11, 30:3, 72:8, 88:16,
    100:25
favor 62:9
favorite 49:18
favors 59:19
Fax 1:31, 1:44, 2:12, 2:24,
    2:33
Federal 7:8, 7:13, 30:13,
    37:18, 39:15, 85:4, 86:3,
    100:13, 102:5
feel 74:1
FELD 2:7, 2:19
few 18:23, 54:14, 57:25,
    74:2, 89:19
Fifth 24:7, 38:23, 39:10,
    39:12, 41:23, 59:12, 64:21,
    69:3, 79:17, 79:19, 80:23,
    96:14, 96:25, 105:13
figure 94:18
file 4:9, 30:6, 106:15,
    106:21
filed 4:6, 6:25, 9:19, 17:2,
    21:17, 32:12, 56:21
filing 10:21, 13:14, 22:5
fill 45:12
final 14:12, 19:15
Finally 8:10, 13:1, 54:12,
    105:23
find 11:2, 11:3, 11:10,
    15:11, 18:15, 52:23, 85:13,
    106:5
finding 65:14, 85:19
findings 39:9, 50:16, 75:23,
    76:1, 77:8
fine 52:13, 58:16, 79:14,
    79:15, 93:9
finished 18:21
firm 3:15, 3:24, 65:20
Fitzwater 84:14, 85:5, 85:25,
    94:13
five 47:15, 49:1, 52:7, 53:16
fix 28:13, 28:16, 29:19
fixed 36:22, 48:12
Flatly 52:5, 52:6
Floor 1:41

flushed 93:22
fly 90:7
follow 95:17
follow-up 71:21
follow-ups 46:11, 46:18,
    46:24, 47:1, 47:4, 47:8,
    47:17
followed 90:10
following 62:14
Football 1:5, 1:12, 1:13,
    2:2, 2:3, 3:5, 3:7, 98:11
forbid 57:11
force 29:20, 34:17
forced 88:13, 88:23, 93:14
forcing 82:13
foreclosed 30:20
foregoing 109:2
forensic 45:18
forgive 37:21
former 51:21, 51:22, 67:25,
    75:22
forth 8:18, 10:15, 61:1
forum 15:17
forward 15:2, 35:20, 37:9,
    41:15, 43:2, 50:19, 58:15,
    58:25, 59:1, 59:4, 63:11,
    82:9
forward. 51:12
found 66:5, 75:9, 75:10
four 46:6, 46:11, 46:18,
    51:2, 51:3, 51:15, 52:6,
    53:1, 55:10, 87:17, 87:19
frankly 7:4, 49:25, 57:1,
    63:5, 94:20, 100:4
free 30:6, 93:24
Freight 37:22
frequently 47:4
Friday 107:5, 108:6
friend 52:11
Frost 25:18
full 46:17, 56:20, 56:23,
    62:10, 80:24, 88:19, 101:8
full-blown 46:14
fully 56:22, 82:4, 82:15,
    87:22, 87:24, 88:14, 106:7
fundamentally 13:7, 28:16,
    38:15, 39:13, 41:2, 61:12,
    62:19, 69:7, 77:24, 87:5,
    88:13, 88:22, 89:18, 92:14,
    92:16, 92:21, 93:8, 93:10,

93:12, 100:22, 104:25,
106:6
future 21:25, 22:3, 41:14


< G >
G. 109:7
GAMBRELL 2:16, 3:20, 3:21,
78:19, 107:21
game 5:16, 6:2, 6:3
games 57:9, 57:17, 58:5,
58:6, 100:15
gamesmanship 15:14
gap 45:12
Garvey 79:24, 102:9
gave 44:2, 53:17, 61:6, 71:1,
94:19
General 60:15, 65:18
generally 64:8, 86:25, 95:10,
97:20
gets 33:11, 58:11, 58:12,
62:25, 81:3, 94:12, 94:13,
97:23, 99:21, 100:14,
103:16
getting 11:23, 29:11, 29:16,
57:22, 57:23, 102:2
give 16:4, 17:19, 18:25,
29:2, 34:24, 36:9, 39:17,
41:19, 48:22, 51:4, 55:10,
55:22, 62:9, 67:4, 88:3
given 9:8, 37:25, 61:5,
74:25, 86:13, 86:18, 87:24,
91:13
gives 15:2, 15:4, 17:20,
92:3, 108:6
giving 106:24
glad 65:9, 101:11
goal 12:16
God 57:11
Goodell 17:16, 54:19, 54:20,
56:13, 67:19, 68:4, 68:11,
78:21, 86:21
governed 23:10, 23:13
grant 10:25, 85:3, 95:21,
101:7
granted 59:17, 98:23, 99:3
granting 59:19
grateful 107:19
Gregory 2:17
grievance 16:10, 16:13, 37:16

grieve 98:1, 98:2
ground 66:22
grounded 80:25, 82:17, 86:1,
95:3, 103:7
grounds 69:3
guarantee 55:21
guarantees 55:22
guard 29:8
guess 4:3, 4:4, 41:13, 46:21,
63:20, 97:9, 98:7, 99:25,
108:8
guest 107:18
guilty 42:20
Gulf 33:16, 39:11, 69:21,
79:13, 82:18, 100:19,
105:13
Gump 2:6, 2:18, 3:21


< H >
half 37:23, 57:18
Hampshire 2:8
handling 3:12, 3:22, 92:13
happen 20:13, 38:1, 84:2,
89:9
happened 28:19, 38:13, 38:14,
51:4, 53:5, 83:17
happens 22:17, 26:3, 60:2
happy 25:12, 68:14, 103:10
harassment 82:10
hard 53:9, 58:22
hardship 59:10, 59:11
hardships 11:3, 62:8
harm 11:3, 15:3, 26:10, 28:3,
29:5, 30:12, 48:1, 58:21,
59:7, 59:13, 59:14, 59:18,
60:1, 60:7, 60:8, 60:12,
60:20, 99:2, 99:16
harmed 20:4
harms 98:7, 98:14
Harwood 1:40
HAUER 2:6, 2:18
Haywood 57:7
he'll 18:11, 94:7, 94:8
he-said/she-said 48:4, 105:25
head 51:22, 54:15
heads 54:2
hear 18:24, 39:1, 48:15, 66:1
heard 48:22, 48:24, 55:14,
61:3, 70:3, 84:23, 97:11,

Concordance

105:11
HEARING 1:16, 4:11, 7:21,
    8:21, 10:2, 12:10, 13:7,
    19:11, 28:22, 32:15, 33:18,
    33:21, 43:16, 48:8, 56:7,
    56:19, 61:11, 65:6, 70:4,
    72:20, 75:8, 79:15, 83:5,
    86:15, 87:10, 89:11, 90:4,
    92:15, 92:25, 99:5
hears 26:8
hearts 60:24
held 11:15, 83:9
Henderson 4:21, 5:11, 5:18,
    9:7, 9:18, 12:14, 13:4,
    13:22, 17:13, 17:15, 17:16,
    22:21, 49:14, 58:15, 67:23,
    73:18, 86:10, 93:5, 103:10,
    103:11, 104:16, 107:1
herring 10:8
herself 53:12, 72:12
high 58:20, 80:11, 96:1
highlights 80:5
hire 55:9
history 7:6, 10:20
hold 33:18, 79:14
Holmes 84:15, 100:10, 101:13,
    105:23
honest 31:13
HONORABLE 1:17
honors 57:20
hope 63:8
hour 9:19, 55:24
hours 37:23, 43:18, 107:16
house 14:23, 14:24, 15:2
hump 65:2
husband 76:14, 76:15


< I >
idea 17:19, 31:16, 81:24,
    96:9, 96:10
identical 11:6
identified 19:7, 66:18
identify 82:21
ignore 101:25
ignores 81:10
III 1:17, 2:28
imagine 6:24, 50:1
immediately 20:19
imminent 14:16, 14:17, 15:1,

28:3, 29:5, 30:12
impact 6:2, 6:3, 60:14
impacts 107:1
importance 38:22
important 21:14, 23:8, 29:8,
    29:9, 32:1, 41:17, 41:20,
    42:2, 42:25, 46:3, 50:24,
    51:18, 56:17, 59:11, 69:17,
    76:3, 80:5, 105:7, 106:8
importantly 64:3, 77:12, 89:1
impose 15:8, 51:5, 55:18
imposed 11:24
imposes 41:10
imposing 24:12
impressions 47:21
improper 19:17, 41:12
improperly 62:18, 99:17,
    105:17
inability 56:14
inappropriate 19:17
incident 52:11
incidents 47:16, 49:1, 52:8,
    59:2
inclined 77:6
include 52:3, 72:1, 91:9
included 71:9, 71:17, 72:6,
    72:11, 76:17, 88:5, 103:23,
    103:24
including 8:3, 23:13, 79:18,
    87:17, 104:1
inconsistencies 47:5, 53:24
Inconsistency. 47:23
inconsistent 47:12
incredible 52:8, 53:7, 53:24,
    57:15
incurred 14:16
indeed. 86:7
independent 43:23
indicate 106:25
indicated 6:10, 12:15, 17:10
indicates 16:9
indication 9:8
individually 26:19
induce 49:11
Industries 39:11, 69:22
inflicting 9:16
infliction 11:12
information 72:9, 73:1, 75:4,
    78:17, 104:23
inherently 57:9

injunction 4:12, 6:8, 10:11,
  11:1, 11:24, 14:20, 15:3,
  16:1, 16:4, 19:2, 19:6,
  28:10, 40:8, 40:20, 42:3,
  57:1, 59:16, 95:20, 98:16,
  98:24, 99:5, 101:8, 102:21,
  107:10
injunctions 10:16, 10:25,
  97:2
injunctive 6:18, 11:11,
  11:20, 38:8, 77:19
injuries 45:15, 74:8, 83:16
injury 9:16, 14:16, 14:22,
  15:1, 45:25, 57:2, 75:9
injustice 14:8
inquiry 68:22
instead 8:11, 67:22
insufficient 50:10, 59:3
interest 60:1, 62:15, 62:17,
  99:24
interested 23:25
interesting 7:11, 15:13,
  41:3, 45:7, 98:20
interestingly 12:5
interfere 99:13, 99:18,
  101:1, 107:5
interference 27:12, 98:17
interferes 107:7
interlocutory 19:13, 21:3,
  30:14
internal 30:14, 90:10
International 37:12
interpretation 77:13, 77:25,
  78:2, 84:7, 103:14
interpreting 8:6, 69:20
intervene 43:7
interview 73:2, 73:24, 75:20
interviewed 44:1, 46:2, 50:5,
  50:6, 50:20, 53:2, 74:3,
  74:19
interviews 45:2, 46:5, 46:10,
  46:15, 46:17, 46:20, 46:25,
  47:2, 47:15, 71:19, 71:21,
  71:22, 71:23, 83:10
interviews. 46:22
introduce 3:11
intuitive 14:18
invade 14:22
investigation 40:23, 50:8,
  50:17, 52:23, 55:10, 83:14,

87:8
Investigations 44:15
investigative 50:12, 66:7,
  67:7, 71:7, 71:11, 75:14
Investigator 46:1, 47:19,
  50:4, 50:5, 65:20, 66:8,
  66:13, 90:17
Investigators 47:21, 47:23,
  49:8, 52:3, 63:10, 66:16,
  78:9
invited 50:21
invoke 8:19, 37:8
involved 56:13, 97:17
involvement 66:7
involves 16:21
involving 10:11, 30:12, 67:22
irreparable 11:3, 26:10,
  57:2, 57:10, 58:7, 59:7,
  59:14, 60:7, 60:12, 60:21,
  99:2
irreparably 60:14
issued 20:17, 20:18, 22:16,
  27:4, 29:24, 32:16, 37:3,
  54:24, 72:21, 93:18, 94:24,
  104:17, 106:17
itself 82:6
itself. 54:17


< J >
J. 2:5
Jackson 11:18, 57:7
jamoona@winston.com 1:34
Jeff 3:12
Jeffrey 1:24, 6:10, 65:18
jgambrell@akingump.com 2:25
jkessler@winston.com 1:32
Jo 51:21, 52:15
job 80:11, 92:4, 107:24,
  107:25
John 2:16, 3:14
Jonathan 1:26
Jones 67:25, 68:2, 68:5
Judge 1:18, 20:2, 25:4,
  25:25, 64:14, 64:18, 67:25,
  68:5, 80:8, 84:14, 85:5,
  85:25, 86:4, 94:12, 94:16,
  98:23
judgment 40:16, 78:13, 85:2,
  86:11, 86:17, 95:21, 99:3,

101:9, 103:15
judgments 79:21, 85:2, 86:9,
    95:24
judicial 9:17, 15:16, 22:14,
    27:14, 29:1, 41:21, 64:9
Judith 109:7
jurisdiction 4:13, 4:17, 6:7,
    6:13, 6:18, 7:3, 7:8, 7:12,
    7:17, 7:19, 7:22, 8:7,
    8:11, 15:21, 19:1, 21:19,
    22:13, 23:7, 30:1, 107:10
jurisdictional 8:8, 8:15,
    21:12, 21:16, 23:16, 23:21,
    24:14, 24:16, 25:7, 27:19,
    35:8
jury 20:1, 20:14
justice 62:11


< K >
Keep 29:15, 61:25, 73:25,
    82:20, 101:20
kept 47:10, 62:5, 87:16,
    87:18
Kia 44:13, 50:4, 50:5, 50:7,
    51:11, 53:19, 53:22, 61:4,
    61:17, 70:24, 73:3, 73:14,
    74:4, 78:8, 80:18, 103:19
kind 64:10, 86:4, 86:10,
    88:6, 103:6
kinds 21:4, 27:1, 79:21,
    82:14, 96:13, 100:14
knock 14:23
knowing 56:11
knows 7:13, 14:19, 39:17,
    40:10, 51:23, 53:13, 53:14,
    58:11, 88:15, 88:18, 90:3


< L >
L. 1:17, 1:24, 2:4
Labor 7:18, 7:23, 8:6, 10:25,
    16:7, 25:24, 27:3, 27:14,
    38:19, 81:9, 85:9, 97:19,
    99:24, 102:5
lack 7:3
Lane 1:38
language 85:5, 85:7
last 4:4, 4:5, 6:24, 19:8,
    19:25, 21:8, 22:1, 24:21,

25:4, 25:25, 26:11, 27:10,
    27:23, 31:19, 35:13, 37:1,
    40:22, 54:24, 57:14, 62:14,
    78:20, 98:6
late 108:1
later 99:3, 101:9
lawsuit 13:14, 28:9
lawyer 53:12, 54:16, 87:20
lawyer-like 92:4
Lead 50:3, 50:4, 90:17
leading 39:11
leads 75:18, 77:3
League 1:5, 1:12, 1:13, 2:3,
    2:4, 3:5, 3:7, 3:8, 26:22,
    45:2, 63:16, 63:19, 66:14,
    67:9, 67:23, 74:5
least 56:16, 56:17, 69:16,
    89:6, 101:7
leave 73:20
left 12:3, 15:23, 17:7, 108:5
legal 83:22
legislative 10:20
legwork 76:17
length 66:9
lengthy 70:12, 83:14, 103:8
letter 45:8, 75:11
letting 58:15
level 95:8, 100:12
lie 52:11
light 68:6
likelihood 40:9, 40:15, 42:4,
    56:24, 96:1, 96:6, 96:18,
    101:5, 101:7
likely 11:2, 41:25, 58:16
limit 63:20
limitations 8:8
limited 7:25
line 99:10
Linseman 57:7
Lisa 61:20, 70:25, 78:8
list 57:6
literally 37:23
litigant 14:21, 16:21, 16:23,
    22:14, 105:17
litigants 15:7
little 12:17, 29:12, 31:13,
    47:25, 62:23
live 48:17
Llp-dallas 2:19
LMRA 8:10, 8:14, 13:8, 15:20,

22:1, 22:4, 23:10, 23:13,
  23:16, 25:8, 30:20, 33:6,
  97:16
locked 60:24
lockout 10:17
long 10:25, 11:10, 31:19,
  38:1, 55:24, 61:22, 70:2,
  84:17, 92:9, 95:2, 95:3,
  103:15, 104:14, 107:20
longer 12:18
look 8:5, 12:5, 12:6, 13:15,
  14:3, 16:18, 18:14, 27:8,
  34:3, 45:10, 47:2, 53:23,
  69:20, 76:15, 78:11, 79:20,
  87:4, 88:20, 90:2, 98:4,
  102:15, 103:3
looked 39:22, 66:4, 70:23,
  101:11, 101:12, 101:13
looking 16:7, 64:9, 86:25,
  87:21, 95:13, 104:17
looks 64:23, 65:4
lost 57:12, 57:20, 69:10
lot 5:5, 8:3, 29:15, 49:10,
  55:22, 58:12, 70:3, 103:10
lots 86:16
love 107:24
lower 89:14
lowers 89:16
lwebster@winston.com 1:46
lying 76:15


< M >
M. 1:37, 1:38
Mackey 11:17
Magnuson 98:23
main 20:10, 32:20
maintain 40:24, 106:7
maintaining 56:18, 62:9
Management 1:14, 2:4, 3:8,
  7:18, 7:23, 16:7, 27:3,
  35:14
manipulate 99:19
marked 54:10
Mary 51:21, 52:15
material 66:1, 66:12, 66:16,
  66:21, 67:6, 67:13, 68:19,
  69:18
materials 12:18, 108:7
matter 4:3, 4:14, 5:21,

13:19, 21:16, 31:2, 38:24,
  58:25, 79:10, 80:15,
  103:18, 109:4
matters 78:14, 98:13
MAZZANT 1:17
Mcneil 11:17
mean 4:24, 25:24, 28:14,
  30:5, 30:25, 38:6, 40:15,
  53:23, 77:17, 80:5, 83:3,
  87:11, 89:5, 89:25, 90:3,
  91:21, 92:2, 93:1, 93:25,
  94:15, 95:22, 99:23, 102:20
means 9:16, 25:10, 60:13,
  63:1
meant 65:10, 105:15
MECHANICAL 1:48
medical 83:15
meet 11:1, 39:19, 45:22,
  50:14, 56:3, 66:11, 73:3,
  73:14, 76:5, 85:21
meeting 50:16, 50:21, 51:14,
  51:24, 70:5, 75:2, 75:15,
  87:18
meetings 86:16, 87:16, 87:17
MELSHEIMER 1:37, 3:10, 6:10,
  107:12
members 78:10
memo 71:10, 91:11, 103:24
mentioned 47:15
merit 33:5
merits 11:2, 23:15, 29:13,
  30:17, 32:6, 34:25, 36:20,
  40:9, 80:12, 96:2, 96:7,
  101:6, 107:10
mess 53:23
messages 74:5, 74:14, 74:17
met 68:12, 85:19
metadata 74:9
mic 5:3, 5:5
middle 108:2
mind 29:15, 35:24, 54:13,
  65:6, 73:25, 82:20
minds 60:24
minimize 101:23
minimum 34:3, 66:7
minute 34:22, 48:23, 76:7
minutes 18:23, 53:15, 54:3,
  54:14, 104:14
Misco 79:23
misconduct 33:15, 82:19,

82:23, 86:5, 86:10, 105:12,
  105:15
misdirection 31:13
misrepresents 52:5
misses 30:11
missing 57:17
mitigation 89:13
moment 7:19, 58:3
moments 57:13
money 57:20
months 99:3
morning 4:4, 55:24
Motion 4:6, 4:7, 4:8, 4:16,
  6:7, 12:22, 13:15, 13:17,
  19:11, 19:18, 32:12, 33:8
MOTIONS 1:16, 85:4
Motor 37:22
move 16:1, 38:5
myself 18:11, 54:6, 84:16


< N >
N. 1:40
name 6:10, 66:25
narrow 23:13, 64:10, 64:23,
  65:3, 65:8, 81:10
Nathan 2:5, 3:23
National 1:5, 1:12, 1:13,
  2:2, 2:3, 3:5, 3:7
nature 46:13, 92:1
necessarily 76:9, 84:3,
  101:24
necessary 67:13, 68:19,
  95:12, 105:18
need 13:23, 27:24, 36:24,
  59:6, 60:6, 74:1, 85:21,
  85:22
needed 54:19, 55:20, 56:7
needs 43:4
neutral 47:11, 67:24
New 1:29, 2:8, 2:31, 31:20,
  49:11, 56:5, 63:18, 68:1
news 104:16, 105:7
next 5:11, 5:12, 5:18, 5:20,
  12:20, 13:19, 13:22, 49:13,
  55:23, 63:17
NFLPA 6:11, 35:14
night 4:5, 6:24
nine 44:16, 44:20
No. 1:10, 44:21, 61:17,

72:18, 80:10
Nobody 28:13, 92:15
noleson@akingump.com 2:14
none 10:3, 15:4, 15:12, 50:6,
  88:3
noon 6:25
nor 72:22
normal 11:1, 101:22
normally 27:22, 92:19
Norris-laguardia 10:8, 10:10,
  10:13, 10:16, 10:24, 11:14,
  12:1
Northern 84:13, 100:10
noted 96:16
notes 46:1, 47:20, 65:20,
  66:14, 66:17, 67:7, 71:18,
  71:24, 72:1, 80:17
nothing 8:8, 9:4, 15:23,
  17:7, 28:7, 30:23, 30:24,
  31:5, 65:23, 69:11, 107:6
notice 65:22
noticed 62:21
notion 104:20
novo 86:14
Number 8:13, 23:23, 32:17,
  48:11, 55:14, 57:13, 57:14,
  67:10, 71:15, 75:17, 77:19,
  96:20, 97:1
numerous 7:15, 33:21
NW 2:8


< O >
O'brien 2:17, 3:24
oath 43:4, 53:14
objection 90:18
obvious 28:4, 29:25, 44:13,
  81:15, 99:25, 100:1
Obviously 20:8, 56:21, 58:10,
  68:20, 105:4, 105:8
occasions 77:19
occurred 48:11
OFFICER 3:2, 78:23, 108:11
Ohio 25:25
Oil 33:16
Okay 3:4, 3:17, 4:23, 5:10,
  5:21, 6:5, 15:17, 18:4,
  18:10, 18:22, 31:17, 32:14,
  32:21, 32:24, 33:15, 33:19,
  35:1, 44:21, 53:14, 54:17,

55:22, 56:11, 58:1, 58:12,
85:19, 95:4, 97:4, 107:23
Oleson 2:5, 3:23
on. 20:6
once 77:5
one. 12:13, 48:11, 57:13,
67:10
opening 103:9
opinion 88:7, 100:20
opinions 48:15, 87:16, 87:24,
88:17, 103:23
opportunities 97:1
opportunity 18:17, 22:8,
34:25, 48:14, 57:13, 58:2,
58:17, 75:3, 106:25
opposed 46:25, 58:5, 62:2
opposite 17:1, 36:13
order 17:14, 40:18, 65:17,
76:4, 85:20
ordered 68:11
original 75:13
originally 78:22
others 11:19, 52:14, 52:15,
52:16, 60:24, 71:24, 74:15
Otherwise 10:23, 15:4
ought 81:19
outcome 64:1
outlined 71:13, 89:2
overcome 48:1
overturn 28:23
overturned 66:21
overwhelming 57:1
overwhelmingly 41:25, 59:19
own 1:7, 3:5, 55:7, 68:17


< P >
p.m. 106:22, 107:5, 108:4
Pacific 2:20
Page 21:24, 22:1, 23:17,
25:2, 25:3, 26:6, 37:4,
71:25
pages 51:8, 51:9, 55:5, 55:6
panel 68:16
paper 6:25
papers 19:10, 21:21, 21:22,
22:5, 73:8
Park 1:28, 2:30
part 4:12, 20:20, 47:8, 51:6,
60:8, 97:15

particular 11:23, 40:3, 40:4,
80:19, 84:5
particularly 34:20, 63:4,
73:9, 99:25
parties 7:6, 7:15, 22:22,
99:19, 108:3
partner 3:12
partners 3:22
Pash 65:18, 66:6, 66:24
passages 54:10
past 20:17, 63:20, 88:5
Pat 3:23
Patrick 2:17
Paul 65:20, 66:17, 67:7
PCP 51:2
penalties 63:7
penalty 89:16
Pennel 9:24, 24:18, 24:20,
26:14, 35:13, 98:15
people 57:25
perhaps 45:14, 47:25, 57:24
permissible 20:9
PERSON 5:2, 43:23, 47:10,
47:12, 64:3, 87:7, 105:17
Personal 42:18, 70:6, 78:15,
78:21
personally 52:23, 76:5
persuaded 32:19
pertinent 66:1, 66:12, 66:21,
67:6, 67:13, 69:18
Peterson 68:23, 69:10, 79:10,
81:11, 84:9, 101:12, 101:17
Petition 8:24, 19:18, 21:10,
21:23, 21:24, 22:2, 31:4,
31:16, 45:11, 56:22
Petitioner 3:6, 3:9, 3:13,
87:3, 107:11
Petitioners 1:24, 4:8
phone 44:2
photographs 74:7, 74:11
photos 83:16
pick 15:16
pictures 45:14
Pit 40:12
place 7:10, 7:21, 10:2,
10:12, 12:10, 15:9, 37:7,
42:22, 51:25
Plaintiff 25:5, 26:9, 37:5,
37:15, 38:1, 59:13
play 4:25, 5:15, 99:21,

100:14, 107:7
Player 9:19, 10:1, 12:10,
  13:8, 24:10, 26:5, 26:6,
  26:18, 35:22, 42:15, 43:3,
  43:5, 43:10, 60:13, 62:5,
  63:1, 84:18, 85:20, 98:9,
  99:21
Players 1:6, 3:5, 11:8,
  11:23, 24:9, 24:20, 26:23,
  59:25, 74:25, 98:11, 100:5,
  107:14
playing 13:18, 40:21
playoffs 57:23
plea 42:21
Please 3:3, 3:11, 3:20, 19:4
pled 42:20
plowing 15:2
pobrien@akingump.com 2:26
point. 20:7, 30:2, 84:14,
  93:17, 103:1, 106:3
pointed 46:19, 59:24, 64:25,
  71:19, 73:17, 73:19, 82:7
pointing 59:22
points 7:1, 23:24, 32:17,
  47:24, 74:2, 97:12
police 52:11, 58:24, 58:25,
  74:18
policies 10:22
pop 54:15
position 7:17, 23:11, 24:20,
  26:24, 36:6, 53:4, 82:25,
  83:1, 83:3
positions 7:6
possibility 57:22
possible 39:25, 40:1, 105:10
possibly 45:12, 45:13, 45:22
potential 14:8
practical 14:9
practice 5:15, 20:20, 30:11,
  90:18
prayer 22:2, 29:17, 29:18
precisely 62:9, 105:5
predicted 104:19, 104:20
preemptory 27:2
prejudice 93:10
preliminary 4:12, 6:8, 11:1,
  11:11, 14:20, 19:1, 40:8,
  41:18, 42:3, 56:25, 98:24
preliminary-injunctive 11:25
prematurely 30:12

premise 7:4, 87:1, 91:5
premising 7:12
prepared 71:10, 91:10
present 7:7, 8:21, 16:21,
  16:25, 17:11, 33:21, 42:1,
  43:15, 98:8, 105:19, 106:8
presented 10:4, 10:5, 17:3,
  18:16, 44:16
presenting 31:21
preserve 40:18
press 58:12, 66:25
presumably 75:10
presume 85:11, 93:13
pretty 37:15, 65:1, 79:15
prevented 28:22
primary 104:7
principal 7:2, 21:19, 32:10,
  32:11, 66:8
principle 25:24, 29:1, 29:8,
  38:23, 66:20
prior 7:6, 86:16
privilege 53:21
Pro 57:15, 57:16
probably 58:18, 70:10, 70:11,
  95:11, 106:18, 106:19,
  107:4
probing 47:5
problem 8:17, 43:24
problems 71:13, 71:16
procedural 19:7, 19:14,
  28:21, 29:19, 30:22, 31:5,
  33:10, 36:10, 79:25, 80:13,
  86:9, 86:22, 93:9, 95:7
procedure 26:16, 28:13
procedures 28:15, 90:10,
  90:11, 99:18
proceed 6:17, 16:2, 38:8,
  107:9
proceeding 7:17, 17:24, 19:9,
  22:15, 32:13, 38:14, 44:14,
  67:21, 70:14
Proceedings 1:48, 3:1, 18:1,
  73:23, 99:18, 100:21,
  108:12, 109:3
process 8:20, 10:18, 15:10,
  16:10, 16:13, 24:11, 30:14,
  37:9, 37:25, 39:13, 44:8,
  51:6, 55:8, 62:19, 63:2,
  63:11, 64:4, 99:14, 108:7
produce 46:1, 65:19, 87:12

PRODUCED 1:49, 66:15, 67:9
producing 61:19
professional 57:8
promise 104:15
promptly 105:10
promulgated 42:18
proof 43:11, 43:14
proper 30:6, 63:14
properly 15:19
property 14:23
propose 15:25
proposition 41:8
propriety 24:4
prosecuted 42:17, 42:20
prosecution 50:19
prosecutor 44:16, 44:20,
    53:11, 59:1, 75:23
prosecutors 55:9
protected 82:10
protection 10:20
proved 70:15
proves 20:7
provide 18:18
provided 37:17, 70:22, 73:1,
    74:8, 91:21
provides 7:24, 36:8
providing 13:7
province 102:6
provision 39:4
public 27:12, 27:14, 54:24,
    62:15, 62:17
pulled 84:11
purely 86:22
purport 40:13
purpose 86:14
purposes 83:20, 89:6
pursue 24:25, 25:11, 50:10,
    97:18, 97:21
put 30:7, 37:22, 42:19,
    50:11, 71:7, 73:13, 74:24,
    75:16, 76:19, 76:25, 107:19


< Q >
ques 94:4
questioned 46:19, 91:8
questioning 95:10
questions 15:25, 27:23,
    33:10, 35:3, 38:4, 41:20,
    42:2, 42:6, 51:23, 53:13,

56:18, 60:5, 72:17, 80:13,
    81:4, 86:23, 95:9, 95:14,
    96:10, 97:10, 105:20,
    106:2, 106:10
quibble 46:23
quick 106:20
Quite 15:13, 20:8, 21:7,
    24:15, 24:21, 27:9, 29:9,
    63:5, 63:14, 71:3, 71:4,
    77:2, 78:16, 95:5, 96:19,
    97:6, 100:25, 102:18
quo 40:18, 40:19, 40:24,
    56:18, 62:9, 106:7
quote 42:22, 50:2, 85:7
quoted 85:6
quoting 26:5


< R >
raise 96:10, 96:23
raised 50:13, 65:10, 69:17,
    102:21
raises 95:14
raising 30:22, 31:11, 65:11
ran 50:7
rare 86:7
Ray 67:22
reach 38:16, 65:7
reached 54:21, 55:6, 64:22,
    68:18
read 10:9, 22:8, 52:16,
    52:18, 53:10, 53:25, 54:6,
    55:5, 57:5, 64:12, 64:13,
    70:9, 70:23, 91:22, 92:2,
    101:16
reading 31:22, 64:16, 64:19,
    91:20, 92:5, 94:7, 94:9
reaffirmed 65:25
real 60:7
really 15:15, 20:11, 30:8,
    30:24, 32:21, 33:17, 34:9,
    45:16, 48:1, 49:2, 49:17,
    64:7, 64:11, 67:2, 90:24,
    94:13, 103:17, 107:14
reason 6:1, 20:10, 28:24,
    43:1, 44:4, 44:12, 46:3,
    47:7, 70:11, 78:18, 81:14,
    95:8, 100:2
reasons 21:2, 76:22
received 6:24

recently 40:12
recognition 42:25, 57:20
recognize 57:8, 69:2
reconsidering 9:7, 9:8
record 9:3, 13:20, 14:11,
  17:6, 18:21, 30:22, 42:12,
  42:13, 44:11, 75:6, 83:12,
  89:7, 94:2, 99:6, 106:4,
  109:3
recorded 46:5
recordings 71:22
recover 57:12
recuse 18:11
recused 18:5
red 10:8
redress 9:21
reduce 21:10, 34:10
reduces 6:1, 31:2
refrain 49:18
refused 33:18, 46:1, 66:1
regard 42:13
regarding 64:22, 93:22
regular 57:18
rejected 24:13, 36:20, 85:8
related 32:7, 65:17
Relation 16:7, 16:18, 87:5
Relations 7:18, 7:23, 27:3,
  27:15
release 66:25
relevant 8:2, 8:24
reliably 45:16
relief 6:18, 11:11, 11:20,
  11:24, 20:13, 20:15, 21:5,
  22:2, 27:13, 29:3, 29:17,
  29:18, 37:18, 38:9, 41:4,
  41:18, 59:19, 77:20
relies 79:13
rely 45:3, 45:9, 45:13,
  45:20, 78:17, 96:14
relying 24:24, 45:19
remaining 97:10
remarkable 27:9
remedied 59:16
remedies 8:14, 8:16, 9:22,
  9:25, 14:7, 15:22, 18:9,
  25:6, 25:9, 25:21, 35:16,
  97:16
remedy 17:20, 17:22, 18:13,
  18:18, 28:8, 29:11, 39:16,
  98:2

remember 29:13, 53:18, 53:21,
  54:14, 95:19
remembered 70:24
Remind 26:14
rendered 7:9, 20:2, 63:13
renewed 94:3
repeat 70:12
repeatedly 33:9, 79:23, 81:19
reply 6:25, 28:7
report 46:21, 50:9, 50:12,
  51:7, 51:8, 55:1, 55:2,
  55:3, 55:13, 62:4, 66:7,
  71:7, 71:11, 71:17, 72:3,
  72:11, 73:13, 74:24, 75:14,
  76:20, 76:25, 88:3, 103:24
REPORTED 1:48, 61:3, 74:15
reports 88:5
representation 61:24, 63:16,
  63:18
representations 99:4, 107:8
representatives 75:1
represented 88:4
reputation 58:14, 63:2
reputational 58:21
request 4:11, 19:6, 23:15,
  28:10, 89:10
requested 9:12
requesting 29:3
require 40:5
required 38:1, 77:20, 81:21,
  81:22, 84:6, 93:19, 95:5
requirement 16:24, 39:19,
  42:19, 42:25
requires 8:19, 9:6, 48:5,
  85:17
resolve 72:16, 72:22, 72:23,
  91:2
resolved 90:14
resolving 21:15
respect 8:7, 21:19, 48:21,
  73:17, 102:1, 105:23
respectfully 19:20, 102:17,
  103:17
respond 16:5, 35:8, 70:18
Respondents 2:2, 3:8, 3:18
responding 70:19
response 4:9, 18:24, 18:25,
  37:1
responsibility 77:1
resume 108:9

retroactive 68:24
retroactivity 69:8
retrying 77:10
revealed 66:17
revelation 61:4
reversed 80:8
review 9:17, 15:16, 19:14,
    21:4, 22:15, 23:14, 24:3,
    33:7, 35:21, 40:14, 41:21,
    42:2, 50:3, 51:4, 64:9,
    65:7, 67:4, 68:14, 75:10,
    77:6, 77:9, 79:5, 80:11,
    80:12, 92:25
reviewed 75:12
Rice 67:22
right-to-confront 85:8
rights 77:21, 77:23
ripe 4:7, 12:4, 12:8, 12:12,
    12:25, 13:3, 13:6, 13:11,
    13:25, 14:11, 15:21, 20:5,
    22:13, 22:18, 22:25, 26:10,
    89:6, 105:8
ripeness 6:13, 12:5, 12:7,
    12:21, 13:13, 13:15, 14:3,
    14:6, 26:12, 27:19
rise 3:2, 95:8, 108:11
RMR 109:8
road 81:17
role 72:16, 76:1
rookie 57:15
room 52:22, 62:22
row 57:16
rule 27:24, 36:9, 39:14,
    48:6, 48:8, 62:19, 79:19,
    105:9, 105:10
ruled 17:4, 17:7, 36:15,
    36:16, 68:2
rules 8:23, 13:22, 26:4,
    69:21
rulings 19:14, 19:21, 20:4,
    21:4, 29:19, 68:15
run 20:3, 25:14, 98:5
running 58:4


< S >
sat 68:6
satisfy 42:2
save 15:12
saw 39:1, 48:17, 61:3

saying 13:2, 13:16, 19:16,
    20:7, 30:8, 47:10, 59:4,
    62:14, 67:1, 69:1, 87:12,
    87:13, 89:25, 90:1, 93:1,
    93:2, 93:3, 95:10
says 12:22, 14:3, 15:17,
    16:11, 18:4, 36:14, 37:15,
    38:25, 39:4, 45:8, 52:2,
    52:7, 52:15, 58:16, 59:12,
    59:18, 67:11, 77:15, 78:6,
    78:16, 79:19, 85:9, 95:4,
    97:25, 98:1, 99:13
scope 39:17, 56:13, 56:23
Scott 37:21
scramble 6:23
scratching 54:2
SE 51:22
season 57:18, 58:6, 60:23
seated 3:3
SEC 51:23
Second 10:7, 49:23, 64:15,
    64:16, 64:19, 65:24, 66:3,
    66:13, 66:19, 68:17, 80:10,
    80:21, 84:9, 87:15, 94:14,
    94:21, 100:9
second-guess 39:8, 79:21,
    86:4, 102:14
second-guessed 33:14
second-guessing 81:17
Secondarily 12:12, 12:14,
    45:25, 61:2, 67:15, 69:6
Secondly 105:11
Section 10:23, 27:2, 82:22
SECURITY 3:2, 108:11
seeing 48:9
seek 9:21, 15:3, 19:13, 22:14
seeking 14:21, 15:8, 21:25,
    29:23, 30:18, 37:18, 40:19,
    40:24, 41:4
seem 47:24, 54:13
seems 46:14
select 35:23
self-evident 59:8
sense 21:2
sent 12:15
separate 69:3, 88:9, 103:24
separately 48:24
sequence 92:17
series 90:2, 92:12, 101:24
seriously 57:3

serve 59:25, 60:3
services 60:22
set 8:18, 10:15, 12:25,
  15:25, 41:9, 60:25, 101:18
settled 96:18, 96:20
several 11:8, 45:15, 99:2
severe 63:5, 65:1
SHERMAN 1:3
short 5:25, 57:10
shortly 13:22
shoulder 79:20
shouldn't 53:9, 77:10, 93:14
show 40:16, 40:17, 41:24,
  42:6, 42:12, 42:13, 52:4,
  56:1, 67:17, 74:17
showed 83:16
showing 52:10, 96:23
shows 35:15
sic 13:17
side 30:15, 60:8, 106:23
sided 64:14
sides 12:16, 38:10, 106:15,
  106:25
significance 53:13, 75:9,
  79:7
significant 39:21, 43:12,
  56:17, 60:5, 60:18, 61:9,
  63:7
similar 26:18, 94:15
simple 100:1
simply 25:1, 29:25, 37:7,
  40:24, 41:18, 62:14, 91:2
single 17:9, 24:12, 24:13,
  25:17, 25:18, 25:22, 83:7,
  88:17
sir 5:4
sit 64:6, 106:10
sitting 55:21, 60:16, 100:13
situation 9:15, 17:1, 20:21,
  26:15, 33:16, 83:4, 88:1,
  88:21, 92:14, 101:21,
  101:22
situations 16:21, 24:24,
  82:25, 87:1
six 14:13, 44:1, 46:2, 46:5,
  46:20, 53:16, 57:17, 58:5
small 65:3
Smedley 1:25, 3:14
sneak 15:15
so-called 70:21, 72:24

sole 19:6
solely 18:19
somebody 63:9, 76:15
someone 4:19, 18:3, 51:23,
  58:11, 63:5, 76:10, 106:15
Sometimes 103:11, 103:12
somewhat 21:20, 49:25, 73:19,
  84:20
sorry 61:15, 68:3, 74:10
sort 28:25, 29:13, 33:15,
  43:20, 72:16, 81:17, 90:24,
  91:5
sorts 85:1
sought 10:1
sounded 70:10, 70:11
Southern 67:25
space 53:15
speaking 5:6
speaks 54:17, 82:6
special 42:19
specific 11:12, 32:1, 35:19,
  36:9, 39:23, 42:11, 66:4,
  68:15, 69:15
specifically 66:20, 103:23
spend 59:8
spent 31:19, 31:22
spilling 29:12
split 69:5
spoke 92:9
Squires 57:7
staff 78:10, 79:2, 108:5
stage 98:17
standard 23:14, 38:19, 40:8,
  55:25, 58:21, 59:4, 66:11,
  70:5, 72:25, 77:9, 85:12,
  92:25, 96:1, 96:9, 96:13,
  96:17, 96:25, 97:3, 101:6,
  101:15, 106:1
standards 11:1, 33:6, 39:19,
  40:10, 40:13, 56:10, 68:17,
  69:13, 98:13
standing 6:14, 12:25, 14:14,
  14:25, 15:2, 15:4, 15:11,
  15:22, 21:12, 22:13, 27:21
star 58:4, 98:9
Starcaps 11:5, 11:17, 57:6,
  59:20, 59:23, 60:3, 62:16,
  98:20, 99:9
stark 27:18
start 4:17, 19:5, 25:11,

31:25, 41:14, 42:7, 58:6,
81:16
started 95:9, 97:14
starting 6:3, 40:7
starts 14:20
state 96:9
statement 54:24, 103:9
States 1:1, 1:18, 7:25
status 40:18, 40:19, 40:24,
56:18, 62:9, 106:7
statutes 22:6
stays 95:21
STENOGRAPHY 1:48
step 18:6, 18:11
steps 38:1
stop 29:19
story 26:1, 74:10, 74:11,
76:16
STRAUSS 2:6, 2:18
Strawn 1:27, 1:39, 3:15
Street 1:40
strenuous 43:3
strike 10:17
strikes 10:22
strong 99:23
study 62:10
stuff 53:7
subject 38:4, 41:11, 42:9,
44:18
submission 25:3, 27:7
submit 19:19, 29:4, 34:1,
53:12, 68:16, 70:14, 73:5,
80:15, 80:23, 94:22, 99:15,
100:1, 100:16, 100:24,
101:10, 102:2, 106:15
submitted 20:1, 20:14, 31:25,
77:18, 78:18, 79:6
subsequent 12:7, 75:14
substantial 42:1, 42:6,
69:17, 96:10
substitute 49:2, 49:3, 49:5
success 11:2, 40:9, 40:15,
42:5, 56:24, 96:2, 96:6,
96:18, 101:5, 101:7
suddenly 54:13, 54:15
sue 25:8
sued 26:22, 85:4
suffer 63:3
suffered 13:8
sufficient 73:11, 91:16

suggest 13:21, 21:1, 30:13,
72:15, 88:25, 95:1, 103:3
suggested 79:12
suggestion 90:23
Suite 2:9, 2:21
summaries 72:4, 73:2
summarized 72:5
summary 40:16, 95:21, 95:23,
99:3, 101:9
Super 57:24
supplement 106:15
support 28:9, 42:23
supported 91:10
supports 25:17, 65:14
supposed 14:8, 51:4, 70:6
suppress 61:11, 67:16
suppressed 56:12
suppression 88:7
Supreme 14:17, 24:3, 24:6,
25:23, 33:9, 37:15, 79:22,
80:24, 80:25, 81:18, 98:10,
102:9
survived 64:18
suspended 9:20, 11:23, 20:19,
26:5, 26:6, 26:7, 58:10,
62:18, 62:25, 100:15
suspending 31:16
suspension 5:20, 11:7, 11:12,
15:16, 21:8, 21:11, 24:10,
24:12, 32:22, 35:21, 41:6,
41:12, 41:15, 59:25, 60:4,
84:18, 84:22, 99:20, 104:9,
104:19, 105:9
suspensions 100:6
sustain 58:18
sustained 104:19
sustaining 11:19, 11:20
system 16:10


< T >
table 3:14
Tagliabue 68:3, 84:24, 85:2,
85:23
talked 28:3, 30:16, 98:20,
98:22
talks 35:12, 81:8, 82:22
TCRR 109:9
team 43:6, 60:25, 63:1,
100:15

teams 99:21, 99:22
Teamsters 37:13
temporal 30:5
Tenth 100:8
Terex 96:14
terms 21:15, 27:16, 30:23,
    31:4, 32:6, 38:12, 58:8,
    58:22, 60:25, 61:1, 63:20,
    65:3, 80:2, 80:22, 89:13,
    89:17, 92:6, 98:14, 100:20
test 45:22, 67:11
testified 46:10, 50:22, 66:9,
    67:1, 68:11, 71:1, 72:10,
    76:8
testify 17:14, 17:16, 32:14,
    33:11, 34:17, 42:8, 43:17,
    43:19, 44:6, 48:14, 53:14,
    61:15, 61:16, 61:17, 61:19,
    68:3, 68:4, 83:2, 87:2,
    87:6, 88:11, 88:13, 88:24,
    89:10, 93:15, 93:19, 95:11,
    102:24, 103:1, 103:16
testifying 61:25
Texas 1:2, 1:42, 2:22, 84:12,
    84:14, 100:11
text 74:5, 74:13, 74:17,
    83:18
themselves 97:21, 98:15
theory 87:3
they've 13:20, 64:22
things. 45:9
thinks 102:10
this. 72:19
Thomas 1:37
Thompson 32:13, 32:24, 34:15,
    42:8, 44:18, 45:6, 52:10,
    61:16, 67:14, 71:14, 71:20,
    72:2, 72:6, 73:12, 74:8,
    74:10, 74:14, 74:15, 74:24,
    75:20, 76:13, 76:21, 82:3,
    83:10, 83:17, 87:6, 88:23,
    89:8, 92:22, 93:19
though 37:9, 40:22, 40:23,
    44:1, 68:19
thousands 51:9
threatened 14:21, 15:3
three 31:19, 36:3, 36:8,
    104:14
three. 35:25
threshold 21:16, 38:7

throwing 31:15
thrown 29:16
throws 30:25
ticketholders 60:24
Tiffany 76:13
till 16:12, 63:15
timeline 5:11, 106:21
times. 47:13
timing 5:17
tmelsheimer@winston.com 1:45
TMR 109:9
today 3:22, 3:23, 4:20, 6:12,
    6:25, 12:15, 12:17, 22:24,
    23:25, 28:7, 36:6, 39:17,
    56:23, 60:17, 77:18, 82:15
together 7:16, 37:22
tomorrow 12:20, 22:18, 22:22,
    22:24, 26:4, 30:3, 55:24,
    63:15, 106:22, 108:9
tonight 12:19, 13:24, 108:5
took 7:20, 24:20, 37:6, 51:25
tossing 5:25
towards 15:2
trained 53:12, 54:16
transcribed 46:6
TRANSCRIPT 1:49, 46:7, 54:10,
    70:10, 70:19, 72:1, 72:5,
    75:5, 75:11, 75:15, 109:3
TRANSCRIPTION 1:49
transcripts 71:23
trial 4:20, 19:20, 19:21,
    107:13, 107:20, 108:2
tried 24:10, 37:5, 37:8,
    61:24, 97:17
TRO 4:12, 6:7, 19:1, 19:18,
    23:15, 38:5, 56:21, 63:13
true 21:7, 27:18, 27:19,
    34:7, 67:23, 86:19
truth 52:6, 76:11
truthful 44:14, 74:18, 74:19
try 15:9, 23:24, 41:13,
    43:25, 45:18, 57:17, 57:19,
    80:16, 89:9, 94:18, 96:11
trying 16:23, 20:22, 24:5,
    37:8, 94:17
Tuesday 5:12, 63:17
turn 6:13, 69:13
turns 59:16, 59:22
twice 36:15, 48:12
two 4:8, 8:12, 13:23, 30:10,

35:22, 36:8, 37:23, 37:24,
43:20, 45:14, 46:5, 46:10,
46:17, 47:13, 47:14, 54:3,
55:14, 57:14, 57:16, 60:10,
60:18, 65:17, 65:21, 66:5,
71:20, 93:14, 97:12, 100:8
two-and-half 107:16
two. 35:10, 36:4
type 7:17
types 63:3
typically 90:16


< U >
ultimate 30:19, 34:5, 36:19,
40:25, 78:6, 92:22
Ultimately 45:14, 46:21,
59:23, 78:12, 100:7,
100:12, 101:3, 107:10
uncertainty 54:18
unclear 92:5
uncovered 67:15
underlying 39:18, 86:15
undermine 27:13
undermined 28:3, 28:4
understand 5:23, 19:12,
20:23, 34:4, 73:10, 80:3,
84:8, 90:9, 95:6, 97:2,
97:7, 98:8, 107:3
understanding 5:19, 103:14
understands 53:13
understood 6:21
undisputed 50:15
unequivocally 60:20
unfair 28:16, 31:17, 41:2,
61:12, 69:7, 72:25, 73:4,
87:5, 88:13, 88:22, 92:14,
92:16, 92:21, 93:8, 93:10,
93:12, 100:22, 106:6
unfairness 9:2, 26:16, 65:14,
105:14
unfortunate 90:6
Unfortunately 108:1
UNIDENTIFIED 5:2
Union 9:24, 10:21, 13:9,
24:25, 36:5, 43:11, 63:6,
97:22, 97:25, 98:1
unions 10:20
uniquely 39:9
United 1:1, 1:18, 7:25

Unless 6:18, 15:24, 26:7,
30:25, 35:2, 38:3, 93:9,
97:10, 106:9
unpublished 96:15
unquestionably 13:25
until 7:8, 13:3, 13:11, 26:7,
40:24, 47:16, 56:19, 63:17,
72:21, 87:9, 94:23, 94:24,
104:11, 108:6, 108:9
uphold 21:8
urge 105:10
urgent 13:23
useless 55:3
using 69:19, 78:22, 91:25
utterly 48:10


< V >
vacate 21:10, 21:25, 22:3,
29:23, 30:19, 41:4, 41:5,
41:15, 45:12, 81:13
vacated 41:2, 68:12
vacates 31:1
vacating 41:7, 64:18
vacatur 8:3, 66:2, 69:21
variation 53:18
variety 78:17
various 17:17, 19:21, 70:5
venue 7:10, 7:24
verbatim 71:23, 72:4
version 102:16
versus 3:7, 14:9, 20:14,
37:12, 37:22
victims 82:8
view 14:1, 14:2, 22:19, 42:5,
50:18, 72:25, 73:11, 91:6,
102:2
views 48:15, 91:10
vindicated 58:24, 62:17
violated 13:6
violation 12:9, 50:11, 85:13,
85:19
violations 86:15
violence 63:6, 82:10, 82:25
Virginia 57:6
virtually 14:19, 45:4, 70:12,
84:19
volume 12:18
voluminous 86:13
voluntarily 44:1, 44:2

Voting 96:21
VS 1:10

< W >
wait 14:24, 16:12, 63:15
wanted 4:3, 76:23, 97:4
wants 59:8
warrant 11:10
warrants 30:12
Washington 2:10
Webster 1:38
week 4:25, 5:15, 5:18, 5:20,
    6:2, 9:20, 13:18, 13:19,
    19:8, 19:25, 20:18, 21:8,
    31:19, 54:24, 74:11
weekend 5:16, 31:22, 107:7
weeks 4:9
weigh 20:6
Weiss 65:20, 66:17, 67:7
well-reasoned 59:21
well-settled 24:2
Wells 66:8, 67:2
Werlinger 109:7
whatever 6:1, 28:24, 46:6,
    89:14
whenever 55:23
White 51:21, 52:15
whole 20:12, 30:25, 44:8,
    56:19, 82:20, 90:2, 95:14,
    101:21
Williams 98:21, 99:9, 100:8
win 25:13, 28:5, 28:11,
    41:25, 42:1
window 20:18, 65:3
Winston 1:27, 1:39, 3:15
within 83:21, 102:6
without 4:25, 14:23, 33:25,
    48:9, 48:10, 62:19
witness 9:10, 9:11, 33:11,
    40:1, 44:5, 44:14, 44:15,
    44:17, 44:19, 44:22, 45:2,
    45:24, 47:9, 49:6, 58:19,
    67:12, 71:5, 74:23, 76:6,
    80:19, 83:1, 102:23
Witnesses 9:1, 19:11, 19:22,
    33:22, 50:6, 50:21, 53:2,
    70:5, 81:23, 85:22, 90:12,
    90:13, 93:14, 102:24, 103:1
words 16:22, 39:24, 39:25,

    41:22, 46:23, 47:7, 47:20,
    59:3, 66:2, 69:19, 91:24,
    91:25, 92:1
work 15:5, 76:18, 95:14
works 9:22, 85:24
worth 56:18
worthy 41:20
wreck 43:5, 43:6
wrestle 81:12
wrestling 104:6
write 47:23, 51:11
written 19:10, 27:7, 32:17,
    93:17, 93:18
wrongly 63:9
wrote 46:20

< Y >
y'all 4:2, 22:23, 108:10
year 24:21, 25:4, 25:25,
    26:11, 27:10, 27:11, 35:13,
    40:22, 57:14, 57:15, 57:24,
    58:4, 76:19, 78:20
years 44:16, 44:20, 57:16
York 1:29, 2:31, 31:20, 68:1
you. 107:22
yourself 47:2, 63:23