**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

NATIONAL FOOTBALL LEAGUE MANAGEMENT
COUNCIL,

                                   Plaintiff,          Case No. 1:17-cv-06761-KPF

              v.

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION,

                                   Defendant.

<u>**MEMORANDUM OF LAW IN SUPPORT OF THE NFLPA'S MOTION FOR**</u>
<u>**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 7

    A.    The Underlying Arbitration ........................................................... 7

    B.    Litigation History.......................................................................... 12

ARGUMENT ....................................................................................................................... 14

    I.    Elliott Will Suffer Irreparable Harm ...................................................... 15

    II.    The Balance of Hardships Weighs in Favor of Elliott and the NFLPA............... 16

    III.    The NFLPA and Elliott Have Demonstrated a Likelihood of Success or, Alternatively, "Serious Questions" on the Merits of Their Vacatur Claim ......... 18

        A.    This Circuit Has Long Recognized the Deep-Seated and Discrete Denial of "Pertinent and Material" Evidence Standard as a Basis for Vacating an Arbitration Award as Fundamentally Unfair ................. 18

        B.    The Award Defies the FAA's Discrete, Textual Requirements and Thus Requires Vacatur............................................................ 22

        C.    The Public Interest Favors Granting an Injunction .................................. 25

CONCLUSION.................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul Wali v. Coughlin,*
754 F.2d 1015 (2d Cir. 1985), *overruled on other grounds* ...................................14

*Allis-Chalmers Corp. v. Lueck,*
471 U.S. 202 (1985)................................................................................................20

*Attia v. Audionamix, Inc.,*
No. 14 CIV. 706 RMB, 2015 WL 5580501 (S.D.N.Y. Sept. 21, 2015)................20

*Brady v. NFL,*
779 F. Supp. 2d 992 (D. Minn. 2011), *rev'd on other grounds*, 644 F.3d 661
(8th Cir. 2011).......................................................................................................15

*Chevron Transp. Corp. v. Astro Vencedor Compania Naviera, S.A.,*
300 F. Supp. 179 (S.D.N.Y. 1969) .......................................................................21

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,*
794 F.2d 38 (2d Cir. 1986).....................................................................................16

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010)..................................................................................3, 18

*El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.,*
247 F.3d 843 (8th Cir. 2001) .................................................................................21

*Gulf Coast Indus. Workers Union v. Exxon Co., USA,*
70 F.3d 847 (5th Cir. 1995) ...................................................................................21

*Home Indem. Co. v. Affiliated Food Distribs., Inc.,*
No. 96 CIV. 9707 (RO), 1997 WL 773712 (S.D.N.Y. Dec. 12, 1997) ............21, 22

*Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas
Local 901,*
763 F.2d 34 (1st Cir. 1985)....................................................................................21

*HRH Constr., L.L.C. v. Local No. 1, Int'l Union of Elevator Constructors, AFL-
CIO,*
No. 03 Civ. 8944 (DC), 2005 WL 31948 (S.D.N.Y. Jan. 5, 2005).......................19

*ICAP Corporates, LLC v. Drennan,*
2015 WL 10319308 (D.N.J. Nov. 18, 2015) .........................................................21

*Kaplan v. Alfred Dunhill of London, Inc.*,
   1996 WL 640901 (S.D.N.Y. Nov. 4, 1996)......................................................................20

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   364 F.3d 274 (5th Cir. 2004) ........................................................................................21

*LaRouche v. Kezer*,
   20 F.3d 68 (2d Cir. 1994)...............................................................................................14

*Linseman v. World Hockey Ass'n*,
   439 F. Supp. 1315 (D. Conn. 1977)................................................................................15

*NFLMC v. NFLPA (Brady II)*,
   820 F.3d 527 (2d Cir. 2016)........................................................................................ *passim*

*NFLPA v. NFL (Starcaps)*,
   598 F. Supp. 2d 971 (D. Minn. 2008)..............................................................15, 16, 17, 18

*NFLPA v. NFL (Elliott)*,
   No. 17-40936 (5th Cir. Oct. 12, 2017)........................................................................ *passim*

*NFLPA v. NFL (Elliott)*,
   No. 4:17-CV-00615, 2017 WL 3940545 (E.D. Tex. Sept. 8, 2017)............................... *passim*

*NFLPA v. NFL (Elliott)*,
   No. 4:17-CV-00615, 2017 WL 4124105 (E.D. Tex. Sept. 18, 2017).......................3, 4, 16, 22

*Ostrom v. Worldventures Mktg., LLC*,
   160 F. Supp. 3d 942 (M.D. La. 2016)..............................................................................21

*Otis Elevator Co. v. Local 1, Int'l Union of Elevator Constructors*,
   No. 03 Civ. 8862 (DAB), 2005 WL 2385849 (S.D.N.Y. Sept. 23, 2005)............................19

*Phillip v. Fairfield Univ.*,
   118 F.3d 131 (2d Cir. 1997).....................................................................................15, 18

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 616 (S.D.N.Y. 2010) ..................................................................................15

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
   77 F. Supp. 2d 399 (S.D.N.Y. 1999)................................................................................25

*Somoza v. NYC Dep't of Educ.*,
   No. 06 CIV. 5025 (VM), 2006 WL 1981758 (S.D.N.Y. July 10, 2006) ................................3

*Tempo Shain Corp v. Bertek, Inc.*,
   120 F.3d 16 (2d Cir. 1997).......................................................................................18, 20

*Textile Workers v. Lincoln Mills*,
   353 U.S. 448 (1957)..................................................................................................20

*Trustees of NYC Dist. Council of Carpenters v. Port Parties, Ltd.*,
   No. 16 CIV. 4719 (KPF), 2017 WL 3267743 (S.D.N.Y. July 31, 2017) ...............................19

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
   484 U.S. 29 (1987)..................................................................................5, 20, 22, 23

*XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*,
   874 F. Supp. 2d 263 (S.D.N.Y. 2012)..............................................................................14

**Statutes**

9 U.S.C. § 10.................................................................................................................5

9 U.S.C. § 10(a)(3)..............................................................................................19, 20, 21

29 U.S.C. § 185.............................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 65(b) .......................................................................................................1

The National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Dallas Cowboys Running Back Ezekiel Elliott ("Elliott"), respectfully submits this Memorandum of Law in Support of its Motion for Temporary Restraining Order and Preliminary Injunction, pursuant to Federal Rule of Civil Procedure 65(b), to preserve the status quo and prevent the National Football League and National Football League Management Council (together, "NFL" or "League") from enforcing the six-game suspension imposed by NFL Commissioner Roger Goodell and sustained by the September 5, 2017 arbitral decision issued by Arbitrator Harold Henderson (the "Award").

## PRELIMINARY STATEMENT

The United States District Court for the Eastern District of Texas has already granted preliminary injunctive relief to the NFLPA in light of the "[f]undamental unfairness [that] infected this case from the beginning, eventually killing any possibility that justice would be served." *NFLPA v. NFL (Elliott)*, No. 4:17-CV-00615, 2017 WL 3940545, at *10 (E.D. Tex. Sept. 8, 2017) ("PI Order"). On appeal, the Fifth Circuit issued a 2-1 decision holding that the NFLPA's Petition to Vacate the Award filed in the Eastern District of Texas lacked subject matter jurisdiction because it was filed before the Award was issued. *See NFLPA v. NFL (Elliott)*, No. 17-40936 (5th Cir. Oct. 12, 2017) (Doc. No. 00514193815) ("Fifth Circuit Order"). The majority declined to analyze the merits of the NFLPA and Elliott's fundamental fairness claim, but nonetheless observed that the "arguments and concerns about the arbitration process may have merit," however, "they must be considered by a court with proper jurisdiction." *Id.* at 9 n.8. The dissenting Judge, like the Texas district court, *did* consider the NFLPA's fundamental fairness ground for vacatur and, like the Texas district court, found that "the NFLPA and Elliott were arguably denied the right to present, by testimony or otherwise, any evidence relevant to

1

the hearing." *Id.* at 18 (quotations mark omitted).   Moreover, he found that Arbitrator Henderson's conduct "impugned the integrity of the arbitration process." *Id.* at 19 (citation omitted).

As the NFLPA previously advised the Court, it intends to petition the Fifth Circuit for rehearing *en banc* which, if granted, would stay the mandate and preserve the preliminary injunction status quo pursuant to which Elliott has played all season-long.   But contrary to the Fifth Circuit's internal operating procedures, and confirmation by the Fifth Circuit clerk that the mandate would not issue immediately and that the NFLPA had 14 days within which to file the petition for rehearing, on October 13, the Fifth Circuit *sua sponte* and "forthwith" issued the mandate.   *See* Mandate, *NFLPA v. NFL (Elliott)*, No. 17-40936 (5th Cir. Oct. 13, 2017) (Doc. No. 00514194917).   The NFLPA immediately moved to recall the mandate because it intends to petition for rehearing *en banc*.   *See* Motion to Recall Mandate, *NFLPA v. NFL (Elliott)*, No. 17-40936 (5th Cir. Oct. 13, 2017) (Doc. No. 00514195816); *see also* ECF No. 25.   The Fifth Circuit, however, has not yet acted on the NFLPA's motion to recall the Mandate, and the NFL has taken the position that it is no longer bound by the preliminary injunction issued by the Texas district court and that Elliott will not be permitted to practice, starting on October 17, or to play in the Cowboys next game, on Sunday, October 22.   The NFLPA and Elliott, therefore, are stuck in procedural limbo and must turn to this Court for preliminary injunctive relief to prevent imminent and irreparable harm to Elliott.

The NFL follows a procedure in which it requires teams to set final rosters (listing active player employees) for that week's game at 4:00 p.m. EDT on Tuesday, so for this week's game, on Tuesday October 17.   Thus, the NFLPA respectfully requests an immediate order from the Court enjoining any suspension until such time as this Court or the Texas district court,

depending upon the outcome of further proceedings, renders a final decision on the NFLPA's vacatur claim (in Texas) or counterclaim (in New York).

To obtain such relief in the Second Circuit, a movant must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the [movant]." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citations omitted).[1]  The NFLPA submits that the "serious questions" standard is applicable on this motion, as the balance of hardships clearly weighs in Elliott's favor, but alternatively the NFLPA has established a likelihood of success.

*First*, the Eastern District of Texas has already held (twice) that Elliott will suffer irreparable harm from a suspension, "join[ing] the long line of cases that have previously held that improper suspensions of professional athletes can result in irreparable harm to the player." PI Order at *10; *see also NFLPA v. NFL (Elliott)*, No. 4:17-CV-00615, 2017 WL 4124105, at *6 (E.D. Tex. Sept. 18, 2017) ("Stay Order").  The NFL's rejoinder that Elliott will not suffer severe and irreparable harm to his season, career, and reputation as a result of his six-game suspension—nearly half of an NFL season—defies reason in this industry, where players' careers are precarious and short.  *See* Declaration of Joseph Arceneaux, Jr. ("Arceneaux Decl.") ¶¶ 5-6, submitted herewith.  Injunctive relief would also prevent the Cowboys from unjustifiably losing their star running back for games that cannot be re-played.  *See* Declaration of Jason Cohen ("Cohen Decl.") ¶ 6, submitted herewith.

---

[1] "It is well established that in this Circuit, the standard for an entry of a TRO is the same as for a preliminary injunction."  *Somoza v. NYC Dep't of Educ.*, No. 06 CIV. 5025 (VM), 2006 WL 1981758, at *3 (S.D.N.Y. July 10, 2006).

**Second**, the balance of hardships tips decidedly in Elliott's favor.  As the Texas district court held (again, twice), "the NFL has shown little, if any, harm."  Stay Order at *6; *see also* PI Order at *11 (finding that preliminary injunction would benefit rather than harm the NFL).  Enjoining the suspension would simply maintain the status quo of Elliott continuing to practice and play for the Cowboys until the NFLPA and Elliott's petition to vacate the Award sustaining his suspension can be resolved on the merits.  Elliott was an active member of the Cowboys during the full year that the League spent investigating the accusations against him that are the basis for the discipline; the NFL unilaterally chose to permit Elliott to play in the opening game of the regular season even before the PI Order was issued; and Elliott has played in each of the Cowboys' games following the Texas court's issuance of the injunction—all without any demonstrable harm to the NFL.  The NFL can simply suspend Elliott at a later date should the NFLPA's vacatur claim ultimately be denied, further discrediting the NFL's claims of cognizable harm.  As Judge Graves explained in his dissent, the NFL failed to show "any irreparable injury for purposes of a stay" and "[t]he status quo is Elliott continuing to play pending resolution of the claim filed below."  Fifth Circuit Order at 22.

**Third**, the NFLPA and Elliott are likely to succeed on the merits or, alternatively, have more than established "serious questions" going to the merits of their vacatur claim.  These conclusions follow *a fortiori* from the fact that all four Judges to review the NFLPA's fundamental fairness claims thus far have either found them meritorious or observed that they may have merit without reaching the issue.  For example, Judge Mazzant held that "this case presents unique and egregious facts," and "[t]he circumstances . . . are unmatched by any case this Court has seen."  PI Order at *8, 10 (citing, by contrast, *NFLMC v. NFLPA* ("*Brady II*"), 820 F.3d 527 (2d Cir. 2016)).  Judge Graves similarly found a likelihood of fundamental unfairness,

and the two majority panel members observed that his analysis of this issue may be meritorious. With four different federal judges reaching similar conclusions, it is difficult to see how the NFLPA has not presented "serious questions" on the merits of its claim, if not a likelihood of success.

The Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and the Federal Arbitration Act, 9 U.S.C. § 10 ("FAA"), simply do not sanction an award, such as this one, that is borne out of a fundamentally unfair arbitration where "the evidence and testimony precluded is material, pertinent, and critically important to Elliott's case."  PI Order at *10.  Although the boundaries of a fundamental fairness vacatur claim may be subject to debate, the Supreme Court has directed district courts reviewing labor arbitrations under the LMRA to look to relevant statutory text in the FAA—here, that vacatur is compelled where arbitrators are "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy."  *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987).  As the Texas district court held, there are at least three reasons why the Award cannot satisfy this test.

First, Lisa Friel and other unknown senior NFL executives conspired to conceal critical evidence about Elliott's innocence from all others involved in the disciplinary process—from Elliott, his Union, his team, Commissioner Roger Goodell (the disciplinarian), and his panel of outside expert advisors.  As detailed in the Answer and Counterclaim ("Answer") and the arbitral record appended thereto, Kia Roberts—the NFL's Director of Investigations, who co-led the NFL's nearly year-long investigation into the allegations that Elliott committed acts of domestic violence, and who personally conducted every witness interview (except one of Elliott)— concluded that the accuser, Tiffany Thompson, *was not credible and that there was insufficient corroborating evidence to proceed with **any** discipline of Elliott*.  Arb. Hr'g Tr, (Aug. 30), Ex. C

at 301:22-302:4.  But senior NFL executives—in an apparent effort to make a public perception display of the NFL's "tough" stance on domestic violence—conspired to suppress this information from the Commissioner and his panel of outside expert advisors who were responsible for determining discipline.  This suppression of Roberts' exculpatory conclusions, including from the NFLPA and Elliott, "infected this case from the beginning."  PI Order at *10.

Second, despite the fact that Elliott's appeal turned on the credibility of his accuser, he and the NFLPA were denied their fundamental right to cross-examine Thompson at the arbitration hearing—the most "pertinent and material" evidence imaginable in a he-said/she-said case, where the credibility of the accuser had already been rejected by the co-lead investigator. Elliott was never arrested, nor charged with *any* crime precisely because the Ohio prosecutor, like Director of Investigations Roberts, found that Thompson's claims and the other evidence amounted to "conflicting and inconsistent information across all incidents."  Ex. A-NFLPA-24 at 2.  Yet, not only did the Arbitrator refuse to require the critical testimony from Thompson, he even denied Elliott and the NFLPA access to the NFL investigators' notes of their six interviews with Thompson.  "In this situation, where credibility is questioned and a dissenting opinion regarding the case and the credibility of Thompson are withheld from, at a minimum, the NFLPA and Elliott, the ability to cross-examine Thompson is both material and pertinent."  PI Order at *9.  This is particularly true because the Personal Conduct Policy ("PCP") under which Elliott was disciplined specifically provides that there must be "credible evidence" for discipline in the absence of criminal charges.

Third, the Arbitrator also denied Elliott and the NFLPA the right to testimony from Commissioner Goodell, who imposed the discipline.  The Commissioner's testimony was essential to determine what he knew and did *not* know about the evidence suppressed by Friel

and others.  This evidence was unequivocally pertinent and material to a fundamentally fair arbitration because the NFL's lawyers argued to Henderson that he should defer to the Commissioner's fact-finding.  *See* PI Order at *9.  But no such deference could have been appropriate if the Commissioner was kept in the dark about the NFL executive principally responsible for conducting the investigation concluding that the accuser was not credible and that the corroborating evidence was insufficient to justify discipline.  Deprived of that evidence, the LMRA—as guided by the plain text of the FAA—was clearly violated.

## STATEMENT OF FACTS[2]

### A.    The Underlying Arbitration

On July 22, 2016, law enforcement officers in Columbus, Ohio began investigating allegations made by Tiffany Thompson—a woman with whom Elliott had an intimate relationship—that Elliott had engaged in multiple incidents of domestic violence against her over the course of the week of July 16, 2016.  Elliott was never arrested.  Police on the scene found no probable cause because of "conflicting versions of what had taken place over the listed dates." Nor was Elliott ever charged with any crime.  On September 6, 2016, after an extensive investigation, the Columbus City Attorney's office made a public statement that it would not be charging Elliott at all, due to "the totality of the evidence" revealing "conflicting and inconsistent information across all incidents," including the claims of Elliott's accuser, the only witness against him.  Ex. A-NFLPA-40.  Elliott, for his part, has all along categorically denied that he engaged in any wrongful acts or abuse toward Thompson.

Pursuant to the NFL's PCP, however, the League takes the position that it may discipline players under the NFL-NFLPA collective bargaining agreement ("CBA") for "conduct

---

[2] The NFLPA incorporates by reference the Answer, submitted herewith, and exhibits appended thereto.

detrimental" to the NFL even in the absence of criminal findings.  But there is an important caveat.  The PCP provides that in cases where a player is accused of criminal behavior, but no criminal charges are levied, the Commissioner may impose discipline only if "***credible evidence*** establishes that [the player] engaged in conduct prohibited by this [PCP]."  Ex. A-NFLPA-16 at 5.  It is also undisputed that such discipline must be "fair and consistent."  Arb. Hr'g Tr. (Aug. 29), Ex. C at 84:3-7.

Despite the Ohio authorities' conclusion, the NFL proceeded with its own investigation into Thompson's allegations, led by NFL Director of Investigations Roberts.  The League conducted 23 witness interviews and collected extensive documentary and other evidence from Thompson and Columbus law enforcement.  Exs. A-NFLPA-44 & 49.  The NFL's investigation lasted almost a year and culminated with the release of the Investigative Report ("Elliott Report") on June 6, 2017.  Ex. A-NFLPA-44.  As part of the investigative process under the PCP, the Commissioner was given advice about whether to impose discipline from four outside expert advisors.  Ex. A-NFLPA-49 at 2.

The Commissioner ultimately decided that during the week of July 16, 2016, Elliott had committed three out of five acts of domestic violence alleged by Thompson.  *Id.* at 3-6.  But what the Commissioner and his advisors apparently did not know (and what Elliott and the Union clearly did not know), is that Friel and other NFL executives had deliberately concealed the fact that Roberts—who had personally conducted all of the fact witness interviews (except one of Elliott) and she, and not Friel, met with and interviewed Thompson (six times)—had reached the conclusion that Thompson's accusations were incredible, inconsistent, and not supported by corroborating evidence sufficient to support the imposition of *any* discipline against Elliott.  *See* Answer ¶¶ 49-61; Arb. Hr'g Tr. (Aug. 30), Ex. C at 301:22-302:4 (Roberts'

conclusion); *id.* at 265:15-21 (decision to omit conclusions in Elliott Report); Arb. Hr'g Tr. (Aug. 29), Ex. C at 161:16-22 (Roberts never met with outside expert advisors); *id.* at 163:11-13 (Roberts excluded from meeting with Commissioner).  The shocking revelation of this effort to suppress exculpatory evidence during the arbitration confirmed that the entire discipline and disciplinary appeal process had been irretrievably corrupted.

NFL Director of Investigations Roberts reached her conclusions because, among other things, Thompson repeatedly lied to the investigators, told her friend to lie to police about the abuse, gave inconsistent accounts of the alleged incidents, destroyed relevant e-mails and text messages, plotted to extort money from Elliott, and threatened Elliott that she would ruin him and his career because he did not want the same type of relationship that Thompson did.  *See* Answer ¶ 46; *e.g.*, Ex. A-NFLPA-30; Ex. A-NFLPA-41; Ex. A-NFLPA-44 at 98, 100; *see also e.g.,* Ex. A-NFLPA-48 at 9, 11, 12, 15-16, 20, 22-29 (collecting evidence from NFL investigation).  Specifically, as Roberts testified at the arbitration, she "ha[d] concerns about [Thompson's] credibility," "[i]t seemed like there were ***numerous witnesses*** who what they had to say was in, you know—***diametrically opposed*** to what [Thompson] stated had occurred that evening," and in her nine-year career as a (former) prosecutor, Roberts had never "cho[sen] to put a witness on the stand knowing that they had this many inconsistencies in their testimony." Arb. Hr'g Tr. (Aug. 29), Ex. C at 172:24, 173:19-22; 226:21-25 (emphases added).

The NFL's other co-lead investigator, NFL Senior Vice President Lisa Friel, testified that she was fully aware of Roberts' conclusion that there was not enough corroborating evidence to overcome Thompson's credibility problems to proceed with discipline.  Arb. Hr'g Tr. (Aug. 30), Ex. C at 301:22-302:4.  Friel and unidentified NFL counsel, however, wanted discipline to be imposed, and therefore kept Roberts' and all other investigators' conclusions out of the Elliott

Report.  *See id.* at 265:15-21.   Moreover, Roberts was thereafter excluded from separate meetings with Commissioner Goodell and his outside expert advisors at which the findings of the investigation were purportedly presented.  Arb. Hr'g Tr. (Aug. 29), Ex. C at 161:16-22; 163:11-13.  The apparent desire to portray the NFL's new domestic violence policy as "tough" caused those who suppressed the evidence to corrupt the process.  Indeed, the arbitral evidence revealed that Friel deliberately concealed the conclusions of Roberts from the Commissioner's four expert advisors when she was asked point blank about the investigators' determinations on the credibility of the allegations.  Ex. A-NFLPA-45 at 151:20-153:14.

On August 11, 2017, Commissioner Goodell suspended Elliott for six games on the ostensible basis of "substantial and persuasive" evidence that Elliott had violated the PCP by committing three out of five alleged acts of domestic violence against Thompson.  Ex. A-NFLPA-49 at 3-6.  At the time the Commissioner imposed this discipline, he was either deprived of the most important conclusions from the investigation—as they were excluded from the Elliott Report and withheld in the meeting with the outside expert advisors (which Henderson found to constitute the relevant record before the Commissioner (*see* Arb. Hr'g Tr. (Aug. 30), Ex. C at 348:18-349:15))—or, if he learned about them through some other channel, he willfully opted to ignore them in his disciplinary determination.  Elliott timely filed an appeal of his suspension pursuant to the procedures set forth in Article 46 of the CBA.  Exs. A-NFLPA-58 & 50.

Article 46 provides that the hearing officer (arbitrator) on appeal is either the Commissioner or his designee.  In this case, Commissioner Goodell designated Henderson, who served 16 years as the NFL's Executive Vice President for Labor Relations and Chairman of Respondent National Football League Management Council's Executive Committee.  Upon

information and belief, Henderson is still employed part-time by the NFL and has been paid millions of dollars by the NFL in the past decade.  Answer ¶ 23.

Given the centrality of Thompson's credibility to the arbitration, and the PCP's requirement of "credible evidence" in matters where there are no criminal charges, Elliott and the NFLPA requested that the NFL produce Thompson for cross-examination as well as their investigator notes of interviews with Thompson.  The NFL refused to provide all of this critical evidence, and its hand-selected Arbitrator denied the NFLPA's Motion to Compel.  Exs. A-NFLPA-52, 53 & 55.  The NFLPA was thus denied the right to confront Elliott's lone accuser and gain access to exculpatory evidence—clearly pertinent and material evidence—in a he-said/she-said proceeding to determine whether "credible evidence" existed to support Thompson's claims.

Moreover, the NFL at first refused to produce Roberts for cross-examination, claiming that her testimony would be "cumulative and unnecessary" because the NFL would produce Friel.  Ex. A-NFLPA-52 at 4.  This was nothing less than a fraud-on-the-arbitration, because the NFL knew—even though the NFLPA and Elliott did not—that Roberts' conclusion that there was no credible evidence to discipline Elliott was the opposite of Friel's.  Friel, in turn, did everything she could to conceal these facts.  Fortunately, in what the Texas district court found to be a "fairness needle in the unfairness haystack," the arbitrator compelled the NFL to produce Roberts.  PI Order, at *9; Ex. A-NFLPA-55 at 2.

The arbitration appeal hearing was held on August 29-31 before Henderson.  Arb. Hr'g Trs., Ex. C.  In addition to the testimonial revelations from Roberts and Friel recounted above, Elliott testified categorically, emphatically, and under oath that he is innocent of the allegations of alleged abuse.  *See, e.g.*, Arb. Hr'g Tr. (Aug. 30), Ex. C at 86:4-10.  Further, although there

11

was no other eyewitness to the alleged incidents besides Elliott and Thompson, Alvarez Jackson was present in Elliott's apartment during the week of the alleged incidents, and he testified at the arbitration that he neither saw nor heard any evidence of abusive conduct or learned of any claims of abuse from Thompson. *Id.* at 222:1-16.

During the arbitration, it became critical to discover what Commissioner Goodell did and did not know about Roberts' conclusions. The Texas district found Friel's testimony on this point incoherent. PI Order, at *9, n.9 (collecting "varying testimony"). The NFLPA thus sought to compel Goodell's testimony on this critical issue, but the arbitrator refused, further depriving Elliott of pertinent and material evidence on the basis for the Commissioner's disciplinary determination.

On September 5, Henderson predictably sustained Elliott's six-game suspension.

**B.     Litigation History**

The NFLPA filed a Petition to Vacate the Award in the Eastern District of Texas on August 31, 2017. *See* Case No. 4:17-cv-00615 (E.D. Tex.) (filed Aug. 31, 2017) (ECF No. 1). The next day, the NFLPA also filed an Emergency Motion for Temporary Restraining Order or Preliminary Injunction. *Id.*, ECF No. 5. During the September 5 hearing, the Texas district court indicated its grave concerns with the underlying arbitration proceedings. *See, e.g.*, Ex. I at 86:24-88:24. Shortly thereafter, the NFL filed its threadbare Complaint in this District. ECF No. 1. On September 8, 2017, the Eastern District of Texas granted the NFLPA's motion and issued a preliminary injunction.

On September 11, 2017, the NFL filed a notice of its intent to appeal the PI Order to the Fifth Circuit Court of Appeals. *See* Case No. 4:17-cv-00615 (E.D. Tex.) (ECF No. 29). The NFL also filed with the district court an Emergency Motion to Stay the injunction pending

12

appeal.  *Id.*, ECF No. 30.  On September 15, 2017, before the district court issued its decision on the NFL's stay motion, the NFL sought an emergency stay of the injunction in the Fifth Circuit.  *See NFLPA v. NFL (Elliott)*, No. 17-40936 (5th Cir. Sept. 15, 2017) (Doc. No. 00514157782).  On September 18, the Texas district court denied the NFL's stay request.

On October 12, the Fifth Circuit panel held in a 2-1 decision that the Texas district court lacked subject matter jurisdiction to issue the preliminary injunction because it found that the NFLPA's Petition to Vacate the Award was premature.  *See* Fifth Circuit Order.  The Court of Appeals did not overrule any of the district court's findings regarding the fundamentally unfair arbitration, irreparable harm to Elliott without an injunction, lack of harm to the NFL or the public interest.  In fact, the dissent found that Henderson's actions had "impugned the integrity of the arbitration process" and that the NFL had failed to show "*any* irreparable injury for purposes of a stay."  *Id.* at 19, 22 (emphasis added).  The majority, in turn, agreed that the NFLPA's fundamental fairness arguments "may have merit."  *Id.* at 9 n.8.

On October 13, 2017, the mandate on the panel's divided October 12 decision issued "forthwith" and *sua sponte*, in the absence of any motion or briefing and despite the Court Clerk's confirmation to NFLPA counsel that the Mandate would not immediately issue and the NFLPA would have the full 14 days within which to petition for rehearing.  *See* Mandate, *NFLPA v. NFL (Elliott)*, No. 17-40936 (5th Cir. Oct. 13, 2017) (Doc. No. 00514194917).  Later that same day, the NFLPA moved the Fifth Circuit for an immediate recall of the Mandate in light of its intention to seek rehearing from the *en banc* court.  *See* Motion to Recall Mandate, *NFLPA v. NFL (Elliott)*, No. 17-40936 (5th Cir. Oct. 13, 2017) (Doc. No. 00514195816).

On October 14, the Eastern District of Texas issued an order deferring dismissal of the case until the Fifth Circuit decides the NFLPA's motion for recall of the mandate.  *See* Case No.

4:17-cv-00615 (E.D. Tex.) (ECF No. 45).  Thus, the Texas action remains active.  However, the NFL has indicated that it does not believe that it is legally required to comply with the preliminary injunction any longer in light of the issuance of the mandate.  And indeed, upon information and belief, the NFL today informed the Cowboys that Elliott will not be permitted to participate in this week's game (on Sunday) or practices (commencing on October 17, the team's first work day since the Fifth Circuit ruled).   Given this procedural posture, the NFLPA and Elliott seek immediate relief from this Court to preserve the status quo so that Elliott may continue to practice and play while his vacatur claim is finally determined.

## ARGUMENT

"[T]he purpose of a preliminary injunction is to maintain the *status quo ante* pending a full hearing on the merits."  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*.  That objective would be fully vindicated by the Court's granting of this motion, which seeks only to maintain the status quo of, as Judge Graves described, "Elliott continuing to play pending resolution of the claim filed below."  Fifth Circuit Order at 22.

Although the NFL may contend that the status quo is that Elliott has been suspended since the Fifth Circuit ruled a few days ago, the NFLPA disagrees, as the "status quo to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which proceeded the pending controversy."  *See XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 272 (S.D.N.Y. 2012) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n. 7 (2d Cir. 1994)).  The fact of the matter is that Elliott has practiced and played the entire season—last weekend, the Cowboys did not have a game or practices—and this is the status quo to be maintained by a temporary restraining order or preliminary injunction from this Court.

14

# I.    Elliott Will Suffer Irreparable Harm

An injunction is unquestionably necessary to prevent irreparable harm to Elliott.  *See Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997) (requiring movant to demonstrate "that the injunction is necessary to prevent irreparable harm").  The mere fact that economic damages may be available does not always mean that a remedy at law is adequate; wherever the threatened harm "cannot be adequately redressed by final relief on the merits," irreparable harm exists.  *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 616, 621 (S.D.N.Y. 2010).

As set forth in the attached declaration of Elliott's agent, Joseph Arceneaux, Jr., the careers of professional football players are short and precarious, providing a limited window in which players have the opportunity to play football in pursuit of individual and team achievements.   Arceneaux Decl. ¶ 6.   Likewise, a long line of decisions—including, most recently, the PI Order—establish that, as a matter of law, depriving professional athletes of the ability to practice and play constitutes irreparable harm.[3]

Elliott stands to miss nearly half of the NFL's sixteen-game regular season and will be prohibited from practicing with his team leading up to the games for which his suspension is in effect.   Arceneaux Decl. ¶ 5.   Missing any games could deprive Elliott of the ability to achieve individual successes and honors, such as earning a spot in the Pro Bowl for a second consecutive season.   *Id.* ¶ 8; *see also Starcaps*, 598 F. Supp. 2d at 982.   Furthermore, the significant monetary losses that Elliott will suffer due to the six-game suspension cannot be calculated because of the snowball effect on Elliott's reputation, earning potential, and overall market value.   Arceneaux

---

[3] *See, e.g.*, *Brady v. NFL*, 779 F. Supp. 2d 992, 1005 (D. Minn. 2011) ("the threat of harm shown by [football players] here, including lost playing time, constitutes irreparable harm"), *rev'd on other grounds*, 644 F.3d 661 (8th Cir. 2011); *NFLPA v. NFL* ("*Starcaps*"), 598 F. Supp. 2d 971, 982 (D. Minn. 2008) ("[i]mproper suspensions . . . can undoubtedly result in irreparable harm"); *Linseman v. World Hockey Ass'n*, 439 F. Supp. 1315, 1319 (D. Conn. 1977).

Decl. ¶ 10.[4]  Indeed, it is very difficult for a professional athlete (or anyone else) to reverse a nationally ingrained perception that the athlete committed domestic abuse.  *Id.* ¶ 9.  Such damage to Elliott's reputation is not remediable by this Court.  *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("Denying a preliminary injunction in this case . . . puts [plaintiff's] reputation beyond its own control.  And, it is that loss of control which is the very thing that constitutes irreparable harm . . . ."); *Starcaps*, 598 F. Supp. 2d at 982.

Recognizing that NFL careers are "short and precarious" and that a suspension will "deprive[] Elliott of the ability to achieve individual successes and honors" and compound the injury to his reputation, the Eastern District of Texas "join[ed] the long line of cases that have previously held that improper suspensions of professional athletes can result in irreparable harm to the player."  PI Order at *10.  The Fifth Circuit did not disturb the district court's findings of irreparable harm to Elliott, and the dissenting judge affirmatively endorsed them.

## II.     The Balance of Hardships Weighs in Favor of Elliott and the NFLPA

The balance of hardships tips decidedly in favor of Elliott.  The NFL will suffer "little, if any, harm" by allowing Elliott to play for the Cowboys as he has since the beginning of the season.  Stay Order at *6; *see also* PI Order at *11 (identifying no harm to the NFL and electing not to require a bond from the NFLPA).  As the Texas court found, an injunction would actually *benefit* the NFL because it has an "interest in ensuring that suspensions meted out under the [PCP] are not tainted by [fundamental unfairness] and wrongdoing."  PI Order at *11 (citing *Starcaps*, 598 F. Supp. 2d at 983).

---

[4] This fact alone dooms any argument by the NFL that the harm suffered by Elliott can be remedied by money damages.  Such argument would also run afoul the long line of cases holding that, as a matter of law, an athlete deprived of the ability to practice and play suffers irreparable harm.

If Elliott misses even one game, that bell cannot be unrung.  But if the Court issues an injunction which merely maintains the status quo until a decision on the merits can be made, there will be no harm to the NFL even if the NFLPA's request to vacate the Award is ultimately denied.  The League would simply suspend Elliott at a later time, to the same effect.  This argument has borne out in the reality of Elliott playing multiple games under the PI Order with no demonstrable adverse consequence to the NFL.

In fact, the framework for Commissioner discipline under the CBA *requires* that players have their right to an Article 46 appeal hearing before they may be disciplined, meaning that it is the ordinary course for players subject to pending, potential discipline to continue to practice and play while they appeal.  The fact that the current proceedings are taking place in court, rather than in a CBA arbitration, is of no moment for the salient takeaway: full participation by an NFL player who may ultimately be subject to discipline does not irreparably harm the NFL.  *See generally Brady II*; *Starcaps*, 598 F. Supp. 2d at 984 (court enjoined enforcement of an NFL arbitration award upholding suspensions but later confirmed the award, and players thereafter served their suspensions with no harm to the NFL).

As noted, the requested injunction will merely maintain the status quo because Elliott has been playing for the Cowboys since the beginning of the season.  Elliott was also an active member of the Cowboys during the entire year when Roberts was investigating Thompson's accusations, and the NFL voluntarily agreed not to enforce its suspension of Elliott for the first week of the season (*i.e.*, before entry of the PI Order).  Permitting Elliott to continue to play while the procedural question of which court will ultimately decide this case is answered, and then a final decision is rendered, will not harm the NFL.  As Judge Graves observed in his dissent, the NFL has failed to show "any irreparable injury."  Fifth Circuit Order at 22.  On the other hand, one of its members—the Cowboys—*will* face irreparable harm if the requested TRO

17

and preliminary injunction is denied. *See Starcaps*, 598 F. Supp. 2d at 982 (teams suffer irreparable harm where players "central to their team's chances of making the playoffs" are prevented from playing); Cohen Decl. ¶ 6; Arceneaux Decl. ¶ 7.

**III.  The NFLPA and Elliott Have Demonstrated a Likelihood of Success or, Alternatively, "Serious Questions" on the Merits of Their Vacatur Claim**

A movant will be granted preliminary injunctive relief if, in addition to showing irreparable harm, it can show *either* (i) a likelihood of success on the merits *or* (ii) sufficiently serious questions going to the merits, plus a balance of hardships in its favor. *Citigroup*, 598 F.3d at 35. Thus, where, as here, a movant is at risk of imminent and irreparable harm such that the balance of equities swings heavily in his favor, this Circuit will order preliminary relief upon a showing that there are "serious questions" raised by the merits of his claims. *Id.*; *Phillip*, 118 F.3d at 134 (affirming use of "serious questions" standard where student-athlete sought preliminary injunction to avert clear irreparable harm attributable to NCAA determination that he was ineligible to compete). In such cases, the demonstration of such "serious questions" displaces the more rigorous "likelihood of success" standard traditionally imposed on litigants seeking injunctive relief, in acknowledgement of a situation in which the "costs outweigh the benefits of not granting the injunction." *Citigroup*, 598 F.3d at 35. Alternatively, the "likelihood of success" requires a showing that the movant is "more likely than not" to succeed on the merits of its underlying claims. *Id.* at 34-35. The NFLPA and Elliott submit that they satisfy both standards.

**A.  This Circuit Has Long Recognized the Deep-Seated and Discrete Denial of "Pertinent and Material" Evidence Standard as a Basis for Vacating an Arbitration Award as Fundamentally Unfair**

While it is clear that the Second Circuit has long applied the FAA's fundamental fairness requirements in non-labor contexts, *see, e.g., Tempo Shain Corp v. Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997), this Court has expressed uncertainty about whether this Circuit recognizes a

"free-floating" fundamental fairness standard under the LMRA following the Second Circuit's decision in *Brady II* that it "need not decide whether the 'free-floating procedural fairness standard' of the FAA ought to be imported to our review of arbitrations conducted pursuant to the LMRA." *Brady II* at 28 n.13; *see Trustees of NYC Dist. Council of Carpenters v. Port Parties, Ltd.*, No. 16 CIV. 4719 (KPF), 2017 WL 3267743, at *14-*15 (S.D.N.Y. July 31, 2017).

Although the applicability of such a "free-floating" fairness standard was deferred by the *Brady II* Court, there should be no doubt that courts within this Circuit have long recognized that the FAA's discrete, deep-seated, and textual directive that the exclusion of "evidence pertinent and material to the controversy" warrants vacatur is broadly applicable to non-labor and LMRA cases alike.  FAA § 10(a)(3); *see, e.g., Otis Elevator Co. v. Local 1, Int'l Union of Elevator Constructors*, No. 03 Civ. 8862 (DAB), 2005 WL 2385849, at *4 (S.D.N.Y. Sept. 23, 2005) ("Particularly in the context of a petition to confirm or vacate an arbitration award, '[t]he policies of [S]ection 301 and the FAA are analogous' .... As such, the Court considers the instant case in light of the body of law developed under Section 301 and draws on the FAA for guidance."); *HRH Constr., L.L.C. v. Local No. 1, Int'l Union of Elevator Constructors, AFL-CIO*, No. 03 Civ. 8944 (DC), 2005 WL 31948, at *4 (S.D.N.Y. Jan. 5, 2005) (collecting cases); *compare Brady II* at 28 n.13.  Indeed, *Brady II* itself confirms that the "pertinent and material" standard survives any doubt cast on the "free-floating" standard:  The Circuit found no fundamental fairness violation where the excluded testimony was merely "collateral to the issues at arbitration," in other words, well short of what is required under the applicable "pertinent and material" standard.  *Brady II* at 28; *see also* PI Order at *10 ("The Second Circuit ultimately held that the

[*Brady II*] arbitrator's denial of this request [to compel testimony] was not fundamentally unfair since the evidence was not material and pertinent to the case.").[5]

Thus, questions about a "free-floating procedural fairness standard" aside, an arbitrator's "exclu[sion of] evidence," whether documentary or testimonial, which is plainly "pertinent and material to the controversy . . . amounts to fundamental unfairness" and warrants vacatur within the Second Circuit and across numerous jurisdictions.  *See Tempo Shain*, 120 F.3d at 20-21 (vacating award under FAA § 10(a)(3)); *Attia v. Audionamix, Inc.*, No. 14 CIV. 706 RMB, 2015 WL 5580501, at *8 (S.D.N.Y. Sept. 21, 2015) (vacating partial and final arbitration awards as "fundamentally unfair and in violation of 9 U.S.C. § 10(a)(3)" where petitioner suffered prejudice because arbitrator struck petitioner's affidavit containing testimony "pertinent and material" to the controversy); *id.* at *9 ("[Petitioner] was denied a 'fundamentally fair hearing,' and, therefore, the Partial Order rendered against him must be set aside. And because the Partial Order was the precursor of the Final Award, the Final Award is also vacated.") (internal citation omitted); *Kaplan v. Alfred Dunhill of London, Inc.*, 1996 WL 640901, at *5 (S.D.N.Y. Nov. 4,

---

[5] Labor policy considerations lead to the same conclusion.  The Supreme Court has ruled that the LMRA "expresses a federal policy that the substantive law to apply in § 301 cases 'is federal law, which the courts must fashion from the policy of our national labor laws.'"  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985) (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957)).  That same court subsequently held that "courts have often looked to the [FAA] for guidance in labor arbitration cases."  *Misco*, 484 U.S. at 41 n.9.  There should thus be no dispute that the LMRA—a statute expressly subject to the development of substantive law by the federal courts and expressly linked to the FAA by the Supreme Court for purposes of sourcing that substantive law—looks to the FAA *at least* for guidance from its express textual term that the exclusion of "evidence pertinent and material to the controversy" necessitates vacatur.  FAA § 10(a)(3).  "[Q]uestions relating to . . . what legal consequences were intended to flow from breaches of [a CBA], must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort."  *Allis-Chalmers Corp.*, 471 U.S. at 211.  As one such uniform source, it would disrupt federal labor policy were the LMRA read to dictate that union-protected employees are entitled to *less* fundamental fairness in the arbitral process than are non-unionized employees—and even corporations—under the FAA.

1996) ("[i]f the arbitrator refuses to hear pertinent and material evidence to the prejudice of one of the parties, the arbitration award may be set aside").[6]  Indeed, "[a] district court is quite limited in its power to overturn an arbitration award. . . .  But arbitrators must, in any event, give each of the parties to the dispute an adequate opportunity to present its evidence and argument. As such, the touchstone for a finding of arbitral misconduct under the Act is the concept of fundamental fairness."  *Home Indem. Co. v. Affiliated Food Distribs., Inc.*, No. 96 CIV. 9707 (RO), 1997 WL 773712, at *3 (S.D.N.Y. Dec. 12, 1997) (internal quotations and citations omitted); *see also Chevron Transp. Corp. v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969) ("The absence of statutory provision for discovery techniques in arbitration proceedings obviously does not negate the affirmative duty of arbitrators to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other side .... [A] failure to discharge this simple duty would constitute a violation of [FAA § 10(a)(3)], where a party can show prejudice as a result.").[7]  Simply put, an arbitrator cannot

---

[6] *See also Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 300–01 (5th Cir. 2004) ("It is appropriate to vacate an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing."); *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995) (affirming vacatur procured from "fundamentally unfair" labor arbitration proceedings when arbitrator refused to consider "pertinent and material" evidence); *Hoteles Condado Beach, La Concha & Convention Ctr. v. Union De Tronquistas Local 901*, 763 F.2d 34, 39-40 (1st Cir. 1985) (affirming vacatur, in part, on fundamental fairness grounds where "the exclusion of relevant evidence 'so affect[ed] the rights of a party that it may be said that he was deprived of a fair hearing'") (citation omitted); *cf. El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 848 (8th Cir. 2001) ("each party must be given the opportunity to present its arguments and evidence").

[7] *Accord Ostrom v. Worldventures Mktg., LLC*, 160 F. Supp. 3d 942, 950 (M.D. La. 2016); *ICAP Corporates, LLC v. Drennan*, 2015 WL 10319308, at *6 (D.N.J. Nov. 18, 2015) ("[P]arties to an arbitration 'must be allowed to present evidence without unreasonable restriction ... and must be allowed to confront and cross-examine witnesses...Where a party to an arbitration does not receive a full and fair hearing on the merits, a district court will not hesitate to vacate the award.'").

"bar a party from defending itself by precluding discovery of files central and dispositive to the dispute before it." *Home Indem. Co.*, 1997 WL 773712, at *5.

### B.     The Award Defies the FAA's Discrete, Textual Requirements and Thus Requires Vacatur

The judicial review executed up to this point provides *a fortiori* that the NFLPA is likely to succeed on its vacatur claim and that the requisite "serious questions" are readily apparent on this record.  To date, no less than four federal judges have considered the merits of the NFLPA and Elliott's claims that the NFL's concealment, and Henderson's denial, of "pertinent and material" evidence deprived Elliott of a full and fair arbitral hearing, requiring that the Award be vacated on the ground of fundamental unfairness.  Of those judges, two have decidedly held that injunctive relief is appropriate here; all four have, at a minimum, acknowledged the potential for the NFLPA and Elliott to prevail in this matter.  *See* PI Order at *10 (holding "the NFLPA demonstrated a substantial likelihood of success on the merits" because "[f]undamental unfairness infected this case from the beginning" and "throughout the entire arbitration process"); Stay Order at *5 (explaining that the court "deci[ded] to grant the preliminary injunction" because Henderson's denials of critical evidence "so affected the rights of the NFLPA and Elliott . . . that they were deprived of a fair hearing"); Fifth Circuit Order at 14, 18-19 (Graves, J., dissenting) (concluding that the district court properly had jurisdiction when it enjoined Elliott's suspension and that "[t]he NFLPA and Elliott were arguably denied the right to 'present, by testimony or otherwise, any evidence relevant to the hearing" such that the "integrity of the arbitration process" was "impugned"); *id.* at 9 n.8 (per curiam) (finding the case must be dismissed for lack of jurisdiction, even though Elliott's "arguments and concerns about the arbitration may have merit").  It defies logic that the NFLPA and Elliott's claims would not raise, at the very least, "serious questions" on

the merits given the four federal judges who have already acknowledged the actual or potential validity of these fundamental fairness claims.

To be sure, vacatur is uncommon, but this case represents one of the "very rare instances when an arbitrator's procedural aberrations rise to the level of affirmative misconduct." *Misco*, 484 U.S. at 41 n.10. The Texas district court held as much in enjoining Elliott's suspension, acknowledging the deference accorded an arbitrator "under ordinary circumstances" but holding that "the set of facts presented in this case are everything but ordinary and are such that the denial of key witnesses and documents amounts to serious misconduct by the arbitrator." PI Order at *8 (citing *Brady II* and *Misco*). The "essential evidence that was sought and denied [by the NFLPA] result[e]d in a fundamentally unfair hearing," warranting vacatur. PI Order at *10.

Senior NFL executives corrupted the proceedings by concealing from the NFLPA, Elliott, the Commissioner, and his panel of outside expert advisors, the fact that the NFL's Director of Investigations—the "only investigator who participated in all 22 of the witness interviews, including those with Elliott's accuser . . . [but] was then excluded from the meetings with Goodell and his outside advisors"—concluded that Elliott's accuser was so incredible, and the corroborating evidence so lacking, that no discipline was appropriate. Fifth Circuit Order at 11 (Graves, J., dissenting). It is hard to imagine a more fundamentally unfair and corrupt disciplinary and arbitral process than one in which the opposing party is conspiring to conceal pertinent, material, and exculpatory facts.

Further, it was fundamentally unfair to deprive Elliott and the NFLPA of the right to confront and cross-examine the sole accuser in a proceeding where the Arbitrator assigned them the burden of proof on the essential issue of whether the discipline was based on "credible evidence" in compliance with the PCP. There was no other eyewitness or direct evidence of

what allegedly happened, making Thompson's testimony indisputably "pertinent and material," yet Elliott and the NFLPA were deprived the right to confront Thompson or even access the NFL's investigator notes from the six times it interviewed Thompson.  The Arbitrator's express duty under the PCP was to determine if there was a fair and consistent basis for the Commissioner's determination that there was "credible evidence" to support the imposition of discipline against Elliott, but he declined to provide the NFLPA and Elliott a fundamentally fair opportunity to meet their burden of proof on this issue.  Ex. A-NFLPA-55 at 2.  The need for access to such evidence was especially critical here, where even Friel—who tried to conceal the exculpatory conclusions of her co-lead investigator Roberts—admitted that some of the accuser's statements and claims of abuse were not credible.  Arb. Hr'g Tr, (Aug. 30), Ex. C at 267:1-2 (Thompson has "credibility issues"); Ex. A-NFLPA-45 at 151:22-152:7 (Thompson's claim of abuse on July 22 was incredible).  *Accord* PI Order at *9 ("Henderson's denial of these requests prevented the NFLPA and Elliott from properly presenting their case and meeting their burden of proof. . . .  Henderson prevented Elliott access to credible evidence necessary to discharge this burden.  In this situation, where credibility is questioned and a dissenting opinion regarding the case and the credibility of Thompson are withheld from, at a minimum, the NFLPA and Elliott, the ability to cross-examine Thompson is both material and pertinent.").

It was also fundamentally unfair for Henderson to refuse to compel the Commissioner's testimony.  "[I]n [a] situation where the evidence that was in front of the Commissioner still remains unclear, it is material and pertinent to question Commissioner Goodell" himself.  PI Order at *9.  Indeed, the NFL argued to the Arbitrator that he should defer to the Commissioner's fact-finding, but in light of the revelations about Roberts, the only way to determine what facts had been considered by the Commissioner and what facts were concealed

was to question the Commissioner himself.  Henderson did not permit the NFLPA to do that.  In fact, in the absence of this critical testimony from the Commissioner, who has previously been compelled to testify in an Article 46 arbitration, Ex. A-NFLPA-14 at 2, Henderson reached the fundamentally unfair conclusion that he would defer to "whatever determinations [the Commissioner] made."  Ex. H at 8.  If any arbitral record warrants this Court vacating an arbitration award on fundamental fairness grounds, it is this one, where "[t]he circumstances of this case are unmatched by any case th[e Texas district court] has seen."  PI Order at *10.

### C.    The Public Interest Favors Granting an Injunction

Finally, the public interest supports enjoining employee discipline where it is the product of an unjust and fundamentally unfair arbitration.  As the Texas district court found, while "there is a preference for private settlements" of labor disputes, "the Court still retains review over the arbitral process to maintain minimum standards of fairness."  PI Order at *11.  An injunction to preserve the status quo while the integrity of the arbitral proceedings below are reviewed will benefit many constituents—including NFL players, fans of the Cowboys, and the NFL, as well as all persons subject to arbitration provisions.  Moreover, the "public interest favors an injunction" where, as here, one is necessary to maintain the status quo between the parties until a determination on the merits is made, no critical public interest would be harmed by its issuance, and the enjoined party can be effectively vindicated after a trial on the merits.  *SEB S.A. v. Montgomery Ward & Co., Inc.*, 77 F. Supp. 2d 399, 405 (S.D.N.Y. 1999).

<u>CONCLUSION</u>

For all of the reasons set forth herein, as supported by the accompanying Answer, exhibits, and declarations, the NFLPA respectfully requests that the Court enter a temporary restraining order before 4 pm on October 17 or as soon thereafter as practicable for the Court.

Dated: October 16, 2017

By:   s/Jeffrey L. Kessler
Jeffrey L. Kessler
David L. Greenspan
Jonathan J. Amoona
Angela A. Smedley
Isabelle Mercier-Dalphond
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com
dgreenspan@winston.com
jamoona@winston.com
asmedley@winston.com
imercier@winston.com

*Counsel for the National Football League
Players Association and Ezekiel Elliott*