UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

                                Plaintiff,

            v.

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION,

                             Defendant.

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 30, 2017

17 Civ. 6761 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Invoking his authority under the operative Collective Bargaining Agreement (the "CBA") and related Personal Conduct Policy (the "PCP"), Roger Goodell, the Commissioner of the National Football League (the "NFL"), imposed a six-game suspension on Ezekiel Elliott, a running back with the Dallas Cowboys, in August of this year after a league-sponsored investigation into allegations of domestic violence. The National Football League Players Association (the "NFLPA") appealed this decision to an arbitrator, who upheld the Commissioner's decision in September.

Unsurprisingly, the National Football League Management Council (the "NFLMC") seeks confirmation of the arbitral award, while the NFLPA seeks its vacatur. Equally unsurprisingly, both parties to this action have staked out litigation positions with specific reference to last year's decision by the Second Circuit in *National Football League Management Council* v. *National Football*

League Players Association (*Brady II*), 820 F.3d 527 (2d Cir. 2016): While the NFLMC argues that *Brady II* compels affirmance of the arbitrator's decision, the NFLPA contends with equal force that the "fundamental fairness" argument left open by *Brady II* both applies to the arbitrator's decision and compels its reversal.

Pending before the Court is the NFLPA's motion for a preliminary injunction to block enforcement of the six-game suspension. After reviewing the parties' comprehensive written submissions and hearing extensive oral argument earlier today, the Court concludes that, on this record, the NFLPA has failed to demonstrate a substantial question warranting the extraordinary remedy of injunctive relief or a balance of hardships that decidedly weighs in its favor. While reasonable minds could differ on the evidentiary decisions made by the arbitrator, the proceedings in their totality accorded with the CBA and the PCP — and, to the extent such an inquiry applies, with precepts of fundamental fairness. The arbitrator gave Mr. Elliott ample opportunity, in terms of both proceedings and evidence, to challenge the Commissioner's decision before the arbitrator; the arbitrator's ultimate decision against Mr. Elliott does not render these proceedings any less fair. Accordingly, the Court dissolves the temporary restraining order that has been in place since October 17, 2017, and denies the NFLPA's motion.

# BACKGROUND

## A.    Factual Background[1]

The essential facts are undisputed, and the Court therefore draws from the record before it.  *See Md. Cas. Co.* v. *Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) ("Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute."  (citations omitted)).

### 1.    The Parties and the Relevant Labor Agreements

A Collective Bargaining Agreement ("CBA") defines the professional relationship between the NFL and its players.  (Compl. ¶ 5).  The NFLMC operates as the bargaining representative of the NFL's member clubs (Compl. ¶ 3; Answer ¶ 19), while the NFLPA is a nonprofit corporation acting as the union and bargaining representative of all NFL players (Compl. ¶ 4; Answer ¶ 20).  One such player is Ezekiel Elliott, a running back for the Dallas Cowboys who is now in his second season in the NFL.  (Answer ¶ 22).  During his first season, he enjoyed notable success, including being named Offensive Rookie of the Year, first team All-Pro, and a Pro Bowl player.  (*Id.*).  But Elliott's

---

[1]    The Court will refer to the parties' submissions in the following manner:  The NFLPA's memorandum of law in support of its motion for injunctive relief will be referred to as "NFLPA Br." (Dkt. #32); the NFLMC's memorandum of law in opposition to the motion as "NFLMC Br." (Dkt. #37); the exhibits appended to the Declaration of Jeffrey L. Kessler, submitted as an attachment to the NFLPA's answer, as "Kessler Decl., Ex [ ]" (Dkt. #29); and the transcript of the August 29-31, 2017 arbitration proceeding as "Kessler Decl., Ex. C at [ ] ([Date of Transcript])" (Dkt. #29-105).  References to the oral argument held earlier today are from the Court's notes because the Court lacked a certified transcript of the proceedings.

rookie season was also notable for allegations of off-the-field misconduct, prompting an internal investigation.

Article 46 of the CBA imparts disciplinary authority to the NFL Commissioner, or his designee, for conduct that is "detrimental to the integrity of, or public confidence in, the game of professional football[.]" (Kessler Decl., Ex. A-58). The Commissioner issues an annual Personal Conduct Policy ("PCP") that identifies behavior he considers "detrimental to the league and professional football" and provides procedures for imposing discipline. (*Id.* at Ex. A-16). Under the operative PCP, issued in 2016, where such conduct does not result in criminal conviction, the Commissioner may impose discipline "if the credible evidence establishes that [a player] engaged in conduct prohibited by" the PCP. (*Id.*).[2] Article 46 of the CBA specifies the exclusive procedures for resolving "[a]ll disputes" over such discipline imposed by the Commissioner, and it provides players the right to a hearing to appeal their discipline. (*Id.* at Ex. A-58).

### 2. The Investigations into Elliott's Alleged Domestic Abuse

In July 2016, the Columbus (Ohio) Police Department investigated claims by Tiffany Thompson, with whom Elliott had previously had an intimate relationship, that Elliott had physically abused her on five occasions during the week of July 16, 2016. (*See* Kessler Decl., Ex. A-24, A-44). By July 22, 2016, law enforcement officers investigating Thompson's allegations had concluded

---

[2]     As the Court noted during its colloquy with counsel for the NFLPA, the credible evidence standard may be construed not as a "higher burden," but as an effort to obtain an evidentiary analogue for a criminal conviction.

that there was insufficient evidence to establish probable cause to arrest

Elliott, due to conflicting accounts of the underlying facts. (*See id.* at

Ex. A-24). The Columbus City Attorney's Office then investigated the

allegations but declined to charge Elliott, citing "conflicting and inconsistent

information … resulting in concern regarding the sufficiency of the evidence to

support the filing of criminal charges." (*Id.* at Ex. A-40).

The NFL's director of investigations, Kia Roberts, and the NFL's Special

Counsel for Investigations, Lisa Friel, conducted a separate investigation into

the allegations, with Roberts conducting a majority of witness interviews over

the course of the investigation. (Kessler Decl., Ex. A-44, Ex. C at 261:8-16

(Aug. 30)).[3] This investigation resulted in a report that the NFL issued on June

6, 2017 (*id.* at Ex. A-44); the NFL then held a meeting on June 26, 2017,

during which Friel presented the findings of the report to Elliott, his agents,

and the NFLPA (*id.* at Ex. A-45). The Commissioner also ordered that an

advisory panel be present. (*Id.* at A-45, 7:14-23).

During this meeting, upon questioning by Mary Jo White, one of the

Commissioner's advisors, Friel represented that only one of the alleged

instances of abuse leveled by Thompson had been found to be not credible.

(Kessler Decl., Ex. A-45 at 151:20-153:14). As the NFLPA points out in its

briefing, Roberts was not present at the meeting, and the report did not include

---

[3]       The NFLPA's submissions are replete with references to intra-league conspiracies, conflicts of interest, and inconsistent (if not false) statements on the part of certain NFL personnel. The Court has found that the bulk of these intimations of nefarious conduct are not borne out by the record.

any investigators' conclusions drawn from the evidence.  (*Id.* at 3; *see, e.g.*, NFLPA Br. 5-6).  The NFLPA responded to the report on July 17, 2017, pointing to evidence in the NFL's report undermining Thompson's credibility and offering alternative explanations for certain facts, including the bruises that had been photographed on Thompson's body.  (*See* Kessler Decl., Ex. A-48).

### 3. The NFL's Discipline of Elliott Pursuant to the CBA

After the NFL's June 2017 meeting, on August 11, 2017, the NFL notified Elliott that the Commissioner was exercising his power under Article 46 of the CBA to suspend Elliott without pay for the first six games of the 2017 NFL regular season for using "physical force against a woman in the context of an intimate relationship." (Kessler Decl., Ex. A-49).  Specifically, the Commissioner found that Elliott had "used physical force against Ms. Thompson resulting in her injury" on three out of the five alleged instances of abuse during the week of July 16, 2016.  (*Id.*).  The Commissioner based this finding "on a combination of photographic, medical, testimonial and other evidence" that the Commissioner considered "sufficiently credible … to establish the facts, *even allowing for concerns … about [Thompson's] credibility.*" (*Id.* (emphasis added)).

On August 15, 2017, the NFLPA appealed Elliott's suspension pursuant to Article 46 of the CBA.  (Kessler Decl., Ex. A-50).  The Commissioner designated Harold Henderson to serve as arbitrator for Elliott's appeal.  (Compl. ¶ 11; Answer ¶ 32).

Before the arbitration, the NFLPA requested that the NFL (i) produce documents related to the Thompson interviews, including investigative notes, and (ii) compel Thompson, Friel, and Roberts to testify at the arbitration hearing. (*See* Kessler Decl., Ex. A-51, A-53). The NFL rejected almost all of the NFLPA's requests, agreeing only to provide Friel's testimony. (*Id.* at Ex. A-52, A-54). After a telephonic hearing, Henderson denied the NFLPA's request for the production of documents and for Thompson's testimony; acknowledged that the NFL would make Friel available to testify; and further ordered the NFL to make Roberts available to testify. (*Id.* at Ex. 55).

From August 29 through 31, 2017, Henderson held the arbitration hearing. (*See generally* Kessler Decl., Ex. C). At the hearing, Roberts testified that she "had concerns about [Thompson's] Credibility" due to contradictory statements by other witnesses, including Thompson's friends. (*Id.* at 172:21-173:22). Significantly, however, she stated that "[a]ny concerns, any inconsistencies were completely put into the [NFL's] report," and that she shared her concerns with Friel and other NFL investigators, including her superior, Cathy Lanier. (*Id.* at 163:11-165:16, 172:21-173:22, 174:7-11 (Aug. 29)).

Friel acknowledged during her testimony that Roberts had "express[ed] the view internally that … there was not sufficient" corroborating evidence of Thompson's allegations. (Kessler Decl., Ex. C at 301:22-302:2 (Aug. 30)). Friel also testified that before the Commissioner decided to impose discipline, Friel informed him that she (Friel) found the evidence sufficient to impose discipline,

but that she was unsure whether Roberts "met with the Commissioner to give [her] views about the sufficiency of the evidence." (*Id.* at 322:21-25, 338:23-339:5 (Aug. 30)). When asked whether she told the Commissioner "specifically that Ms. Roberts had expressed the view that the corroborating evidence was insufficient to proceed," Friel replied that she could not "recall whether it was stated in those words"; later, she clarified that "[t]he Commissioner was told … that Kia Roberts did not think that we had enough for a violation," and that her earlier equivocation "had more to do with the exact language of ['] insufficient evidence[']." (*Id.* at 324:8-13, 336:8-12, 338:8-17 (Aug. 30)).[4] Friel testified further that the NFL Report excluded any investigator's recommendation as to whether Elliott violated the PCP as the result of a decision she reached "in conjunction with counsel"; the decision was that, due to the voluminous report, she "thought the Commissioner would be better served by … a report that laid out all that evidence." (*Id.* at 265:10-266:17 (Aug. 30)).

Elliott testified at the hearing and denied any acts of abuse against Thompson. (Kessler Decl., Ex. C at 86:4-10 (Aug. 30)). He also produced a witness, Alvarez Jackson, who was present in Elliott's apartment during the relevant time period and testified that he did not see any signs of, nor hear any complaints of, abuse by Thompson. (*Id.* at 220:16-221:25 (Aug. 30)). The

---

[4]     Having read the full transcript, the Court does not agree with the position of counsel for the NFLPA that Friel's testimony was so inconsistent as to (i) be incredible or (ii) necessitate additional evidence at the arbitration in the form of testimony from Thompson or the Commissioner.

NFLPA also presented expert evidence in an attempt to discredit photos of Thompson's alleged injuries. (*Id.* at 91-132 (Aug. 29)). During the hearing, the NFLPA demanded, for the first time, that the arbitrator compel the Commissioner to testify so that the arbitrator could determine whether he should defer to the Commissioner's factual findings, as the NFL argued he should. (*Id.* at 348:1-17 (Aug. 30)). The arbitrator declined the request to compel. (*Id.* at 348:18-349:15 (Aug. 30))

On September 5, 2017, the arbitrator issued an award affirming the six-game suspension, finding "that the record contains sufficient credible evidence to support" the Commissioner's determinations. (Kessler Decl., Ex. H). The award's analysis begins by noting that although both Friel and Roberts "expressed surprise that they were not asked to make a recommendation on discipline based on their investigation and report," and "Roberts could not explain why she was not invited to participate in the" June 2017 meeting, "their roles fit squarely into the process outlined" in the PCP. (*Id.*). The award notes that despite the NFLPA's claim that Friel's and Roberts's testimony revealed "new evidence" regarding Thompson's credibility that was material to the Commissioner's decision, "all the statements and inconsistencies [undermining her credibility were] included in the Investigative report and other materials provided to the Commissioner for his review." (*Id.*). Furthermore, Friel's and Roberts's "recommendations were not sought or required at that point, pursuant to" the PCP. (*Id.*).

The arbitrator then set forth the standard he was to apply as the Commissioner's designated Hearing Officer: "[M]y responsibility is to determine whether the Commissioner's decision on discipline of Mr. Elliott is arbitrary and capricious, meaning was it made on unreasonable grounds or without any proper consideration of circumstances." (Kessler Decl., Ex. H). The arbitrator clarified further that his review was limited to "determin[ing] whether the player was afforded adequate notice of his alleged violation, the right to representation, opportunity to present evidence, and a decision which is fair and consistent," i.e., "whether the process and result were in compliance with the terms of [NFL] policy." (*Id.*). Finding that the record satisfied that standard, the arbitrator affirmed the Commissioner's determination and denied the appeal. (*Id.*).

**B.  Procedural History**

Almost certainly as a result of the *Brady II* decision, the parties commenced dueling lawsuits in different jurisdictions to address the arbitral award. On August 31, 2017, five days *before* the arbitrator issued his decision, the NFLPA filed suit in the United States District Court for the Eastern District of Texas to vacate the forthcoming award and, the following day, moved for an emergency temporary restraining order or preliminary injunction. (*See* Answer ¶ 74). On September 5, 2017, the date on which the arbitrator issued his decision, the NFLMC filed the instant suit in the Southern District of New York. (*See* Dkt. #1).

On September 8, 2017, a district judge in the Eastern District of Texas granted the NFLPA's motion for a preliminary injunction. *See Nat'l Football League Players Ass'n* v. *Nat'l Football League*, No. 4:17-CV-00615, 2017 WL 3940545, at *1 (E.D. Tex. Sept. 8, 2017). The NFLMC sought an emergency stay of the injunction from the United States Court of Appeals for the Fifth Circuit on September 15, 2017, and the Fifth Circuit issued a ruling on October 12, 2017, vacating the injunction and remanding the case to the district court for dismissal, reasoning that the district court lacked subject matter jurisdiction over the NFLPA's suit because it was filed before the arbitral award issued. *See Nat'l Football League Players Ass'n* v. *Nat'l Football League*, No. 17-40936, 2017 WL 4564713, at *1, 3-5 (5th Cir. Oct. 12, 2017) (per curiam) (2-1). A day later, the Fifth Circuit issued the mandate, returning the case to the district court in order to dismiss the action. (Answer ¶ 79). As of the date of this decision, the NFLPA has not filed a petition for rehearing *en banc*.

On October 16, 2017, the NFLPA answered the complaint in the instant case, counterclaimed to vacate the arbitral award, and moved for a temporary restraining order and preliminary injunction barring the NFL's enforcement of the six-game suspension. (Dkt. #28, 32-35). On October 17, 2017, the NFLMC filed opposing papers, and the Honorable Paul A. Crotty, sitting in Part I, heard argument on the motion for injunctive relief and granted a temporary restraining order until the earlier of either (i) October 30, 2017, or (ii) the disposition of the preliminary injunction. (*See* Dkt. #31, 37). Judge Crotty

also issued an order to show cause that set a hearing on the preliminary injunction for today, October 30, 2017; directed the NFLPA to post a $100,000 bond; and requested answering papers from the NFLMC and reply papers from the NFLPA prior to the hearing. (*See* Dkt. #30). The NFLMC elected to stand on its initial opposition brief, and the NFLPA filed a brief in further support of its motion for injunctive relief on October 25, 2017. (Dkt. # 45).

## DISCUSSION

### A.     Applicable Law

#### 1.     Injunctive Relief

A preliminary injunction "is an extraordinary and drastic remedy" that a district court should grant only if "the movant, by a clear showing, carries the burden of persuasion." *Grand River Enter. Six Nations, Ltd.* v. *Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Moore* v. *Consol. Edison Co. of N.Y.,* 409 F.3d 506, 510 (2d Cir. 2005)). This burden requires the movant to "establish [i] irreparable harm; [ii] either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and [iii] that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman* v. *Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015), (internal quotation marks omitted) (quoting *Oneida Nation of N.Y.* v. *Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)).

Where, as here, a movant seeks a preliminary injunction under the "serious questions" standard, the movant "must not only show that there are

'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor," and thus the "overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Glob. Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal citation omitted).

### 2. Judicial Review of Arbitral Awards Under the Labor Management and Relations Act

In determining the existence *vel non* of a "substantial question going to the merits," the Court must acknowledge the legal framework within which it reviews arbitral awards. The general principles applicable to judicial review of an arbitral award under the Labor Management and Relations Act (the "LMRA") are well-settled in this Circuit, and last year's *Brady II* decision only crystallized the doctrine.

In *Brady II*, the Second Circuit, while reviewing an arbitration award that affirmed the suspension of New England Patriots quarterback Tom Brady, rejected arguments similar to those here and ordered confirmation of the arbitration award. *See* 820 F.3d at 532. More fundamentally, the Court emphasized the "narrowly circumscribed and highly deferential" function that courts play in reviewing labor arbitration awards under the LMRA:

> Our review of an arbitration award under the LMRA is … very limited. We are therefore not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement, but inquire only as to whether the arbitrator acted within the scope of his authority as defined by the collective bargaining agreement. Because it is the arbitrator's view of the facts and the meaning of the contract for which the

parties bargained, courts are not permitted to substitute their own. It is the arbitrator's construction of the contract and assessment of the facts that are dispositive, however good, bad, or ugly. … . In short, it is not our task to decide how we would have conducted the arbitration proceedings, or how we would have resolved the dispute.

Instead, our task is simply to ensure that the arbitrator was even arguably construing or applying the contract and acting within the scope of his authority and did not ignore the plain language of the contract. Even failure to follow arbitral precedent is no reason to vacate an award. *As long as the award draws its essence from the collective bargaining agreement and is not merely the arbitrator's own brand of industrial justice, it must be confirmed.* If the arbitrator acts within the scope of this authority, the remedy for a dissatisfied party is not judicial intervention, but for the parties to draft their agreement to reflect the scope of power they would like their arbitrator to exercise.

*Id.* at 536-37 (emphasis added) (internal quotation marks, citations, and footnotes omitted). Viewed through this lens, the NFLPA's burden in seeking a preliminary injunction in this case is weighty.

**B.    Analysis**

The NFLPA's argument for a preliminary injunction largely relies on the proposition that the "fundamental fairness" standard found in the Federal Arbitration Act ("FAA") applies with equal force to judicial review of arbitral awards under the LMRA. (*See* NFLPA Br. 18-25). The NFLPA argues that, under this standard, it is entitled to a preliminary injunction because it is likely to prevail on the merits or, alternatively, that it raises a serious question going to the merits and the balance of hardships tips in its favor. (*See id.* at 18). Under scrutiny, neither of these conclusions holds water, and because the

NFLPA fails to establish a serious question going the merits, it follows *a fortiori* that it cannot establish a likelihood of success on the merits. The NFLPA similarly fails to show that Elliott will suffer irreparable harm in the absence of injunctive relief or that the public interest favors an injunction. The Court therefore declines to issue a preliminary injunction.

1. **The NFLPA Fails to Establish a Serious Question on the Merits**

   a. **The Fundamental Fairness Standard Should Not Apply to Judicial Review of Arbitral Awards Under the LMRA**

As an initial matter, the Court is skeptical that the FAA's fundamental fairness standard should apply to LMRA cases such as this one. The NFLMC initiated this action under § 301 of the LMRA, which bestows federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C. § 185. Section 301 "is a source of federal substantive law" although it "contains no substantive provisions." *Coca-Cola Bottling Co. of N.Y.* v. *Soft Drink & Brewery Workers Union Local 812 Int'l Bhd. of Teamsters*, 242 F.3d 52, 54 (2d Cir. 2001) (citation and internal quotation marks omitted). The Second Circuit has held that the FAA's body of law is "analytically distinct from" that of § 301, and thus even though "the body of law developed under [§] 301 will at times draw upon provisions of the FAA," it does so "by way of guidance alone." *Id.* at 54-55.

The NFLPA urges the Court to import a standard from the FAA to vacate the arbitral award at issue. Specifically, the FAA provides that a district court may vacate an arbitration award "where the arbitrators were guilty of misconduct in … refusing to hear evidence pertinent and material to the

controversy." 9 U.S.C. § 10(a)(3). This standard allows vacatur of an arbitral award "only if fundamental fairness is violated." *Brady II*, 820 F.3d at 545 (internal quotation marks and citation omitted). The fundamental fairness standard that the NFLPA argues for this setting would either be coextensive with the standard contained in the FAA, or, more likely, would use that statute as a point of departure for the development of a body of federal common law on fundamental fairness.

Crucially, the Second Circuit "ha[s] never held that the requirement of 'fundamental fairness' applies to arbitration awards under the LMRA." *Brady II*, 820 F.3d at 553 n.13. To be sure, the Court has not ruled out its applicability in this setting. That said, there are reasons for a court to be hesitant. For starters, the very context of § 301's jurisdictional grant over cases involving "contracts between an employer and a labor organization," suggests that courts should not superimpose an extracontractual definition of "fairness" in arbitrations beyond the actual standards and procedures for which the parties bargained. As the Supreme Court has long held, courts reviewing arbitral awards under the LMRA may not vacate an award even if the arbitrator "committed serious errors." *United Paperworkers Int'l Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 38 (1987).

Moreover, this contextual difference suggests that courts should be more deferential to arbitrators in the context of labor disputes than other commercial disputes. Indeed, the Supreme Court has recognized that, "[i]n the commercial case, arbitration is the substitute for litigation. Here arbitration is the

substitute for industrial strife." *United Steelworkers of Am.* v. *Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960). Thus, "the hostility evinced by courts toward arbitration of commercial agreements has no place" in reviewing arbitrations under the LMRA. *Id.*

Commentators have also noted that in the context of judicial review of arbitral awards under the LMRA, a more searching standard of review would contravene the LMRA's purpose of promoting efficient dispute resolution. *See, e.g.*, Charles B. Craver, *Labor Arbitration As A Continuation of the Collective Bargaining Process*, 66 CHI.-KENT L. REV. 571, 595 (1990) ("A more intrusive standard of judicial review would have the deleterious consequence of inducing arbitrators to prepare detailed and legalistic decisions to protect their awards from judicial reversal."). And, of potentially greater relevance to the issues in this case, another commentator has noted that courts reviewing arbitral awards have been more receptive to arguments raised by NFL players than other unionized workers, thereby creating unequal access to justice among workers who participate in arbitrations subject to the LMRA. *See* Michael Z. Green & Kyle T. Carney, *Can NFL Players Obtain Judicial Review of Arbitration Decisions on the Merits When A Typical Hourly Union Worker Cannot Obtain This Unusual Court Access?*, 20 N.Y.U. J. LEGIS. & PUB. POL'Y 403, 442–43 (2017). An enlarged scope of judicial review in LMRA cases would therefore have practical, injurious effects for parties to collective bargaining agreements engaged in arbitrations to resolve labor disputes.

### b. The NFLPA Fails to Establish That the Arbitrator's Decision Was Fundamentally Unfair

Assuming that fundamental fairness has a place in a court's review of arbitral awards under the LMRA, the Court concludes that the NFLPA has failed to show that Elliott's arbitration hearing fell below this standard. In other words, even if the applicability of the fundamental fairness exception to LMRA arbitrations were a "substantial question," it is not a "substantial question on the merits" *in this action.* The NFLPA claims three errors by the arbitrator that rendered the proceeding unfair; whether considered individually or collectively, the putative errors do not constitute — and do not raise a substantial question concerning — the fundamental fairness of the challenged arbitral proceedings.

*First*, the NFLPA claims that "[s]enior NFL executives corrupted the proceedings by concealing" Roberts's conclusion that Thompson's allegations did not warrant discipline. (NFLPA Br. 23). But as counsel for the NFLMC observed at oral argument, this argument confuses Roberts's views concerning Thompson's credibility, which were both sought by and communicated to the Commissioner, with her views concerning the propriety of discipline, which were not similarly sought. The arbitrator found that "all the statements and inconsistencies" underlying any doubts that Roberts or Friel harbored about Thompson's allegations were "included in the Investigative report and other materials provided to the Commissioner for his review." (Kessler Decl., Ex. H). Furthermore, counsel for the NFLPA examined Roberts at length about Thompson's credibility (Kessler Decl., Ex. C, at 172:21-235:16 (Aug. 29)), and

Roberts testified that she told Friel that she "had concerns about [Thompson's] credibility" (*id.* at 172:24 (Aug. 29)). And while Friel's testimony on whether Roberts' view that the evidence was insufficient to discipline Elliott may have appeared to equivocate, she clearly testified that the basis of Roberts' contrary view — Thompson's credibility — was communicated to the Commissioner. (*See id.* at 324:8-13, 336:8-12, 338:8-17 (Aug. 30)).

*Second*, the NFLPA argues that "it was fundamentally unfair to deprive Elliott and the NFLPA of the right to confront and cross-examine the sole accuser," Thompson, given that "the Arbitrator assigned [the NFLPA] the burden of proof on … whether the discipline was based on 'credible evidence' in compliance with the PCP." (NFLPA Br. 23). Even under fundamental fairness review, however, arbitrators are not required to apply the normal rules of evidence that might otherwise compel a right of confrontation. *See TIG Ins. Co. v. Glob. Int'l Reinsurance Co., Ltd.*, 640 F. Supp. 2d 519, 523 (S.D.N.Y. 2009). The sole provision broaching the issue of evidentiary procedure in Article 46, found in § 2(g)(i), provides that "the parties shall exchange copies of any exhibits upon which they intend to rely" within three days of the hearing. (Kessler Decl., Ex. A-58). The CBA thus provides no express authority for an arbitrator to compel anyone, much less a non-NFL employee, to testify. And given Thompson's alleged abuse, coupled with the preexisting evidentiary record containing Thompson's statements and reports casting doubt on her

credibility, the arbitrator could reasonably interpret the CBA to decline to compel testimony that would be emotionally difficult and likely duplicative.[5]

*Third* and finally, the NFLPA asserts that Henderson's refusal to compel the Commissioner to testify was fundamentally unfair. (NFLPA Br. 24-25). But this argument fails for much the same reason as the last: The CBA does not grant authority to, much less require, an arbitrator to compel the Commissioner to testify. The Court also notes that the NFLPA made this request *during* the hearing, and compelling the Commissioner's testimony could thus very well have thwarted the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc.* v. *Weiss*, 989 F.2d 108, 111 (2d Cir. 1993).

### c. The NFLPA Fails to Establish a Balance of Harms That Tips Decidedly in Its Favor

While it is a closer question, the Court finds that the NFLPA has also failed to establish a balance of harms that tips decidedly in its favor. The NFLPA's arguments on this point echo its arguments for irreparable harm, and the Court will focus on them here. It argues principally that if a preliminary injunction does not issue, Elliott will suffer irreparable harm consisting of missed games, which could lead to lost opportunity to attain individual awards (such as Pro Bowl selection), and "significant monetary losses" that would be

---

[5] Relatedly, the arbitrator acted within his authority in denying the NFLPA's request for the NFL's investigator notes as nothing in the CBA required him to accede to that demand. Moreover, the Second Circuit rejected an almost identical argument in *Brady II*, where the NFLPA sought interview notes from outside investigators based on the slim discovery provision in the CBA. *See* 820 F.3d at 546-47.

unquantifiable "because of the snowball effect on Elliott's reputation, earning potential, and overall market value." (NFLPA Br. 15). But these alleged injuries are either speculative or deserving of a monetary award rather than an injunction.

To support the notion that missed games constitute irreparable injury, the NFLPA points out that an average career in the NFL is "short and precarious." (NFLPA Br. 15). Even so, just as in other professions, future economic injuries such as lost profits are compensable through monetary awards. *See Buckingham Corp.* v. *Karp*, 762 F.2d 257, 262 (2d Cir. 1985). And any individual honors Elliott might attain absent suspension depend on countless variables — such as the Cowboys' overall offensive performance, his opponents' defensive performance, and Elliott's health — that together render this alleged harm far too speculative to justify injunctive relief. *See Tom Doherty Assocs., Inc.* v. *Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

As for damage to Elliott's reputation, cases in this Circuit require a more concrete economic impact than mere negative publicity to constitute irreparable harm. *Cf., e.g.*, *Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) (concluding that unauthorized trademark use by "former licensee invariably threatens injury to the economic value of the goodwill and reputation associated with a licensor's mark" and thus constitutes irreparable harm); *Rex Med. L.P.* v. *Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (observing that cases involving reputational harm such as "loss of goodwill or business

21

relationships have involved situations where the dispute … leaves one party

unable to provide its product to its customers").[6]

---

[6]     The NFLPA's argument relies on decisions by courts in other districts finding irreparable harm in the form of actions taken against players by professional sporting associations including the NFL. (*See* NFLPA Br. 15 & n.3). Even if those opinions controlled the Court's analysis, however, they would not alter the Court's conclusion that the NFLPA has failed to establish irreparable harm.

    In *Brady* v. *National Football League*, for instance, the district court enjoined the NFL's member teams from engaging in a coordinated "lockout" of unionized players designed to coerce those players to adopt a CBA that favored the NFL, and as a result, the players voted to de-unionize and disband the NFLPA as its collective bargaining representative. 779 F. Supp. 2d 992, 1004 (D. Minn.), *vacated on other grounds*, 644 F.3d 661 (8th Cir. 2011). The court reasoned in part that the lockout could have eliminated the players' opportunity to play for an entire year, and the "players' unique abilities and circumstances compound[ed] the difficulty in determining the salary and benefits that each player might have earned in a competitive market." *Id.* at 1035. In addition, a season-long lockout would deprive the players of the skill development that they would enjoy over the course of a season. *Id.* at 1036. By contrast, this case involves only one player and a suspension of only six games. The relative brevity of Elliott's suspension also distinguishes this case from *Linseman* v. *World Hockey Association*, in which the court found irreparable harm based on the World Hockey Association's prohibiting persons under 20-years old from playing professional hockey, thereby completely barring the 19-year-old plaintiff from playing hockey for a season under a contract he had already entered with a professional hockey team. *See* 439 F. Supp. 1315, 1318-19 (D. Conn. 1977)

    In another case out of the District of Minnesota, the court considered the NFL's four-game suspension of certain players for taking an over-the-counter weight loss supplement containing a substance that was prohibited under the NFL's Policy on Anabolic Steroids and Related Substances. *Nat'l Football League Players Ass'n* v. *Nat'l Football League*, 598 F. Supp. 2d 971, 975 (D. Minn. 2008). In entering a temporary restraining order against the suspensions, the court found irreparable harm because such a suspension resulted in a player being ineligible for post-season awards, at least some of the suspended players were "central to their team's chances of making the playoffs," and the case involved "substantial questions about the process used to suspend the players" including the arbitrator's partiality. *Id.* at 979-83. Here, the NFLPA does not contend that Elliott will be ineligible for post-season awards, but only that a suspension "could deprive [him] of the ability to achieve" those accolades. (NFLPA Br. 15). And as discussed above, this case does not involve "substantial questions" about the NFL's disciplinary process. Finally, the Court declines to adopt here a rationale that a lessened likelihood of a team's success resulting from a player's suspension constitutes irreparable harm to that player; such an injury is principally borne by the team and its fans and is thus not personalized to the player. *See Innovative Health Sys., Inc.* v. *City of White Plains*, 117 F.3d 37, 44 n.7, 46 n.13 (2d Cir. 1997) (refusing to find irreparable harm to plaintiff who failed to "demonstrate[] any injury personal to him"), *superseded on other grounds by Noel* v. *N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012).

Any such harms, moreover, are counterbalanced by the harms identified by the NFLMC in its papers and at oral argument. Having negotiated with the NFLPA over the terms of a particular CBA, the NFL has an interest in obtaining the benefit of its bargain — an interest that might well be eroded if courts such as this one were permitted to micromanage the disciplinary decisions of the Commissioner. What is more, the NFL has a critical interest in ensuring player compliance with the PCP, particularly in the area of combating off-the-field misconduct. Indeed, all parties to this litigation are keenly aware of recent criticisms of the NFL's efforts to redress and combat domestic abuse by NFL players. Put simply, Elliott's personal concerns, while not insubstantial, are outweighed by the broader, league-wide concerns proffered by the NFLMC.

In sum, the NFLPA has not raised a serious question on the merits of this case or a balance of hardships that tips decidedly in its favor.

### 2. The NFLPA Fails to Establish Other Factors Warranting Injunctive Relief

The Court will discuss more summarily the NFLPA's deficiencies with respect to the remaining factors. On the issue of irreparable harm, as noted in the preceding section, the harms identified by the NFLPA are either speculative, insufficient to warrant the extraordinary remedy of injunctive relief, and/or outweighed by the concerns identified by the NFLMC. Turning finally to the issue of public interest, the Court finds that here, too, the NFLPA's arguments fail to carry the day.

The NFLPA argues that an injunction would be in the interest of the public, including NFL players, Cowboys fans, the NFL, and "all persons subject

23

to arbitration provisions," because Elliott's discipline resulted from "an unjust and fundamentally unfair arbitration."  (NFLPA Br. 25).  This position, however, takes a one-sided view of the public interest.  The pertinent terms of the CBA reside at the crossroads of the public's desire for the controlled carnage that is the sport of football and the NFL's ability to discipline players for off-the-field violence.  With this in mind, the Court finds that the public interest weighs in favor of denying injunctive relief, as doing so furthers the LMRA's purpose of "promot[ing] industrial stabilization through the collective bargaining agreement," *Warrior & Gulf Nav. Co.*, 363 U.S. at 578 — particularly where the relevant CBA implicates the ability of those in positions of authority to address an issue as dire as domestic violence.

## CONCLUSION

For the foregoing reasons, the NFLPA's motion for a preliminary injunction is DENIED.   Enforcement of this Order is STAYED for 24 hours, to afford the parties an opportunity to consider their appellate options.

SO ORDERED.

Dated:       October 30, 2017
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge